# EXHIBIT 3

**Electronically Filed**
**9/12/2019 9:42 AM**
**Steven D. Grierson**
**CLERK OF THE COURT**

1   **ACOM**
    STEVEN B. WOLFSON, ESQ.
2   Nevada Bar No. 1565
    District Attorney
3   200 E. Lewis Ave
4   Las Vegas, NV 89101
    Tel.: 702-671-2700
5   Email: steven.wolfson@clarkcountyda.com

6
    ROBERT T. EGLET, ESQ.
7   Nevada Bar No. 3402
    ROBERT M. ADAMS, ESQ.
8   Nevada Bar No. 6551
    RICHARD K. HY, ESQ.
9   Nevada Bar No. 12406
10  **EGLET ADAMS**
    400 S. 7th Street, 4th Floor
11  Las Vegas, NV 89101
    Tel.: (702) 450-5400
12  Fax: (702) 450-5451
13  E-Mail      eservice@egletlaw.com
    *Attorneys for Plaintiff, Clark County*
14

15                          **DISTRICT COURT**
16
                        **CLARK COUNTY, NEVADA**
17

18

19  CLARK COUNTY,                    )  Case No.:  A-17-765828-C
                                     )  Dept No.:  Department 16
20              Plaintiff,           )
                                     )
21  v.                               )
                                     )
22  PURDUE PHARMA, L.P.; PURDUE      )  **THIRD AMENDED COMPLAINT**
23  PHARMA, INC.; THE PURDUE         )  **AND DEMAND FOR JURY TRIAL**
    FREDERICK COMPANY, INC.  d/b/a THE )
24  PURDUE FREDERICK COMPANY, INC.;  )
25  PURDUE PHARMACEUTICALS, L.P.;    )
    RICHARD S. SACKLER; JONATHAN D.  )
26  SACKLER, MORTIMER D.A. SACKLER;  )
    KATHE A. SACKLER; ILENE SACKLER  )
27  LEFCOURT; DAVID A. SACKLER;      )
28  BEVERLY SACKLER; THERESA         )
    SACKLER; PLP ASSOCIATES HOLDINGS )
    L.P.; ROSEBAY MEDICAL COMPANY    )

1  L.P.; BEACON COMPANY; TEVA  )
2  PHARMACEUTICALS USA, INC.;  )
   CEPHALON, INC.; ENDO HEALTH  )
3  SOLUTIONS INC.; ENDO  )
   PHARMACEUTICALS, INC.; PAR  )
4  PHARMACEUTICAL, INC.; PAR  )
   PHARMACEUTICAL COMPANIES, INC.;  )
5  ALLERGAN INC.; ALLERGAN USA INC.;  )
   ACTAVIS, INC. f/k/a WATSON  )
6  PHARMACEUTICALS, INC.; WATSON  )
7  LABORATORIES, INC.; INSYS  )
   THERAPEUTICS, INC.; JOHN KAPOOR;  )
8  RICHARD M. SIMON; SUNRISE LEE;  )
   JOSEPH A. ROWAN; MICHAEL J. GURRY;  )
9  MICHAEL BABICH; ALEC BURLAKOFF;  )
10 MALLINCKRODT LLC; SPECGX LLC;  )
   ACTAVIS LLC; AND ACTAVIS PHARMA,  )
11 INC. f/k/a WATSON PHARMA, INC.;  )
12 AMERISOURCEBERGEN DRUG  )
   CORPORATION; CARDINAL HEALTH,  )
13 INC.;  CARDINAL HEALTH 6 INC.;  )
   CARDINAL HEALTH TECHNOLOGIES  )
14 LLC; CARDINAL HEALTH 414 LLC;  )
15 CARDINAL HEALTH 200 LLC;  )
   MCKESSON CORPORATION;  )
16 WALGREENS BOOTS ALLIANCE, INC.;  )
   WALGREEN CO.; WALGREEN EASTERN  )
17 CO., INC.; WALMART INC.; CVS HEALTH  )
18 CORPORATION; CVS PHARMACY, INC.;  )
   CVS INDIANA L.L.C.; CVS RX SERVICES,  )
19 INC.; CVS TENNESSEE DISTRIBUTION,  )
20 L.L.C.; MASTERS PHARMACEUTICAL,  )
   LLC f/k/a MASTERS PHARMACEUTICAL,  )
21 INC.; C & R PHARMACY d/b/a KEN'S  )
   PHARMACY f/k/a LAM'S PHARMACY,  )
22 INC.; EXPRESS SCRIPTS HOLDING  )
   COMPANY; EXPRESS SCRIPTS, INC.;  )
23 AIDA B MAXSAM; STEVEN A HOLPER  )
24 MD; STEVEN A. HOLPER, M.D.,  )
   PROFESSIONAL CORPORATION;  )
25 HOLPER OUT-PATIENTS MEDICAL  )
   CENTER, LTD.; DOES 1 through 100; ROE  )
26 CORPORATIONS 1 through 100 and ZOE  )
27 PHARMACIES 1 through 100, inclusive,  )
                                          )
28 _____  )
              Defendants.              )

2

Plaintiff Clark County, by and through the undersigned attorneys, files this Second Amended Complaint against the named Defendants seeking to recover its damages as a result of the opioid epidemic Defendants caused, and alleges as follows:

## INTRODUCTION

1. Opioid addiction and overdose in the United States as a result of prescription opioid use has reached epidemic levels over the past decade.

2. While Americans represent only 4.6% of the world's population, they consume over 80% of the world's opioids.

3. Since 1999, the amount of prescription opioids sold in the U.S. has nearly quadrupled. In 2010, 254 million prescriptions were filled in the U.S. – enough to medicate every adult in America around the clock for a month. In that year, 20% of all doctors' visits resulted in the prescription of an opioid (nearly double the rate in 2000).

4. By 2014, nearly two million Americans either abused or were dependent upon opioids.

5. On March 22, 2016, the Food and Drug Administration (FDA) recognized opioid abuse as a "public health crisis" that has a "profound impact on individuals, families and communities across our country."

6. The Centers for Disease Control (CDC) reports that overdoses from prescription opioids are a driving factor in the 15-year increase in opioid overdose deaths.

7. From 2000 to 2015, more than half a million people died from drug overdoses (including prescription opioids and heroin). The most recent figures from the CDC suggest that 175 Americans die everyday from an opioid overdose (prescription and heroin).

8. Many addicts, finding painkillers too expensive or too difficult to obtain, have turned to heroin. According to the American Society of Addiction Medicine, four out of five people who try heroin today started with prescription painkillers.

9. County and city governments and the services they provide their citizens have been strained to the breaking point by this public health crisis.

10. The dramatic increase in prescription opioid use over the last two decades, and the resultant public-health crisis, is no accident.

3

11.     The crisis was precipitated by Defendants, who, through deceptive means, and using one of the biggest pharmaceutical marketing campaigns in history, carefully engineered and continue to support a dramatic shift in the culture of prescribing opioids by falsely portraying both the risks of addiction and abuse and the safety and benefits of long-term use.

12.     Defendant drug companies named herein, manufacture, market, and sell prescription opioids (hereinafter "opioids"), including brand-name drugs like Oxycontin, Vicodin and Percocet, as well as generics like oxycodone and hydrocodone, which are powerful narcotic painkillers.

13.     Historically, because they were considered too addictive and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis),1 opioids were used only to treat short-term acute pain or for palliative (end-of-life) care.

14.     Defendants' goal was simple: to dramatically increase sales by convincing doctors that it was safe and efficacious to prescribe opioids to treat not only the kind of severe and short-term pain associated with surgery or cancer, but also for a seemingly unlimited array of less severe, longer-term pain, such as back pain, headaches and arthritis.

15.     Defendants knew that their opioid products were addictive, subject to abuse, and not safe or efficacious for long-term use.

16.     Defendants' nefarious plan worked and they dramatically increased their sales and reaped billions upon billions of dollars of profit at the expense of millions of people who are now addicted and the thousands who have died as a result.

17.     Defendant drug companies should never place their desire for profits above the health and well being of their customers or the communities where those customers live, because they know prescribing doctors and other health-care providers rely on their statements in making treatment decisions, and drug companies must tell the truth when marketing their drugs and ensure that their marketing claims are supported by science and medical evidence.

18.     Defendants broke these simple rules and helped unleash a healthcare crisis that has had far-reaching financial, social, and deadly consequences in Clark County and throughout Nevada.

4

1       19.     Defendants falsely touted the benefits of long-term opioid use, including the

2  supposed ability of opioids to improve function and quality of life, even though there was no

3  "good evidence" to support their claims.

4       20.     Defendants disseminated these common messages to reverse the popular and

5  medical understanding of opioids.

6       21.     As a result of the drug companies' marketing campaign, opioids are now the

7  most prescribed class of drugs generating over $11 billion in revenue for drug companies in

8  2014 alone.

9       22.     As a result of the drug companies' marketing campaign, the fatalities continued

10  to mount while the living continue to suffer.

11       23.     In 2015, over 33,000 Americans died of a drug overdose involving opioids with

12  studies suggesting that these fatalities are statistically underreported.  In 2015, the estimated

13  economic impact of the opioid crisis was $504.0 billion, or 2.8 % of our U.S.'s gross domestic

14  product that same year.  Previous estimates of the economic cost of the opioid crisis greatly

15  understate it by undervaluing the most important component of the loss—fatalities resulting

16  from overdoses.

17       24.     Most opioid related deaths occur among those between the ages of

18  approximately 25 and 55 years old.  Studies have shown that the overall fatality rate was 10.3

19  deaths per 100,000 population, and in the 25 to 55 year old age group, fatality rates were much

20  higher, ranging from 16.1 to 22.0 deaths per 100,000 population.



**Figure 2. Opioid–involved Overdose Deaths by Age in 2015**
(Number of deaths)

Source: CDC Wonder database, multiple cause of death files

25.     In addition to the cost of fatalities each year, opioid misuse among the living imposes important costs as well.  It is estimated that prescription opioid misuse increases healthcare and substance abuse treatment costs in the United States by $29.4 billion, increases criminal justice costs by $7.8 billion, and reduces productivity among those who do not die of overdose by $20.8 billion (in 2015 $). The total nonfatal cost of $58.0 billion divided by the 1.9 million individuals with a prescription opioid disorder in 2013 results in an average cost of approximately $30,000.[1] And when patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin, fueling the secondary drug market.

26.     Further compounding issues is that this problem is worsening at an alarming rate. According to a report published by the White House Council of Economic Advisors (CEA), opioid-involved overdose deaths have doubled in the past ten years and quadrupled in the past sixteen.

---

[1] Florence, C., Zhou, C., Luo, F. and Xu, L. 2016. "The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013." *Medical Care*, 54(10): 901-906.

6



**Figure 1. Opioid-involved Overdose Deaths, 1999–2015**
(Thousands of Deaths)

Source: CDC Wonder database, multiple cause of death files

27.     The crisis that Defendants caused has directly impacted Clark County as it bears the financial brunt of this epidemic as it unfolds in our community.

28.     Apart from the toll on human life, the crisis has financially strained the services Clark County provides its residents and employees. Human services, social services, court services, law enforcement services, the office of the coroner/medical examiner and health services, including hospital, emergency and ambulatory services, have all been severely impacted by the crisis. For example, as a direct and foreseeable consequence of Defendants' egregious conduct, Clark County paid, and continues to pay, a significant amount for health care costs that stem from prescription opioid dependency. These costs include unnecessary and excessive opioid prescriptions, substance abuse treatment services, ambulatory services, emergency department services, and inpatient hospital services, among others. Defendants' conduct also caused Clark County to incur substantial economic, administrative and social costs relating to opioid addiction and abuse, including criminal justice costs, victimization costs, child

7

protective services costs, lost productivity costs, and education and prevention program costs among others.

29. After creating a public health crisis, Defendants have not pulled their opioid products from the market, acknowledged the very real dangers of addiction and abuse even if the opioids are taken as prescribed, or acknowledged that opioids are inappropriate for long-term pain management. Instead, Defendants have taken the position that their opioid products are not dangerous and continue to sell these dangerous and addictive drugs, thereby continuing to fuel the crisis.

30. As a result, physicians, pharmacists and patients are not able to appropriately and adequately evaluate the relevant risks associated with opioids use, particularly the risks to patients who have been and are being exposed to, unnecessarily, including but not limited to the risk of severe and disabling addiction, actual addiction, the consequences of addiction, and other adverse medical conditions. Additionally, the rising numbers of persons addicted to opioids have led to a dramatic increase of social problems, including drug abuse and diversion and the commission of criminal acts to obtain opioids. Consequently, public health and safety have been significantly and negatively impacted due to the misrepresentations and omissions by Defendants regarding the appropriate uses and risks of opioids, ultimately leading to widespread inappropriate use of the drug.

31. As a result of Defendants' misconduct, physicians, pharmacists and patients have not been provided with accurate information about the appropriate uses, risks and safety of these drugs, thus causing the crisis before us as well as giving rise to this lawsuit.

32. Plaintiff files this Complaint naming the drug companies herein as Defendants and placing the industry on notice that Clark County is taking action to abate the public nuisance that plagues our community.

33. By its Complaint, Clark County seeks to recover from Defendants its damages as a result of the opioid public-health crisis Defendants caused. Namely, this action is brought by this Plaintiff pursuant to constitutional, statutory, common law and/or equitable authority for purposes of, *inter alia*:

a. recovering restitution and reimbursement for all the costs Clark County has incurred in paying excessive and unnecessary prescription costs related to opioids;

b. recovering restitution and reimbursement for all the costs expended by Clark County for health care services and programs associated with the diagnosis and treatment of adverse health consequences of opioids use, including but not limited to, addiction;

c. recovering restitution and reimbursement for all the costs consumers have incurred in excessive and unnecessary prescription costs related to opioids;

d. disgorgement;

e. recovering damages for all costs incurred and likely to be incurred in an effort to combat the abuse and diversion of opioids in Clark County;

f. recovering damages incurred as costs associated with the harm done to the public health and safety.

34. However, Plaintiff does not bring claims, as part of this action, for products liability nor does the County seek compensatory damages for death, physical injury to person, emotional distress, or physical damage to property.

## PARTIES AND JURISDICTION

### A. Plaintiff, Clark County.

35. Plaintiff, Clark County ("CLARK COUNTY" or "Plaintiff"), is an unincorporated county organized under the laws of the State of Nevada.

36. Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

37. Plaintiff has all the powers possible for a county to have under the constitution of the State of Nevada, and the laws of the State of Nevada.

38.     Plaintiff has standing to bring this litigation to provide for the orderly government of Clark County and to address matters of local concern including the public health, safety, prosperity, security, comfort, convenience and general welfare of its citizens.

39.     Clark County declares that the unlawful distribution of prescription opiates, by the Defendants named herein, has created a serious public health crisis of opioid abuse, addiction, morbidity and mortality and is a public nuisance.

40.     Plaintiff is authorized by law to abate any nuisance and prosecute in any court of competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance to exist and prevent injury and annoyance from such nuisance.

**B. Defendants, Drug Manufacturers.**

41.     Defendant PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware, and registered and authorized to do business in the State of Nevada, under the laws thereof.  At all times relevant herein, PURDUE PHARMA L.P. takes and took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend drug patents. PURDUE PHARMA INC. is a corporation organized under the laws of both Delaware and New York, with its principal place of business in Stamford, Connecticut, and THE PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of business in Stamford, Connecticut. Defendant PURDUE PHARMACEUTICALS, L.P., ("Purdue Pharmaceuticals") is and was a limited partnership organized under the laws of the State of Delaware.  At all times relevant hereto, the foregoing, (collectively, "PURDUE") are and were in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or distributing OxyContin and have done so to and within the State of Nevada. At all times relevant herein, PURDUE hired "Detailers" in Clark County, Nevada, to make personal contact with physicians and clinics to advocate for the purchase and use of opioid medications which were contrary to known safety concerns and sound medical advice.

42.     In 2007, Purdue settled criminal and civil charges against it for misbranding OxyContin and agreed to pay a $635 million fine – at the time, one of the largest settlements with a drug company for marketing misconduct. None of this stopped Purdue. In fact, Purdue

10

1    continued to create the false perception that opioids were safe and effective for long-term use,

2    even after being caught, by using unbranded marketing methods to circumvent the system. On

3    May 8, 2007, as part of these settlements, Purdue entered into a consent judgment with the State

4    of Nevada, in which it agreed to a number of terms intended to prevent any further misleading

5    marketing in the State of Nevada. In short, Purdue paid the fine when caught and then continued

6    business as usual, deceptively marketing and selling billions of dollars of opioids each year.

7         43.      At all relevant times, Purdue, which is a collection of private companies, has

8    been controlled by members of the extended Sackler family, who are the ultimate intended

9    beneficiaries of virtually all of Purdue's profit distributions. The individual Defendants named

10    in this action are the remaining living Sackler family members who served on the board of

11    Purdue Pharma, Inc. (the "Purdue board"), which functioned as the nexus of decision-making

12    for all of Purdue.

13         44.      Defendant RICHARD S. SACKLER became a member of the Purdue board in

14    1990 and became its co-chair in 2003, which he remained until he left the board in 2018. He was

15    also Purdue's head of research and development from at least 1990 through 1999, and its

16    president from 1999 through 2003. He resides in New York, Florida, and Texas. He currently

17    holds an active license to practice medicine issued by the New York State Education

18    Department. He is a trustee of the Sackler School of Medicine, a director and the vice president

19    of the Raymond and Beverly Sackler Foundation, and a director and the president and treasurer

20    of the Richard and Beth Sackler Foundation, Inc., all three of which are New York Not-for-

21    Profit Corporations.

22         45.      Defendant JONATHAN D. SACKLER was a member of Purdue's board from

23    1990 through 2018. He resides in Connecticut. He is a trustee of the Sackler School of Medicine,

24    the president and CEO of the Raymond and Beverly Sackler Foundation, and the vice president

25    of the Richard and Beth Sackler Foundation Inc., all three of which are New York Not-for-Profit

26    Corporations.

27         46.      Defendant MORTIMER D.A. SACKLER has been a member of Purdue's

28    Board since 1993. He resides in New York. Mortimer is a director and the president of the

Mortimer and Jacqueline Sackler Foundation, and a director and the vice president and treasurer of the Mortimer D. Sackler Foundation, Inc., both of which are New York Not-for-Profit Corporations.

47.     Defendant KATHE A. SACKLER was a member of Purdue's board from 1990 through 2018. She resides in New York and Connecticut. Kathe is a director and president of the Shack Sackler Foundation, a director and vice president and secretary of the Mortimer D. Sackler Foundation Inc. and is a governor of the New York Academy of Sciences, all three of which are New York Not-for-Profit Corporations.

48.     Defendant ILENE SACKLER LEFCOURT was a member of Purdue's board between 1990 and 2018. She resides in New York. She is a director of Columbia University and is the president of the Sackler Lefcourt Center for Child Development Inc., both of which are New York Not-for-Profit Corporations.

49.     Defendant DAVID A. SACKLER was a member of Purdue's board from 2012 through 2018. He resides in New York.

50.     Defendant BEVERLY SACKLER was a member of Purdue's board from 1993 through 2017. She resides in Connecticut. Beverly Sackler serves as a Director and the Secretary and Treasurer of the Raymond and Beverly Sackler Foundation, a New York Not-for-Profit Corporation.

51.     Defendant THERESA SACKLER was a member of Purdue's board from 1993 through 2018. She resides in New York and the United Kingdom.

52.     These individual Defendants used a number of known and unknown entities named as Defendants herein as vehicles to transfer funds from Purdue directly or indirectly to themselves. These include the following:

53.     Defendant PLP ASSOCIATES HOLDINGS L.P., which is a Delaware limited partnership and a limited partner of Purdue Holdings L.P. Its partners are PLP Associates Holdings Inc. and BR Holdings Associates L.P.

54.     Defendant ROSEBAY MEDICAL COMPANY L.P., which is a Delaware limited partnership ultimately owned by trusts for the benefit of one or more of the individual

1   Defendants. Its general partner is Rosebay Medical Company, Inc., a citizen of Delaware and
2   Connecticut. The Board of Directors of Rosebay medical Company, Inc. includes board
3   members Richard S. Sackler and Jonathan D. Sackler.

4        55.     Defendant BEACON COMPANY, which is a Delaware general partnership
5   ultimately owned by trusts for the benefit of members of one or more of the individual
6   Defendants.

7        56.     The foregoing individual Defendants are referred to collectively as "the
8   Sacklers." The foregoing entities they used as vehicles to transfer funds from Purdue directly
9   or indirectly to themselves are referred to as "the Sackler Entities." Together, the Sacklers and
10  the Sackler Entities are referred to collectively as "the Sackler Defendants."

11       57.     Defendant TEVA PHARMACEUTICALS USA, INC., is a Delaware
12  corporation with its principal place of business located in North Whales, Pennsylvania. Teva
13  USA is a wholly owned subsidiary of TEVA PHARMACEUTICALS INDUSTRIES LTD., an
14  Israeli Corporation.  TEVA develops, makes, manufactures, and distributes generic opioid
15  medications worldwide, including within Clark County, Nevada.

16       58.     Defendant CEPHALON, INC., is Delaware corporation with its principal place
17  of business located in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired CEPHALON, INC.

18       59.     Defendant ENDO HEALTH SOLUTIONS INC., is a Delaware corporation with
19  its principal place of business located in Malvern, Pennsylvania. ENDO
20  PHARMACEUTICALS, INC., is a wholly-owned subsidiary of Endo Health Solutions Inc.,
21  and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

22       60.     Defendant PAR PHARMACEUTICAL, INC. is a Delaware corporation with its
23  principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a
24  wholly- owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical
25  Holdings, Inc. Defendant PAR PHARMACEUTICAL COMPANIES, INC. is a Delaware
26  corporation with its principal place of business located in Chestnut Ridge, New York. Par
27  Pharmaceutical Companies, Inc. (and by extension its subsidiary, Par Pharmaceutical, Inc.,)
28  (collectively, "Par Pharmaceutical") was acquired by Endo International plc in September 2015
    and is currently an operating company of Endo International plc. Endo Health Solutions Inc.,

Endo Pharmaceuticals, Inc., Par Pharmaceutical, and their DEA registrant subsidiaries and affiliates, (collectively, "Endo"), manufacture opioids sold nationally, and in Clark County, Nevada.

61.  Defendants ALLERGAN INC. and ALLERGAN USA INC. are Delaware corporations with headquarters in Madison, New Jersey.  ALLERGAN INC. and ALLERGAN USA INC.  (ALLERGAN INC. and ALLERGAN USA INC., collectively are referred to herein as "Allergan.")  Prior to that, WATSON PHARMACEUTICALS, INC., acquired ACTAVIS, INC. in October 2012; the combined company changed its name to ACTAVIS, INC. SUBSEQUENTLY, ACTAVIS, INC. acquired ALLERGAN and changed the parent company to ALLERGAN.

62.  Defendant WATSON LABORATORIES, INC. is, and was at all times relevant herein, a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan PLC, the parent company of Defendants ALLERGAN INC. and ALLERGAN USA INC., (f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC.).  At all times relevant herein, Watson Laboratories, Inc. takes and took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend drug patents. ACTAVIS PHARMA, INC. (f/k/a ACTAVIS, INC.), is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

63.  Defendant INSYS THERAPEUTICS, INC.[2], is, and was at all times relevant herein, a Delaware corporation with its principal place of business located in Chandler, Arizona. At all times relevant herein, Defendant INSYS THERAPEUTICS, INC. was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or distributing Subsys, a transmucosal immediate-release formulation of fentanyl, packed in a single-dose spray device intended for oral sublingual administration, and has done so to and within in the State of Nevada. At all times relevant herein, INSYS THERAPEUTICS, INC.

---

[2] Defendant Insys Therapeutics, Inc. recently filed for Chapter 11 Bankruptcy and, thus, in accordance with the automatic stay, has not been served with these papers.

1  hired "Detailers" in Clark County, Nevada to make personal contact with physicians and clinics
2  to advocate for the purchase and use of opioid medications which were contrary to known safety
3  concerns and sound medical advice.  At all times relevant herein, INSYS THERAPEUTICS,
4  INC., used deceptive tactics to gain authorization for Subsys prescriptions from health insurance
5  providers for off-label, high dosage uses.

6        64.     Defendant JOHN KAPOOR, the founder of Insys Therapeutics, Inc. and former
7  Executive Chairman, was a member of Insys's board between 1990 and 2017. He resides in
8  Phoenix, Arizona.

9        65.     Defendant RICHARD M. SIMON was a former National Director of Sales for
10  Insys during the time relevant to the allegations of this action. He resides in Seal Beach,
11  California.
12

13        66.     Defendant SUNRISE LEE was a former Regional Sales Director of Insys. He
14  resides in Bryant City, Michigan.

15        67.     Defendant JOSEPH A. ROWAN was a former Regional Sales Director of Insys
16  during the time relevant to the allegations of this action. He resides in Panama City, Florida.
17

18        68.     Defendant MICHAEL J. GURRY was a former Vice President of Managed
19  Markets for Insys during the time relevant to the allegations of this action. He resides in
20  Scottsdale, Arizona.
21

22        69.     Defendant MICHAEL BABICH was the former president and CEO of Insys
23  during the time relevant to the allegations of this action.  He resides in Scottsdale, Arizona.

24        70.     Defendant ALEC BURLAKOFF was the former vice president of sales for
25  Insys during the time relevant to the allegations of this action. He resides in Charlotte, North
26  Carolina.
27

28        71.     The foregoing individual Defendants associated with Insys are referred to
collectively as "the Insys Executives."

72.     Insys's founder and owner, John Kapoor, was recently convicted of criminal racketeering in a case brought by the Massachusetts Department of Justice. Insys executives, Richard M. Simon, Sunrise Lee, Joseph A. Rowan, and Michael J. Gurry, were all convicted in the same case. Michael L. Babich, former Insys chief executive, pleaded guilty to conspiracy and mail fraud charges. Alec Burlakoff pled guilty to one count of racketeering conspiracy.

73.     MALLINCKRODT LLC is a Delaware corporation with its principal place of business in Hazelwood, Missouri. MALLINCKRODT operates in the United States under the name Mallinckrodt Pharmaceuticals, with its United States headquarters are located in Hazelwood, Missouri. At all times relevant herein, Defendant MALLINCKRODT was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling, and/or distributing opioid products known as Exalgo, Roxicodone, and Xartemis XR, and has done so to and within the State of Nevada.

74.     Defendant SPECGX LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri, and is registerd with the Nevada Secretary of State to do business in Nevada. SpecGx LLC is a subsidiary of Mallinckrodt plc that operates its specialty generics business. Defendants Mallinckrodt LLC and SpecGx LLC, together with their DEA and Nevada registrant and licensee subsidiaries and affiliates (collectively, "Mallinckrodt"), manufacture, market, sell, and distribute pharmaceutical drugs throughout the United States, and in Clark County, Nevada.

75.     That at all times relevant herein, PURDUE PHARMA, L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.  dba THE PURDUE FREDERICK COMPANY, INC.; PURDUE PHARMACEUTICALS, L.P.; RICHARD S. SACKLER; JONATHAN D. SACKLER, MORTIMER D.A. SACKLER; KATHE A. SACKLER; ILENE SACKLER LEFCOURT; DAVID A. SACKLER; BEVERLY SACKLER; THERESA SACKLER; PLP ASSOCIATES HOLDINGS L.P.; ROSEBAY MEDICAL COMPANY L.P.; BEACON COMPANY; TEVA PHARMACEUTICALS USA, INC.; TEVA PHARMACEUTICALS INDUSTRIES LTD; CEPHALON, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.;

16

1  PAR PHARMACEUTICAL COMPANIES, INC.; ALLERGAN INC.; ALLERGAN USA
2  INC.; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON
3  LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON
4  PHARMA, INC., INSYS THERAPEUTICS, INC.; JOHN KAPOOR; RICHARD M. SIMON,
5  SUNRISE LEE, JOSEPH A. ROWAN; MICHAEL J. GURRY; MICHAEL BABICH; ALEC
6  BURLAKOFF; MALLINCKRODT, LLC and SPECGX LLC,  (collectively "Defendant
7  Manufacturers" or "Defendants") were, and currently are, regularly engaged in business in
8  Clark County.  More specifically, Defendants were, and currently are, in the business of
9  designing, testing, manufacturing, labeling, advertising, promoting, marketing, and/or selling
10  opioids throughout Clark County.

11    **C. Defendants, Wholesale Distributors.**

12    76.    Defendant, AMERISOURCEBERGEN DRUG CORPORATION, is, and at all
13  times pertinent hereto, was, a foreign corporation authorized to do business in the County of
14  Clark, State of Nevada.  Upon information and belief, and at all times relevant hereto,
15  AMERISOURCEBERGEN DRUG CORPORATION's principal place of business is located in
16  Chesterbrook, Pennsylvania, operating distribution centers in Ohio.

17    77.    Defendant, CARDINAL HEALTH, INC. is, and at all times pertinent hereto,
18  was, a foreign corporation with multiple wholly-owned subsidiaries incorporated under the laws
19  of the State of Nevada and/or authorized to do business in said state, and conducting business
20  in the County of Clark, State of Nevada.

21    78.    Upon information and belief, and at all times relevant hereto, CARDINAL
22  HEALTH, INC.'s principal office is located in Dublin, Ohio, operating, distribution centers in
23  Ohio. CARDINAL HEALTH 6 INC. is a Nevada Domestic Corporation.  CARDINAL
24  HEALTH TECHNOLOGIES LLC is a Nevada Domestic LLC.  At all times relevant herein,
25  CARDINAL HEALTH TECHNOLOGIES LLC takes and took advantage of the legislative,
26  regulatory and tax schemes of the State of Nevada to own, maintain and defend patents,
27  including those relating to drug labeling, coding and distribution.

28    79.    CARDINAL HEALTH 414 LLC is an LLC incorporated under the laws of the
   state of Delaware and headquartered in Dublin, Ohio, and registered and authorized to conduct

1   business within the State of Nevada. At all times relevant herein, CARDINAL HEALTH 414

2   LLC takes and took advantage of the legislative, regulatory and tax schemes of the State of

3   Nevada to own, maintain and defend medical patents. Further, CARDINAL HEALTH 414

4   LLC operates a pharmacy within the physical confines of the County of Clark. CARDINAL

5   HEALTH 200 LLC is an LLC incorporated under the laws of the state of Delaware and

6   headquartered in Dublin, Ohio, and registered and authorized to conduct business within the

7   State of Nevada. To Wit, CARDINAL HEALTH 200 LLC has obtained a business license in

8   the County of Clark to register as a "Procurement Vendor," which is a company registered to

9   submit bids to sell products to Nevada and Clark County government entities, such as to sell

10  medical goods or drugs to the County-operated hospital.

11

12

13          80.     Defendant, McKESSON CORPORATION, is, and at all times pertinent hereto,

14  was, foreign corporation authorized to do business in the County of Clark, State of Nevada.

15  Upon information and belief, and at all times relevant hereto, McKESSON CORPORATION's

16  principal place of business is located in San Francisco, California, operating distribution centers

17  in Ohio. At all times relevant herein, McKESSON CORPORATION takes and took advantage

18  of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and

19

20  defend patents, including those relating to drug labeling, coding and distribution.

21          81.     Defendant WALGREENS BOOTS ALLIANCE, INC. is a Delaware

22  corporation with its principal place of business in Illinois.

23

24          82.     Defendant WALGREEN CO. is and was registered to do business with the

25  Nevada Secretary of State as an Illinois corporation with its principal place of business in

26  Deerfield, Illinois. Walgreen Co. is a subsidiary of Walgreens Boots Alliance, Inc. and does

27  business under the trade name Walgreens.

28

            83.     Defendant WALGREEN EASTERN CO., INC. is a New York corporation with

18

its principal place of business in Deerfield, Illinois.

84.     Defendants Walgreens Boots Alliance, Inc., Walgreen Eastern Co., and Walgreen Co. are collectively referred to as "Walgreens". Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Walgreens distributed prescription opioids throughout the United States, including in Clark County, Nevada. At all relevant times, this Defendant operated as a licensed pharmacy wholesaler in the State of Nevada, and in Clark County, Nevada.

85.     Defendant WALMART INC., ("Walmart") formerly known as Wal-Mart Stores, Inc., is and was registered to do business with the Nevada Secretary of State as a Delaware corporation with its principal place of business in Arkansas. Walmart, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor under named business entities including Wal-Mart Warehouse #6045 a/k/a Wal-Mart Warehouse #45. At all times relevant to this Complaint, Walmart distributed prescription opioids throughout the United States, including in Clark County, Nevada. At all relevant times, this Defendant operated as a licensed pharmacy wholesaler in the State of Nevada, and in Clark County, Nevada.

86.     Defendant CVS HEALTH CORPORATION ("CVS HC") is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. CVS HC conducts business as a licensed wholesale distributor under the following named business entities, among others: CVS Orlando FL Distribution L.L.C. and CVS Pharmacy, Inc. (collectively "CVS"). At all times relevant to this Complaint, CVS distributed prescription opioids throughout the United States, including in Clark County, Nevada.

87.     Defendant CVS PHARMACY, INC. ("CVS Pharmacy") is a Rhode Island

19

corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy is a subsidiary of CVS HC. At all times relevant to this Complaint, CVS Pharmacy operated as a licensed pharmacy wholesaler, distributor and controlled substance facility in Clark County, Nevada.

88.     Defendant CVS Pharmacy, Inc. distributed prescription opioids to Plaintiffs' Community through the following wholly owned subsidiaries that are alter-egos of CVS Pharmacy, Inc.:

    a.     Defendant CVS INDIANA L.L.C., an Indiana limited liability company with its principal place of business in Indianapolis, Indiana;

    b.     Defendant CVS RX SERVICES, INC. d/b/a CVS Pharmacy Distribution Center, a New York corporation with its principal place of business in Woonsocket, RI; and

    c.     Defendant CVS TENESSEE DISTRIBUTION, L.L.C. a Tennessee corporation with its principal place of business in Woonsocket, Rhode Island.

89.     Defendant CVS Pharmacy, Inc. instituted set-up, ran, directed, and staffed with its own employees, the majority of the Suspicious Order Monitoring and diversion control functions for CVS Indiana, LLC, CVS Rx Services, Inc., and CVS TN Distribution LLC.

90.     Collectively, CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, LLC, CVS Rx Services, Inc., and CVS TN Distribution, LLC are referred to as "CVS." CVS conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, CVS distributed prescription opioids throughout the United States, including in Clark County, Nevada; CVS pharmacies located in Clark County supplemented their supply of Schedule 3 controlled substances including prescription opioids through purchases made by CVS from outside vendors; and CVS pharmacies located in Clark County were supplied with Schedule 2

controlled substances including prescription opioids through purchases made by CVS from outside vendors.

91.     Defendant, MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS PHARMACEUTICAL, INC., is, and at all times pertinent hereto, was, foreign corporation authorized to do business in the County of Clark, State of Nevada. Upon information and belief, and at all times relevant hereto, MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS PHARMACEUTICAL, INC.'s, operates distribution centers in Ohio.

92.     AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; CARDINAL HEALTH 6 INC.; CARDINAL HEALTH TECHNOLOGIES LLC; CARDINAL HEALTH 414 LLC; CARDINAL HEALTH 200 LLC; McKESSON CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; WALGREEN CO.; WALGREEN EASTERN CO., INC.; WALMART INC.; CVS HEALTH CORPORATION; CVS PHARAMCY, INC.; CVS INDIANA, LLC; CVS RX SERVICES, INC.; CVS TN DISTRIBUTION, LLC; and MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS PHARMACEUTICAL, INC.; (collectively "Defendant Distributors" or "Defendants") distributed opioids or facilitated the distribution of opioids into Clark County. The United States Drug Enforcement Administration has found it necessary to levy disciplinary action against these and each of these including large fines and suspension or permanent cancellation of their licenses for distribution of controlled substances, based on dangerous and abusive distribution practices as detailed herein and below.

93.     Defendant Distributors purchased opioids from manufacturers, including the named Defendants herein, and distributed them to pharmacies throughout Clark County, and the State of Nevada.

94.     Defendant Distributors played an integral role in the chain of opioids being distributed throughout Clark County, and the State of Nevada.

        **D. Defendants, Detailers.**

21

95.     Defendant AIDA B MAXSAM (hereinafter "DETAILER") is a natural person who is, and at all relevant times herein was, a resident of Clark County, Nevada, who is or was engaged in specialty drug sales on behalf of Defendant Manufacturer and Distributor PURDUE.

96.     Defendant DETAILER was trained to, and did in fact, make personal contact with physicians and clinics within Clark County, Nevada for the purpose, and with the result, of encouraging them to prescribe opioid medications in a manner inconsistent with known safety concerns and contrary to sound medical practice.

**E. Defendants, Pharmacies, and Pharmacy Benefit Managers.**

97.     Defendant C & R PHARMACY d/b/a KEN'S PHARMACY f/k/a LAM'S PHARMACY, INC. ("LAM'S PHARMACY") is and was at all times pertinent hereto a domestic corporation authorized to do business in the County of Clark, State of Nevada. Upon information and belief, and at all times relevant hereto, KEN'S PHARMACY f/k/a LAM'S PHARMACY, INC.'s principal place of business was and is in Las Vegas, Nevada. Plaintiff is informed, believes, and alleges that C & R PHARMACY d/b/a KEN'S PHARMACY purchased and is the possessor and controller of all of the assets of the former LAM'S PHARMACY including drugs, premises, prescription records, customer lists, telephone numbers, goodwill, and all other business assets.

98.     Defendant LAM'S PHARMACY and other pharmacies (collectively "Defendant Pharmacies" or "Defendants") sold opioids to residents of Clark County giving rise to the opioid crisis.

99.     Pharmacy Benefit Managers ("PBMs") administer benefit contracts and riders that determine coverage for some or all of the costs of pharmaceutical products and/or provide access to such products, sometimes through the PBM's own mail-order pharmacy. PBMs establish formularies which govern which drugs are reimbursed and how. PBMs also determine pre-authorization requirements and negotiate with drug manufacturers to offer preferred drug formulary placement for drugs. Additionally, PBMs establish reimbursement rates for drugs dispensed and can earn revenue from fees from health plans and insurers, rebates and other incentives from drug manufacturers, including administrative fees and volume bonuses, and

1    fees from maintaining pharmacy networks. Given their "gatekeeper" role, PBMs exercise
2    significant power over the quantity of prescription opioids that enter the market.

3         100.    PBMs also have massive quantities of data regarding the opioid prescribing and
4 usage of the doctors and patients who participate in their plans. As a result, PBMs can
5 identify: (a) patients who receive, and doctors who prescribe opioids in excessive volumes,
6 frequency, or dosage; (b) patients who receive, and doctors who prescribe opioids in
7 combination with other drugs indicative of diversion; (c) patients who receive opioids after
8 having been treated or while being treated for opioid overdoses and addition; and (d) patients
9 who receive opioids who are at higher risk for overdose, for example, because they also receive
10 benzodiazepines. This information, and their representations about their efforts to manage and
11 improve patients' health, created an obligation for PBMs to identify, report, and otherwise
12 address potential diversion or other dangerous instances of opioid use and prescribing.

13         101.    In addition, PBMs distribute opioids directly through their mail order
14 pharmacies, and, like other pharmacies, are DEA and state registrants. In distributing opioids,
15 PBMs are obligated to prevent diversion and to identify, report, and not ship suspicious orders
16 of opioids. Upon information and belief, to be confirmed by transaction data in the exclusive
17 possession of the PBMs, PBMs failed to carry out these duties.

18         102.    Defendant EXPRESS SCRIPTS HOLDING COMPANY ("ESHC") is a
19 Delaware corporation with its principal place of business in St. Louis, Missouri. Defendant
20 EXPRESS SCRIPTS, INC. ("ESI") is a wholly-owned subsidiary of ESHC and is incorporated
21 in the State of Delaware with its principal place of business located in St. Louis, Missouri. In
22 2012, ESI acquired its rival, Medco Health Solutions Inc., otherwise known as Merck Medco,
23 in a $29.1 billion deal. As a result of the merger, ESHC was formed and became the largest
24 PBM in the nation, filing a combined 1.4 billion prescriptions for employers and
25 insurers. ESHC and ESI are collectively referred to as "Express Scripts."

26         103.    Upon information and belief, Express Scripts derived and continues to derive
27 substantial revenue as a result of managing pharmacy benefits throughout Nevada, including
28 within Clark County.

104.    Defendant Pharmacies and PBMs played an integral role in the chain of opioids being sold throughout Clark County.

**F.  Defendants, Health Care Providers**

105.    Defendant STEVEN A HOLPER MD is, and was at all times relevant herein, a resident of Clark County, Nevada and was a licensed medical doctor in the State of Nevada. Upon information and belief, and at all times relevant hereto, Defendant STEVEN A HOLPER MD, conducted business and provided medical services as STEVEN A. HOLPER, M.D., PC, a Nevada Domestic Professional Corporation in Clark County, Nevada. Defendant HOLPER OUT-PATIENTS MEDICAL CENTER, LTD. (collectively, with STEVEN A HOLPER MD and STEVEN A. HOLPER M.D., PC, "Defendant Providers" or "HOLPER"), is, and was at all times relevant herein, a Nevada Domestic Corporation with its principal place of business in Clark County, Nevada, and served as the location from which Defendant STEVEN A HOLPER MD provided his medical services.

106.    HOLPER habitually prescribed and delivered highly addictive and potentially lethal opioid medications, including, but not limited to, Subsys, to patients in Clark County, Nevada who did not meet the qualifications for such medication, specifically, were not cancer patients experiencing break-through cancer pain.

107.    HOLPER participated in a deceptive scheme to obtain authorization for such prescriptions from health insurance providers.

**G.  Defendants, Does, Roes and Zoes.**

108.    That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant DOES 1 through 100, inclusive, are unknown to Plaintiff. Plaintiff will ask leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when they become known to Plaintiff. Plaintiff believes each Defendant named as DOE was responsible for the misconduct alleged herein.

109.    That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant ROE CORPORATIONS I through 100, are unknown to Plaintiff.  These Defendants include the manufacturer(s), distributor(s) and any third party that

24

1   may have developed, manufactured, produced, sold, altered or otherwise distributed the subject

2   drug, which caused Plaintiff's injuries as complained herein. Plaintiff will ask to leave of the

3   Court to amend this Complaint to show the true names and capacities of these Defendants, when

4   they become known to Plaintiff. Plaintiff believes each Defendant named as ROE

5   CORPORATION was responsible for contributing to the misconduct alleged herein.

6         110.    That the true names and the capacities, whether individual, agency, corporate,

7   associate or otherwise, of Defendant ZOE PHARMACIES I through 100, are unknown to

8   Plaintiff.  These Defendants include the pharmacies or similarly situated retailers that may have

9   developed, manufactured, produced, sold, altered or otherwise distributed opioids which caused

10  Plaintiff's injuries as complained herein. Plaintiff will ask to leave of the Court to amend this

11  Complaint to show the true names and capacities of these Defendants, when they become known

12  to Plaintiff. Plaintiff believes each Defendant named as ZOE PHARMACY was responsible for

13  contributing to the misconduct alleged herein.

14        111.    That Plaintiff is informed and believes, and based upon such information and

15  belief, alleges that each of the Defendants herein designated as DOES, ROES and/or ZOES are

16  in some manner responsible for the misconduct alleged herein.

17        112.    Plaintiff is informed and believes and thereon alleges that at all relevant times

18  herein mentioned Defendants, and each of them, were the agents and/or servants and/or partners

19  and/or joint venture partners and/or employers and/or employees and/or contractors of the

20  remaining Defendants and were acting within the course and scope of such agency,

21  employment, partnership, contract or joint venture and with the knowledge and consent of the

22  remaining Defendants at the time of the event leading to the misconduct alleged herein.

23        **H. Jurisdiction & Venue.**

24        113.    That exercise of the jurisdiction by this Court over each and every Defendant in

25  this action is appropriate because each and every Defendant has done, and continues to do,

26  business in the State of Nevada, and committed a tort in the State of Nevada.  Additionally, this

27  Court has jurisdiction over the claims alleged herein as they arise under Nevada statutes and

28  Nevada common law.

114.  Venue is proper in the District Court of Clark County, Nevada where part of the claims alleged herein occurred.

### GENERAL FACTUAL ALLEGATIONS

**A. Opioids Generally**

115.  Defendants design, manufacture, distribute, sell, market, and advertise prescription opioids, including brand-name drugs like Oxycontin and Subsys, and generics like oxycodone, which are powerful narcotic painkillers. Historically, because they were considered too addictive and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis), opioids were used only to treat short-term acute pain cancer patients or for palliative (end-of-life) care.

116.  Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

117.  In the 1970s and 1980s, studies were conducted that made clear the reasons to avoid opioids. By way of example, the World Health Organization ("WHO") in 1986 published an "analgesic ladder" for the treatment of cancer pain. The WHO recommended treatment with over-the-counter or prescription acetaminophen or non-steroidal anti-inflammatory drugs ("NSAIDs") first, then use of unscheduled or combination opioids, and then stronger (Schedule II or III) opioids if pain persisted. The WHO ladder pertained only to the treatment of cancer pain, and did not contemplate the use of narcotic opioids for chronic pain - because the use of opioids for chronic pain was not considered appropriate medical practice at the time.

118.  Due to concerns about their addictive qualities, opioids have been regulated as controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious, life-threatening, or fatal respiratory depression," as a result of an excessive dose.

**B. Defendants' Fraudulent Marketing**

26

119.    To take advantage of the lucrative market for chronic pain patients, Defendants developed a well-funded marketing scheme based on deception. Defendants used both direct marketing and unbranded advertising disseminated by purported independent third parties to spread false and deceptive statements about the risks and benefits of long-term opioid use.

120.    Yet these statements were not only unsupported by or contrary to the scientific evidence, they were also contrary to pronouncements by and guidance from federal agencies such as the Food and Drug Administration ("FDA") and Centers for Disease Control and Prevention ("CDC") based on that evidence. They also targeted susceptible prescribers and vulnerable patient populations, including the elderly and veterans.

121.    Defendants also used kickback systems, prior authorization systems, and incentives to encourage health care providers to prescribe the opioid medications.

### ***Direct Marketing Efforts***

122.    Defendants' direct marketing of opioids generally proceeded on two tracks. First, Defendants conducted, and continue to conduct, promotional campaigns extolling the purported benefits of their branded drugs.  Advertisements were branded to deceptively portray the benefits of opioids for chronic pain.  For instance, Defendant Purdue commissioned series of ads in medical journals, called "Pain vignettes," for Oxycontin in 2012.  These ads featured chronic pain patients and recommended opioids for each.  One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that Oxycontin would help the writer work more effectively.  Purdue agreed in late 2015 and 2016 to halt these misleading representations in New York, but no similar order has been issued in Nevada. Defendant Mallinckrodt marketed its products, Exalgo and Xartemis as specially formulated to reduce abuse and published information on its website minimizing addition risk as well as advocating access to opioids. Defendant Insys provided health care providers with false and misleading information in order to deceive such providers into believing the FDA had approved Subsys for more uses than the FDA had actually approved.

123.    Second, Defendants promoted, and continue to promote, the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs.  Defendants' detailing to

27

1    doctors is effective. By establishing close relationships with prescribing physicians,
2    Defendants' sales representatives are able to disseminate their misrepresentations in targeted,
3    one-on-one settings that allowed them to differentiate their opioids and to address individual
4    prescribers' concerns about prescribing opioids for chronic pain.

5    124.    These direct techniques were also accompanied by kickbacks, prior
6    authorization systems, and the use of other incentives to encourage health care providers, to
7    prescribe the opioid medication for chronic pain.

8    125.    Numerous studies indicate that marketing impacts prescribing habits, with face-
9    to-face detailing having the greatest influence. Defendants devoted, and continues to devote,
10   massive resources to direct sales contacts with doctors.

11   126.    Defendants paid sham "speaker fees" to doctors to run educational events to
12   discuss the use of their products, but the fees were actually intended to reward those doctors for
13   prescribing Defendants' product and incentivize them to prescribe more of those products to
14   patients. In fact, often times the speakers spoke at events with minimal to no attendance simply
15   to collect the fee. These kickbacks increased as the number of prescriptions written by the
16   speakers increased.

17   127.    Upon information and belief and at all times relevant herein, Defendants
18   ensured, and continue to ensure, marketing consistency nationwide through national and
19   regional sales representative training; national training of local medical liaisons, the company
20   employees who respond to physician inquiries; centralized speaker training; single sets of visual
21   aids, speaker slide decks, and sales training materials; and nationally coordinated advertising.
22   Upon information and belief, Defendants' sales representatives and physician speakers were
23   required to adhere to prescribed talking points, sales messages, and slide decks, and supervisors
24   rode along with them periodically to both check on their performance and compliance.

25   128.    Upon information and belief and at all times relevant herein, Defendants
26   employed, and continue to employ, the same marketing plans and strategies and deployed the
27   same messages in Nevada as they did nationwide.

28   129.    As the opioid epidemic spread, many health care providers recognized the
dangers of opioid medication, including health risks and the risk of addiction. Others, however,

28

1     continued to prescribe such medication for off-label purposes without adequately warning
2     patients of the dangers associated with opioids.

3         130.    Upon information and belief, Defendant Providers received financial incentives
4     to continue writing prescriptions for such opioid medication despite the dangers associated with
5     same.

6         131.    Across the pharmaceutical industry, "core message" development is funded and
7     overseen on a national basis by corporate headquarters. This comprehensive approach ensures
8     that Defendants' messages are accurately and consistently delivered across marketing channels
9     – including detailing visits, speaker events, and advertising – and in each sales territory.
10    Defendants consider this high level of coordination and uniformity crucial to successfully
11    marketing their drugs.

12                ***Unbranded/Third-Party Marketing by Defendants***

13         132.    In addition to direct communications, Defendants utilized third-party marketing
14    to promote their line of prescription opiates. This "unbranded" marketing refers not to a specific
15    drug, but more generally to a disease state or treatment. For instance, these marketing materials
16    generally promoted opioid use but did not name a specific opioid. Through these unbranded
17    materials, Defendants presented information and instructions concerning opioids that were
18    generally contrary to, or at best, inconsistent with, information and instructions listed on
19    Defendants' branded marketing materials and drug labels and with Defendants' own knowledge
20    of the risks, benefits and advantages of opioids. An example of such unbranded marketing
21    techniques is Defendant Mallinckrodt's Collaborating and Acting Responsible to Ensure Safety
22    (C.A.R.E.S.) Alliance, which promoted a book "Defeat Chronic Pain Now!" minimizing the
23    risk of opioid addiction and emphasizing opioid therapy for regular use for moderate chronic
24    pain.

25         133.    Using "Key Opinion Leaders" (KOLs) and "Front Groups," Defendants
26    disseminated their false and misleading statements regarding the efficacy of opioids. These
27    KOLs and Front Groups were important elements of Defendants' marketing plans, because they
28    appeared independent and therefore outside of FDA oversight. However, Defendants did so
     knowing that unbranded materials typically were not submitted or reviewed by the FDA. By

1   acting through third parties, Defendants was able both to avoid FDA scrutiny and to give the

2   false appearance that these messages reflected the views of independent third parties.

3   Afterwards, Defendants would cite to these sources as corroboration of their own statements.

4         134.    Defendants worked, and continue to work, in concert with the Front Groups and

5   KOLs which they funded and directed to carry out a common scheme to deceptively market the

6   risks, benefits, and superiority of opioids to treat chronic pain. Although participants knew this

7   information was false and misleading, these misstatements were nevertheless disseminated to

8   Nevada prescribers and patients.

9         ***Key Opinion Leaders (KOLs)***

10         135.    Upon information and belief and at all times relevant herein, Defendants

11   recruited, as part of its unbranded marketing efforts, a cadre of doctors who were financially

12   sponsored because of their preference to aggressively treat chronic pain with opioids. KOLs

13   were retained by Defendants to influence their peers' medical practice, including but not limited

14   to their prescribing behavior. KOLs gave lectures, conducted clinical trials and occasionally

15   made presentations at regulatory meetings or hearings. KOLs were carefully vetted to ensure

16   that they were likely to remain on message and supportive of Defendant' agenda.

17         136.    Defendants' financial support helped these doctors become respected industry

18   experts. Upon information and belief, these doctors repaid Defendants by extolling the benefits

19   of opioids to treat chronic pain as quid pro quo. Defendants would cite to these sources later

20   on as corroboration of their own false and misleading statements regarding opioids.

21         ***Front Groups***

22         137.    Defendants also entered into arrangements with seemingly unbiased and

23   independent patient and professional organizations to promote opioids for the treatment of

24   chronic pain. Under their direction and control, these "Front Groups" generated treatment

25   guidelines, unbranded materials, and programs that favored chronic opioid therapy. They also

26   assisted Defendants by refuting negative articles, by advocating against regulatory changes that

27   would limit opioid prescribing in accordance with the scientific evidence, and by conducting

28   outreach to vulnerable patient populations targeted by Defendants.

138.    These Front Groups depended on Defendants for funding and, in some cases, for survival. Defendants exercised significant control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In so doing, Defendants made sure that these Front Groups would generate only favorable messages. Despite this, the Front Groups held themselves out as independent and serving the needs of their members – whether patients suffering from pain or doctors treating those patients.

139.    While Defendants utilized many Front Groups, one of the most prominent of was the American Pain Foundation ("APF"). APF received more than $10 million in funding from opioid manufacturers from 2007 until it closed its doors in May 2012. Upon information and belief, Defendant Purdue was one of its primary financial backers.

140.    APF issued education guides for patients, reporters, and policymakers that touted the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction. APF also launched a campaign to promote opioids for returning veterans, which has contributed to high rates of addiction and other adverse outcomes – including death – among returning soldiers. APF also engaged in a significant multimedia campaign – through radio, television and the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the programs and materials were available nationally and were intended to reach Nevadans.

141.    In or about May 2012, the U.S. Senate Finance Committee began investigating APF to determine the relationship, financial and otherwise, between the organization and the manufacturers of opioid analgesics. The investigation caused considerable damage to APF's credibility as an objective and neutral third party, and Purdue, upon information and belief, stopped financially supporting the organization.

142.    Within days of being targeted by Senate investigation, APF's board voted to dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist, effective immediately."

***Continuing Medical Education (CMEs)***

31

143.    CMEs are ongoing professional education programs required for physicians. Physicians must attend a certain number and, often, type of CME programs each year as a condition of their licensure. These programs are delivered in person, often in connection with professional organizations' conferences, and online, or through written publications. Doctors rely on CMEs not only to satisfy licensing requirements, but to get information on new developments in medicine or to deepen their knowledge in specific areas of practice. Because CMEs are typically delivered by KOLs who are highly-respected in their fields and are thought to reflect their medical expertise, they can be especially influential with doctors.

144.    By utilizing CMEs, Defendants sought to reach general practitioners, whose broad area of focus and lack of specialized training in pain management made them particularly dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions. Defendants sponsored CMEs promoted chronic opioid therapy.

145.    These CMEs, while often generically titled to relate to the treatment of chronic pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids, and frequently omitted or downplayed their risks and adverse effects.

146.    Upon information and belief and at all times relevant herein, CMEs paid for or sponsored by Defendants were intended to reach prescribing physicians in Nevada.

### ***Drug Manufacturer Defendants—Kickbacks to Encourage Prescriptions***

147.    Upon information and belief, Defendants utilized a system of kickbacks to encourage health care providers to write prescriptions for, and deliver, the opioid medications. Kickbacks took the form of "speaker fees" paid to health care providers that spoke at programs regarding the purported benefits and safety of using opioid medications to treat chronic pain. Such speakers were recruited by Defendants based upon the number of prescriptions the providers wrote for opioid medications. The more prescriptions written, the more times the speaker was asked to appear at a program, and the more "speaker fees" were paid to the provider. Defendants' employees were rewarded when their "speakers" increased the prescriptions they wrote. These speaking programs did not result in other health care providers writing a significant number of prescriptions for Defendants' products, but the "speakers" continued to be paid to speak so long as they increased their own prescriptions. Many of the speaker

32

1 programs had few or no attendees that would actually be able to write prescriptions for
2 Defendants' products. Upon information and belief, Defendant Providers, benefitted from such
3 programs.

4      ***Prior Authorization Programs***

5      148.   Upon information and belief, Defendants developed prior authorization
6 programs in order to gain authorization and approval from insurance companies to cover the
7 costly opioid products for off-label uses. These programs involved representatives from
8 Defendants contacting insurance companies and representing that they are from a health care
9 provider's office rather than from the Defendant manufacturer or distributor; providing
10 inaccurate diagnosis information on the authorization requests; and drafting Letters of Medical
11 Necessity for health care providers to sign-off on for purposes of receiving authorization from
12 health insurance providers. Upon information and belief, Defendant Providers also participated
13 in misleading the health insurance providers to authorize the numerous prescriptions written for
14 opioid medications, including, but not limited to, Subsys.

15      ***Medication Switch Programs***

16      149.   Upon information and belief, Defendants encouraged and incentivized detailers
17 and sales people to convince health care providers to substitute stronger, more expensive opioid
18 medications for medications that patients were already prescribed. Detailers and sales people
19 were informed that they would receive higher pay and/or bonuses by convincing health care
20 providers to change prescriptions. These programs ignored any warnings that one opioid drug
21 could not be substituted on a one-for-one basis with another opioid medication. Each opioid
22 medication is unique in its dosing and has a different approved dosage level. Switch programs
23 encouraged a one-for-one substitution despite the differences in the original and substitute
24 medication.

25      ***Drug Manufacturer Defendants—Marketing Targeting the Elderly and Veterans***

26      150.   In its pursuit of profit, Defendants targeted vulnerable segments of the
27 population suffering from chronic pain including veterans and the elderly.

28      151.   Defendants' targeted marketing to the elderly and the absence of cautionary
language in their promotional materials creates a heightened risk of serious injury. Studies have

shown that elderly patients who used opioids had a significantly higher rate of death, heart attacks, and strokes than users of NSAIDs.  Additionally, elderly patients taking opioids have been found to suffer elevated fracture risks, greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression.

152.    Defendants' efforts were successful.  Since 2007, opioid prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59. Based on anecdotal evidence, many of these elderly patients started on opioids for chronic back pain or arthritis.

153.    Veterans are also suffering greatly from the effects of Defendants' targeted marketing.   Opioids are particularly dangerous to veterans. According to a study published in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, like overdoses and self- inflicted and accidental injuries, than the general U.S. population.

154.    *Exit Wounds*, a 2009 publication sponsored by Defendant Purdue and distributed by APF, written as a personal narrative of one veteran, describes opioids as "underused" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury. It notes that opioid medications "increase a person's level of functioning" and that "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications."

155.    *Exit Wounds* downplays and minimizes the risks from chronic opioid therapy and does not disclose the risk that opioids may cause fatal interactions with benzodiazepines taken by a significant number of veterans. It is not the unbiased narrative of a returning war veteran. It is another form of marketing, sponsored by Defendant Purdue.

156.    The deceptive nature of *Exit Wounds* is made obvious in comparing it to guidance on opioids published by the U.S. Department of Veterans Affairs and the Department of Defense in 2010 and 2011. The VA's Taking Opioids Responsibly describes opioids as "dangerous." It cautions against taking extra doses and mentions the risk of overdose and the dangers of interactions with alcohol.

### C. Defendants' Misrepresentations

34

157.   To convince prescribing physicians and prospective patients that opioids are safe, Defendants deceptively concealed the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations.  Defendants manipulated their promotional materials and the scientific literature to make it appear that these items were accurate, truthful, and supported by objective evidence when they were not.

158.   These misrepresentations regarding opioids include but are not limited to:

  a.   Starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed;

  b.   Patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs;

  c.   The use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and

  d.   Abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive.

159.   Upon information and belief, Defendants have not only failed to correct these misrepresentations, they continue to make them today.

160.   For example, Defendant Purdue misrepresented, and continues to misrepresent, Oxycontin as providing 12 continuous hours of pain relief with one dose.  However, studies have shown, as well as Purdue's own internal research, that the effects of the drug wear off in or about six (6) hours in one quarter of its patients and in or about ten (1) hours in one-half of its patients.

161.   Defendants also misrepresented the benefits of chronic opioid therapy.  For example, Defendant Purdue falsely claimed that long-term opioid use improved patients' function and quality of life in advertisements for Oxycontin in medical journals entitled, "Pain Vignettes" which were case studies featuring patients with pain conditions persisting over several months and recommending Oxycontin for them. These advertisements implied that Oxycontin improves patients' function.

162.     However, these claims find no support in the scientific literature. In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."    Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely."

163.     Upon information and belief and at all times relative herein, Defendants made and/or disseminated deceptive statements related to opioids, including, but not limited to, in the following ways:

    a.  Creating, sponsoring, and assisting in the distribution of patient education materials distributed to Nevada consumers that contained deceptive statements;

    b.  Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

    c.  Assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction;

    d.  Developing and disseminating scientific studies that misleadingly concluded opioids are safe and effective for the long-term treatment of chronic non-cancer pain and that opioids improve quality of life, while concealing contrary data;

    e.  Targeting the elderly and veterans by assisting in the distribution of guidelines that contained deceptive statements concerning the use of opioids to treat chronic non-cancer pain and misrepresented the risks of opioid addiction in this population;

    f.  Exclusively disseminating misleading statements in education materials to Nevada hospital doctors and staff while purportedly educating them on new pain standards; and

36

g.  Making deceptive statements concerning the use of opioids to treat chronic non-cancer pain to Nevada prescribers through in-person detailing.

**D. Duty of Drug Distributors and Pharmacies as Gate Keepers**

164.  In Nevada, opioids are a controlled substance and are categorized as "dangerous drugs." Therefore, Defendant Distributors have a duty to exercise reasonable care under the circumstances.

165.  This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct-and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another-is under a duty to exercise reasonable care to prevent the threatened harm.

166.  All opioid distributors are required and have a duty to maintain effective controls against opioid diversion. They are also required and have a duty to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency.

167.  To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

168.  Defendant Distributors each have an affirmative duty to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs.

169.  Defendant Distributors each have a non-delegable duty to identify and track suspicious orders of controlled substances.

170.  In addition, Defendant Distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

171.  Defendant Distributors have a duty to detect questionable and suspicious orders to prevent the diversion of opioids into Clark County, which include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency.

172.  Defendant Distributors not only have a duty to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society.

173.  In so doing, this is intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

174.  Notwithstanding this duty and obligation, the DEA has been required to take administrative action against Defendant Distributors to force compliance. The United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Division, reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012. The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision, including 76 actions involving orders to show cause and 41 actions involving immediate suspension orders.[3]  Some of these actions include the following:

(a)  On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement which resulted in the suspension of its DEA registration;

(b)  On November 28, 2007, the DEA issued an *Order to Show Cause and immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

(c)  On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

(d)  On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

(e)  On January 30, 2008, the DEA issued an *Order to Show Cause and*

---

[3] *The Drug Enforcement Administration's Adjudication of Registrant Actions*, United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Divisions, 1-2014-003 (May 2014).

*Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

(f)     On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 CFR § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program;"

(g)     On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia; Valencia, California; and Denver, Colorado;

(h)     On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center for failure to maintain effective controls against diversion of oxycodone;

(i)     On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center;

(j)     On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum of Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA; and

(k)     On July 11, 2017, Mallinckrodt agreed to pay the DEA $35 million to settle allegations for the company's failure to report suspicious orders of opioids and allegations of faulty record keeping. The investigation originally began in 2011 and federal investigators reportedly found 44,000 violations potentially exposing Mallinckrodt to $2.3 billion in fines.

175.     In another example, on August 9, 2013, the DEA issued an Order to Show Cause for Defendant MASTERS PHARMACEUTICALS, LLC to consider whether to revoke its distributor license for failing to monitor, report, and prevent the distribution of suspicious orders under federal law. *See,* Masters Pharmaceuticals, Inc.; Decision and Order, 80 FR 55418, 55419

(2015). The Order *inter alia* made allegations regarding Masters suspicious distributions of oxycodone to various pharmacies across the country, including 1.7 million dosage units . . . to a pharmacy located in Clark County from January 1, 2009 through November 30, 2010. *Id.* The registration was ultimately revoked and Masters appealed.

176. On June 30, 2017, the Court of Appeals for the D.C. Circuit issued an order in denying MASTERS PHARMACEUTICAL, INC.'s, Petition for Review seeking to overturn the DEA's revocation of Masters' DEA registration finding that there was substantial evidence which supported revocation because suspicious orders were not investigated. *See, Masters Pharmaceutical, Inc. v. Drug Enforcement Administration* (No. 15-1335).

177. Because Defendant Distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on these distributors to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system collapses.

178. The sheer volume of prescription opioids distributed to pharmacies in Clark County is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

179. Over the course of a decade, Defendant Distributors and Pharmacies failed to detect suspicious orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into Clark County.

180. Defendants ignored the law, paid the fines, and continued to unlawfully fill suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Clark County, and/or orders which Defendants knew or should have known were likely to be delivered and/or diverted into Clark County.

181. Defendant Pharmacies must exercise reasonable care under the circumstances. This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct, and thereafter realizes or should realize that such conduct has

created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to prevent the threatened harm.

182.    Like Defendant Distributors, Defendant Pharmacies also serve as gatekeepers in keeping drugs from entering the illicit market. As the "last line of defense," they are meant to be the drug experts in the healthcare delivery system and as such have considerable duties and responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a doctor if the prescription is not for a legitimate medical purpose.

183.    Therefore, Defendant Pharmacies are required to ensure that prescriptions for controlled substances are valid, and that they are issued for a legitimate medical purpose by practitioners acting in their usual course.  But by filling prescriptions of questionable or suspicious origin the Defendant Pharmacies have subsequently breached that duty.

184.    Upon information and belief and at all times relevant herein, questionable or suspicious prescriptions issued by Defendant Pharmacies include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities) for controlled substances compared to other practitioners in the area; (2) prescriptions which should last for a month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time; (4) prescriptions with quantities or dosages that differ from usual medical usage; (5) prescriptions that do not comply with standard abbreviations and/or contain no abbreviations; (6) photocopied prescriptions; and/or (7) prescriptions containing different handwritings.

185.    In addition to having common law duties, Defendant Pharmacies have a statutory duty under state law to track and report certain information to the Nevada State Board of Pharmacy. The Nevada State Board of Pharmacy has been licensing and regulating the practices of pharmaceutical wholesalers in Nevada since 1967.

186.    State law requires that statements of prior sales ("pedigrees") must be in "electronic form, if the transaction occurs on or after January 1, 2007 and also when one of two things is true:  (1) the selling wholesaler is not an authorized distributor for the manufacturer of the drug, or (2) The selling wholesaler bought the drug from another wholesaler.

187.   In addition, the mandatory data to be reported must include, but is not limited to as follows: (a) name, address, telephone number, and Nevada license number of the wholesaler making the pedigree; (b)  name and title of person certifying the pedigree's accuracy; (c)  invoice number and date for the transaction of which the pedigree is part; (d)  purchase order number and date for the transaction of which the pedigree is part; (e)  order number and date (if one) for the transaction of which the pedigree is part;(f)  the business name, address, and telephone number of each preceding seller of the drug; (g)  the business name, address, and telephone number of the customer to whom the reporting wholesaler sold the drug; (h)  the date of each preceding or subsequent sale; (i)  name of the drug; (j)  strength of the drug; (k)  size of the container; and/or (l)  number of containers.

188.   Because Defendant Pharmacies handle such large volumes of controlled substances, and are a last line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on these Defendants to maintain effective controls to prevent diversion of controlled substances. Should Defendants deviate from these checks and balances, the closed system collapses.

189.   For instance, on August 9, 2013, the DEA issued an Order to Show Cause for Defendant MASTERS PHARMACEUTICALS, LLC to consider whether to revoke its distributor license for failing to monitor, report, and prevent the distribution of suspicious orders under federal law. *See,* Masters Pharmaceuticals, Inc.; Decision and Order, 80 FR 55418, 55419 (2015).  The Order *inter alia* made allegations regarding Masters suspicious distributions of oxycodone to various pharmacies across the country, including 1.7 million dosage units . . . to a pharmacy located in Clark County, LAM'S PHARMACY, from January 1, 2009 through November 30, 2010. *Id.*

190.   The sheer volume of prescription opioids distributed to pharmacies in Clark County is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

191.  Over the course of a decade, Defendant Pharmacies failed to detect suspicious orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into Clark County.

192.  Yet, Defendants ignored the law, paid the fines, and continued to unlawfully fill suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Clark County, and/or orders which Defendants knew or should have known were likely to be delivered and/or diverted into Clark County.

193.  Additionally, PMBs were gate keepers with the duty to prevent the flood of opioids into the market. Instead of fulfilling their duties to Clark County residents, these Defendants further exacerbated the flood of opioids into the market.

194.  Pharmacy Benefit Managers (PBMs) are companies that administer prescription drug plans for entities that include insurers, self-insured employers, and state and federal government agencies (collectively, these entities are referred to as "plan sponsors"). PBMs review and pay claims; PBMs also review and decide the medications that are most effective for any given therapeutic use. In effect, a PBM's plan can determine what medications will (or will not) be available, at what quantity, and how difficult it may be for a prescriber to receive that medication (e.g., by requiring pre-authorization).

195.  In essence, because PBMs choose which drugs appear on their formularies, they wield significant influence over which drugs are disseminated throughout Plaintiffs' communities and how those drugs are paid for.

196.  Upon information and belief, PBM Defendants colluded with manufacturers who offer financial incentives, such as rebates and administrative fees, in exchange for benefit plan design, formulary placement, and drug utilization management that would result in more opioids entering the marketplace. PBMs earnings were maximized when manufacturers charged high list prices then paid large rebates and discounts to lower the actual price of the transaction.

197.  In addition to rebates, PBMs negotiate the payment of administrative fees, volume bonuses and other forms of consideration from manufacturers. The PBMs' ability to negotiate these incentives from drug manufacturers derives from their control of the factors driving utilization, including formulary development and plan design.

198.    PBMs require, and receive, incentives from Manufacturer Defendants to keep certain drugs on and off formularies.

199.    These incentives include the payment of rebates by Manufacturer Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits.

200.    Upon information and belief, when PBMs were asked by their clients to implement greater safeguards that limited access to opioids, PBMs refused.  Instead, the PBMs opted to receive lucrative rebates from drug manufacturers in exchange for making the manufacturers' prescription opioids as available and accessible as possible.

201.    By placing prescription opioids on their formularies and declining to impose appropriate limits on approval for its use, the PBM Defendants facilitated the proliferation and subsequent diversion of prescription opioids throughout Nevada and within Clark County, in particular.

202.    Upon information and belief, the practice of negotiating certain rebate percentages, maintaining opioids on a certain tier, lowering co-pays, and preventing prior authorizations was prevalent for all PBM Defendants and Manufacturer Defendants.  This practice was consistent nationwide: manufacturers provide financial incentives and, in return, the PBM Defendants agreed to make certain prescription opioids available without prior authorization and with low copayments.

203.    PBMs' complicity in the overall deceptive scheme is knowing and purposeful. Manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements and other hurdles that would slow down flow. Upon information and belief, the defendant PBM formularies include the majority of the opioids at issue in this case, often in preferred tiers, without quantity limits or prior authorization requirements.

204.    Moreover, at the same time that PBMs made it easier to obtain prescription opioids, they made it more difficult to receive treatment for addiction.

**D. Opioid Addiction in Nevada**

205.    In Nevada, the opioid epidemic is widespread, not localized to any particular city or county.  In 2016, Nevada was ranked as the <u>sixth highest</u> state for the number of milligrams of opioids distributed per adult according to a study by the DEA.  From 2009 to 2013, hospitals across the State had patients presenting to emergency rooms for heroin or opioid dependence, abuse, or poisoning.  Of those visits, 71% occurred in Clark County.



206.    According to data from the Nevada Division of Public and Behavioral Health, the total number of opioid-related hospitalizations in Nevada nearly doubled from 2010 to 2015. In 2010, the number of opioid-related emergency room hospitalizations in Nevada totaled about 4,518 patients.  By comparison, that number rose steeply to about 8,231 visits in a mere five years.  Similarly, in 2010, the number of opioid-related inpatient admissions statewide totaled 3,095 hospitalizations.  However, in a span of only five years, that number exponentially increased to 7,035 visits in 2015.  From 2010 to 2015, over 26% of opioid-related emergency room hospitalizations in Nevada were among patients aged 55 years and older.  Over 36% of opioid-related inpatient admissions in the State were among that same age group.

207.    Opioid-induced hospitalizations and emergency room visits are a significant area of health expenditure.  For instance in 2012, over $40 million was billed for opioid-induced

45

hospitalizations and over $7 million for similar emergency room visits in Southern Nevada alone.



Opioid-Related Hospitalizations, Nevada Residents, 2010-2015

208.    In addition to hospitalizations, the total number of opioid-related deaths continues to mount.  According to the Centers for Disease Control, nearly half of all U.S. opioid overdose deaths involve a prescription opioid.  In 2015, more than 15,000 people in the U.S. died from overdoses involving prescription opioids.

209.    Nevada has the <u>fourth highest</u> drug overdose mortality rate in the United States. From 2010 to 2015, approximately 2,800 deaths in Nevada have been attributed to opioid-related overdose.  It is estimated that 55% of those deaths were caused by natural and semi-synthetic opioids.

46



Opioid-Related Overdose Deaths, Nevada Residents, 2010-2015*

**E. The Consequences of Defendants' Fraudulent Scheme**

210.    Through direct promotional marketing, in conjunction with third-party Front Groups and KOLs, Defendants accomplished exactly what they set out to do: change the institutional and public perception of the risk-benefit assessments and standard of care for treating patients with chronic pain.  As a result, Nevada doctors began prescribing opioids long-term to treat chronic pain - something most would never have considered prior to Defendants' extensive marketing campaign.

211.    But for the misleading information disseminated by Defendants, prescribing physicians would not, in most instances, have prescribed opioids as medically necessary or reasonably required to address chronic pain.  The impact of Defendants' fraudulent marketing on doctors' prescribing and patients' use of opioids is evidenced by the increase in opioid prescribing nationally in concert with Defendants' marketing, and the consequences of opioid over-prescription - including addiction, overdose, and death.

**F. Prescription Opioids Fueling Secondary Market of Illegal Drugs**

212.    Defendants' successful efforts in expanding the market for opioids to new patients and chronic conditions has created an abundance of drugs available for criminal use and fueled a new wave of addiction and abuse. Defendants' behavior supplies both ends of the secondary market for opioids – producing both the inventory of narcotics to sell and the addicts to buy them. It has been estimated that the majority of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.   Because heroin is cheaper than prescription painkillers, many prescription opioid addicts migrate to heroin. Thus, prescription drug abuse is fueling the rise of heroin usage in Nevada.

213.    As a result, self-reported heroin use nearly doubled in the U.S. between 2007 and 2012, from 373,000 to 669,000 individuals and, in 2010, more than 3,000 people in the U.S.

1  died from heroin overdoses, also nearly double the rate in 2006; nearly 80% of those who used
2  heroin in the past year previously abused prescription opioids.



14  214.  While the use of opioids continues to take an enormous toll on Clark County and
15  its residents, pharmaceutical companies reap blockbuster profits.

16  215.  In 2014 alone, opioids generated $11 billion in revenue for drug companies,
17  Defendants experienced a material increase in sales, revenue, and profits from their fraudulent
18  advertising and other unlawful and unfair conduct as described above.

19  216.  Defendants should be held accountable for their misrepresentations and the
20  harms caused to Clark County as well as its residents thus giving rise to this lawsuit.

## FIRST CAUSE OF ACTION

*(Public Nuisance Against All Defendants)*

23  217.  Plaintiff repeats and reiterates the allegations previously set forth herein.

24  218.  This action is brought by Clark County for violations of statutory provisions
25  concerning public nuisance under NRS 202 *et seq*. Nevada law provides that a where a
26  controlled substance, including but not limited to opioids, is "unlawfully sold, served, stored,
27  kept, manufactured, used or given away" constitutes a public nuisance.

28  219.  The public nuisance created by Defendants' actions is substantial and
unreasonable. It has caused, and continues to cause, significant harm to the community. The

1   rates of opioid use resulting from Defendants' deceptive marketing efforts have caused harm to
2   the community

3       220.   As a result of Defendants' conduct, Plaintiff has incurred substantial costs
4   including but not limited to law enforcement action opioid-related to drug crimes, for addiction
5   treatment, and other services necessary for the treatment of people addicted to prescription
6   opioids.

7       221.   Defendants, and each of them, have contributed to, and/or assisted in creating
8   and maintaining a condition that is harmful to the health of Clark County citizens, "renders a
9   considerable number of persons insecure in life" and/or interferes with the comfortable
10   enjoyment of life in violation of Nevada law.

11       222.   Defendants knew or should have known that their marketing of opioid use would
12   create a public nuisance.

13       223.   Defendants' actions were, and continue to be, a substantial factor in opioids
14   becoming widely available and widely used. Defendants' actions were, and continue to be, a
15   substantial factor in prescribing physicians and prospective patients not accurately assessing
16   and weighing the risks and benefits of opioids for chronic pain. Without Defendants' actions,
17   opioid use would not have become so widespread, and the enormous public health hazard of
18   opioid overuse, abuse, and addiction that now exists would have been averted.

19       224.   The health and safety of the citizens of Clark County, including those who use,
20   have used or will use opioids, as well as those affected by users of opioids, is a matter of great
21   public interest and of legitimate concern.

22       225.   Defendants' conduct has affected and continues to affect a considerable number
23   of people within the physical boundaries of Clark County and is likely to continue to cause
24   significant harm to people who take opioids, their families, and the community at large.

25       226.   Defendants' conduct constitutes a public nuisance and, if unabated, will continue
26   to threaten the health, safety and welfare of the County's residents, creating an atmosphere of
27   fear and addiction that tears at the residents' sense of well-being and security. Clark County has
28   a clearly ascertainable right to abate conduct that perpetuates this nuisance.

227.    Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Clark County, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids. Such actions were inherently dangerous.

228.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without maintain effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in Clark County.

229.    Defendants' actions also created a qualified nuisance. Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

230.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

231.    The damages available to the Plaintiff include, inter alia, recoupment of governmental costs, flowing from an "ongoing and persistent" public nuisance which the government seeks to abate.

232.    Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

233.    As a direct result of Defendants' conduct, the County has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services. The County here seeks recovery for its own harm.

234.    The County has sustained specific and special injuries because its damages include, *inter alia,* health services, law enforcement expenditures, costs related to opioid addiction treatment and overdose prevention, and related costs.

235.    The County further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference with a right common to the public.

236.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of prescription opioid abuse and heroin use resulting from Defendants' abdication of their gate-keeping duties has caused harm to the entire community that includes, but is not limited to:

   a.  The high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

   b.  Nor have children escaped the opioid epidemic unscathed. Easy access to prescription opioids has made opioids a recreational drug of choice among teenagers; opioid use among teenagers is only outpaced by marijuana use. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

   c.  Even those County residents who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

   d.  The opioid epidemic has increased health care costs.

   e.  Employers have lost the value of productive and healthy employees.

51

f.  Defendants' failure to maintain effective controls against diversion of dangerously addictive prescription opioids for non-medical use and abuses has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g.  Defendants' dereliction of duties resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. Increased supply, due to Defendants' conduct, led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h.  The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on health care services and law enforcement in the County.

i.  The significant unreasonable interference with the public rights caused by Defendants' conduct has taxed the human, medical, public health, law enforcement, and financial resources of Clark County.

j.  Defendants' interference with the comfortable enjoyment of life in Clark County is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

237.  Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* abatement, compensatory damages, and punitive damages from the Defendant Wholesale Distributors for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

238.  The continued tortious conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

239. Therefore, Plaintiff's claims are subject to equitable tolling, stemming from Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information underlying its claims.

240. That Plaintiff has been required to prosecute this action and is entitled to attorneys' fees and costs as provided by Nevada statute.

241. That Plaintiff's general, special and punitive damages are in amounts in excess of $15,000.00.

### SECOND CAUSE OF ACTION

*(Common Law Public Nuisance against all Defendants)*

242. Plaintiff repeats and reiterates the allegations previously set forth herein.

243. Defendants, each of them, have contributed to, and/or assisted in creating and maintaining a condition that is harmful to the health of Clark County citizens or interferes with the comfortable enjoyment of life.

244. The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to the community and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid use resulting from Defendants' marketing efforts have caused harm to the community.

245. Defendants, and each of them, knew or should have known that their promotion of opioid use would create a public nuisance.

246. Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used.

247. Defendants' actions were, at the least, a substantial factor in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain.

248. Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

249. The health and safety of those individuals in Clark County, including those who use, have used or will use opioids, as well as those affected by users of opioids, is a matter of great public interest and of legitimate concern.

250.    The public nuisance created, perpetuated, and maintained by Defendants can be abated and further reoccurrence of such harm and inconvenience can be prevented.

251.    Defendants' conduct has affected and continues to affect a considerable number of people within the State is likely to continue to cause significant harm to chronic pain patients who take opioids, their families, and the community at large.

252.    That at all times hereinafter mentioned, upon information and belief, the above-described culpable conduct by Defendants was a proximate cause of injuries sustained by Plaintiff.

253.    That as a result of the aforesaid occurrence, Plaintiff has suffered extensive monetary and pecuniary losses and other compensatory damages were also incurred and paid, including necessary medical, hospital, and concomitant expenses.

254.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the County's residents, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. The County has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

255.    Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Clark County, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids. Such actions were inherently dangerous.

256.    Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without maintain effective controls against diversion, including monitoring, reporting,

54

1  and refusing shipment of suspicious orders, that the opioids would be diverted, and create an
2  opioid abuse nuisance in Clark County.

3       257.    Defendants' actions also created a qualified nuisance. Defendants acted
4  recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls
5  against diversion, thereby creating an unreasonable risk of harm.

6       258.    Defendants acted with actual malice because Defendants acted with a conscious
7  disregard for the rights and safety of other persons, and said actions have a great probability of
8  causing substantial harm.

9       259.    The damages available to the Plaintiff include, inter alia, recoupment of
10  governmental costs, flowing from an "ongoing and persistent" public nuisance which the
11  government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff
12  seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the
13  nuisance and harm created by Defendants' conduct.

14       260.    As a direct result of Defendants' conduct, the County has suffered actual injury
15  and damages including, but not limited to, significant expenses for police, emergency, health,
16  prosecution, corrections and other services. The County here seeks recovery for its own harm.

17       261.    The County has sustained specific and special injuries because its damages
18  include, *inter alia,* health services, law enforcement expenditures, costs related to opioid
19  addiction treatment and overdose prevention, and related costs.

20       262.    The County further seeks to abate the nuisance created by the Defendants'
21  unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference with a
22  right common to the public.

23       263.    The public nuisance created by Defendants' actions is substantial and
24  unreasonable – it has caused and continues to cause significant harm to the community, and the
25  harm inflicted outweighs any offsetting benefit. The staggering rates of prescription opioid
26  abuse and heroin use resulting from Defendants' abdication of their gate-keeping duties has
27  caused harm to the entire community that includes, but is not limited to:

28            a.   The high rates of use have led to unnecessary opioid abuse, addiction, overdose,
                  injuries, and deaths.

55

b. Nor have children escaped the opioid epidemic unscathed. Easy access to prescription opioids has made opioids a recreational drug of choice among Clark County teenagers; opioid use among teenagers is only outpaced by marijuana use. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

c. Even those County residents who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

d. The opioid epidemic has increased health care costs.

e. Employers have lost the value of productive and healthy employees.

f. Defendants' failure to maintain effective controls against diversion of dangerously addictive prescription opioids for non-medical use and abuses has created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

g. Defendants' dereliction of duties resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them. Increased supply, due to Defendants' conduct, led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

h. The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids has increased the demands on health care services and law enforcement in the County.

i. The significant unreasonable interference with the public rights caused by Defendants' conduct has taxed the human, medical, public health, law enforcement, and financial resources of Clark County.

56

1    j.   Defendants' interference with the comfortable enjoyment of life in Clark County

2         is unreasonable because there is little social utility to opioid diversion and abuse,

3         and any potential value is outweighed by the gravity of the harm inflicted by

4         Defendants' actions.

5    264.   Plaintiff seeks all legal and equitable relief as allowed by law, including *inter*

6    *alia* abatement, compensatory damages, and punitive damages from the Defendant Wholesale

7    Distributors for the creation of a public nuisance, attorney fees and costs, and pre- and post-

8    judgment interest.

9    265.   The continued tortious conduct by the Defendants causes a repeated or

10   continuous injury. The damages have not occurred all at once but have increased as time

11   progresses. The tort is not completed nor have all the damages been incurred until the

12   wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

13   266.   Therefore, Plaintiff's claims are subject to equitable tolling, stemming from

14   Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information

15   underlying its claims.

16   267.   That Plaintiff has been required to prosecute this action and is entitled to

17   attorneys' fees and costs as provided by Nevada statute.

18   268.   That Plaintiff's general, special and punitive damages are in amounts in excess

19   of $15,000.00.

20   **THIRD CAUSE OF ACTION**

21   *(Negligent Misrepresentation against all Defendants)*

22   269.   Plaintiff repeats and reiterates the allegations previously set forth herein.

23   270.   Defendants had a duty to exercise reasonable care in the marketing of opioids.

24   271.   Defendants were aware of the potentially dangerous situation involving opioids.

25   272.   Defendants marketed opioids in an improper manner by:

26   a.   overstating the benefits of chronic opioid therapy, promising improvement in

27        patients' function and quality of life, and failing to disclose the lack of evidence

28        supporting long-term use;

b. trivializing or obscuring opioids' serious risks and adverse outcomes, including the risk of addiction, overdose, and death;

c. overstating opioids' superiority compared with other treatments, such as other non-opioid analgesics, physical therapy, and other alternatives;

d. mischaracterizing the difficulty of withdrawal from opioids and the prevalence of withdrawal symptoms; and

e. marketing opioids for indications and benefits that were outside of the opioids' labels and not supported by substantial evidence.

273. It was Defendants' marketing — and not any medical breakthrough— that rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and abuse. The result has been catastrophic.

274. Defendants disseminated many of their false, misleading, imbalanced, and unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing materials. These KOLs and Front Groups were important elements of Defendants' marketing plans, which specifically contemplated their use, because they seemed independent and therefore outside FDA oversight. Through unbranded materials, Defendants, with their own knowledge of the risks, benefits and advantages of opioids, presented information and instructions concerning opioids generally that were contrary to, or at best, inconsistent with information and instructions listed on Defendants' branded marketing materials and drug labels. Defendants did so knowing that unbranded materials typically are not submitted to or reviewed by the FDA.

275. Defendants also marketed opioids through the following vehicles: (a) KOLs, who could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body of biased and unsupported scientific literature; (c) treatment guidelines; (d) CMEs; (e) unbranded patient education materials; and (f) Front Group patient-advocacy and professional organizations, which exercised their influence both directly and through Defendant-controlled KOLs who served in leadership roles in those organizations.

276. Defendants knew or should have known that opioids were unreasonably dangerous and could cause addiction.

58

277. Defendants' marketing was a factor in physicians, patients, and others to prescribe or purchase opioids.

278. As a direct and proximate result of Defendants' negligence, Plaintiff has suffered and continues to suffer injury, including but not limited to incurring excessive costs related to diagnosis, treatment, and cure of addiction to opioids, bearing the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, and law enforcement services for its residents and using County resources in relation to opioid use and abuse.

279. However, Defendants continued to design manufacture, market, distribute and sell opioids so as to maximize sales and profits at the expense of the health and safety of the public, in conscious disregard of the foreseeable harm caused by the opioid drug.

280. Defendants' conduct exhibits such an entire want of care as to establish that their actions were a result of fraud, ill will, recklessness, or willful and intentional disregard of Plaintiff's rights, and, therefore, Plaintiff is entitled to punitive damages.

281. The continued tortious conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

282. Therefore, Plaintiff's claims are subject to equitable tolling, stemming from Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information underlying its claims.

283. That Plaintiff has been required to prosecute this action and is entitled to attorneys' fees and costs as provided by Nevada statute.

284. That Plaintiff's general, special and punitive damages are in amounts in excess of $15,000.00.

## FOURTH CAUSE OF ACTION

*(Negligence against Defendant Distributors, Defendant Pharmacies, & Defendant Providers)*

285. Plaintiff incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

59

286.     Defendant Distributors and Pharmacies owed a non-delegable duty to exercise reasonable care in the distribution and/or sale of opioids.

287.     Defendants Distributors and Pharmacies further owe a non-delegable duty to Plaintiff to conform their behavior to the legal standard of reasonable conduct under the circumstances, in the light of the apparent risks.

288.     Defendant Distributors and Pharmacies breached this duty by failing to take any action to prevent or reduce the distribution of the opioids.

289.     Defendant Providers owed a duty to exercise reasonable care in the prescription of opioids.

290.     Defendant Providers further owe a duty to Plaintiff to conform their behavior to the legal standard of reasonable conduct under the circumstances, in light of the apparent risks, and in light of Defendant Providers' knowledge as it relates to the inherent dangers in the use of opioids.

291.     Defendant Providers breached this duty by, not only failing to recognize the risk of writing increased numbers of prescriptions for opioids, but by actively disregarding the dangers associated with opioid use, particularly for off-label purposes and in dosages far exceeding those recommended.

292.     Defendant Providers further breached their duty by providing false information to health insurance providers in order to obtain authorization and coverage for the opioid prescriptions.

293.     As a proximate result, Defendant Distributors and Pharmacies, as well as Defendant Providers, and their agents have caused Plaintiff to incur significant damages, including but not limited to costs related to diagnosis, treatment, and cure of addiction or risk of addiction to opioids. Clark County has borne the massive costs of these illnesses and conditions by having to provide necessary medical care, facilities, and services for treatment of County residents.

294.     Defendant Distributors and Pharmacies and Defendant Providers were negligent in failing to monitor and guard against third-party misconduct and participated and enabled such misconduct.

60

295.     Defendant Distributors and Pharmacies were negligent in disclosing to Plaintiff suspicious orders for opioids.

296.     Defendant Providers were negligent in writing improper prescriptions for opioids.

297.     Defendant Distributors and Pharmacies' and Defendant Providers' acts and omissions imposed an unreasonable risk of harm to others separately and/or combined with other Defendants.

298.     A negligent violation of this trust poses distinctive and significant dangers to the County and its residents from the diversion of opioids for non-legitimate medical purposes and addiction to the same by consumers.

299.     Defendant Distributors and Pharmacies and Defendant Providers were negligent in not acquiring and utilizing special knowledge and special skills that relate to the dangerous activity in order to prevent and/or ameliorate such distinctive and significant dangers.

300.     Defendant Distributors and Pharmacies are required to exercise a high degree of care and diligence to prevent injury to the public from the diversion of opioids during distribution.

301.     Defendant Providers are required to exercise a high degree of care to prescribe appropriate medications in appropriate dosages to avoid harm to patients and their communities.

302.     Defendant Distributors and Pharmacies breached their duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of its business.

303.     Defendant Providers breached their duty to exercise the degree of care required to protect their patients and their communities.

304.     Defendant Distributors and Pharmacies are in exclusive control of the distribution management of opioids that it distributed and/or sold in Clark County.

305.     Defendant Providers were active in providing patients within Clark County with the prescriptions for opioids that were supplied by the Defendant Distributors and Pharmacies

61

306.     Plaintiff is without fault and the injuries to the County and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the distribution of opioids.

307.     The continued tortious conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

308.     Therefore, Plaintiff's claims are subject to equitable tolling, stemming from Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information underlying its claims.

309.     That Plaintiff has been required to prosecute this action and is entitled to attorneys' fees and costs as provided by Nevada statute.

310.     That Plaintiff's general, special and punitive damages are in amounts in excess of $15,000.00.

## FIFTH CAUSE OF ACTION

*(Unjust Enrichment against all Defendants)*

311.     Plaintiff has expended substantial amounts of money to fix or mitigate the societal harms caused by Defendants' conduct.

312.     The expenditures by Plaintiff in providing healthcare services to people who use opioids have added to Defendants' wealth. These expenditures have helped sustain Defendants' businesses.

313.     Plaintiff has conferred a benefit upon Defendants, by paying for what may be called Defendants' externalities- the costs of the harm caused by Defendants' negligent distribution and sales practices.

314.     Defendants are aware of this obvious benefit, and that retention of this benefit is unjust.

315.     Defendants made substantial profits while fueling the prescription drug epidemic into Clark County.

316.    Defendants continue to receive considerable profits from the distribution of controlled substances into Clark County.

317.    Defendants have been unjustly enriched by their negligent, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

318.    It would be inequitable to allow Defendants to retain benefit or financial advantage.

319.    Plaintiff demands judgment against each Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

320.    Plaintiff is without fault and the injuries to the County and its residents would not have occurred in the ordinary course of events had Defendants used due care commensurate to the dangers involved in the distribution of opioids.

321.    The continued tortious conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing has not ceased. The public nuisance remains unabated.

322.    Therefore, Plaintiff's claims are subject to equitable tolling, stemming from Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information underlying its claims.

323.    That Plaintiff has been required to prosecute this action and is entitled to attorneys' fees and costs as provided by Nevada statute.

324.    That Plaintiff's general, special and punitive damages are in amounts in excess of $15,000.00.

## SIXTH CAUSE OF ACTION

*(Violation of the Nevada Racketeering Act against Defendants Purdue and the Sackler Defendants, Endo, Par Pharmaceutical, Mallinckrodt, SpecGx, Actavis, Teva, McKesson, Cardinal, Amerisourcebergen, and Express Scripts)*

325.    Clark County, both as a "person" who has sustained injury brings this claim for civil remedies under the Racketeering Act, NRS §§ 207.350 to 207.520, against the following Defendants, as defined above: Purdue and the Sackler Defendants, Endo, Par Pharmaceutical,

Mallinckrodt, SpecGX, Actavis, Teva, McKesson, Cardinal, AmerisourceBergen, and Express Scripts (collectively, for purposes of this Count, the "Racketeering Defendants").

326. The Racketeering Defendants conducted and continue to conduct their business through legitimate and illegitimate means in the form of a criminal syndicate or enterprise as defined by NRS §§ 207.370 and 207.380. At all relevant times, the Racketeering Defendants were "persons" under NRS § 0.039 and are included in the definition stating that a person is "any form of business or social organization...including, but not limited to, a corporation, partnership, association, trust or unincorporated organization."

327. Section 207.400 of the Racketeering Act makes it unlawful "for a person....employed by or associated with any enterprise to conduct or participate, directly or indirectly, in: (1) The affairs of the enterprise through racketeering activity; or (2) Racketeering activity through the affairs of the enterprise." NRS § 207.400(1)(c).

328. The term "enterprise" is defined as including a "sole proprietorship, partnership, corporation, business trust or other legal entity" as well as a "union, association or other group of persons associated in fact although not a legal entity." The definition includes "illicit as well as licit enterprises and governmental as well as other entities." NRS § 207.380.

329. For over a decade, the Racketeering Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, the Racketeering Defendants are not permitted to engage in a limitless expansion of their market through the unlawful sales of regulated painkillers. As "registrants," the Racketeering Defendants operated and continue to operate within the nationwide "closed-system" created under the Controlled Substances Act, 21 USC § 821, *et seq.* (the "CSA") and the Nevada Controlled Substances Act, §§ 453.005 to 453.730. Together, the CSA and Nevada Controlled Substances Act restrict the Racketeering Defendants' ability to manufacture or distribute Schedule II substances like opioids nationally and in Nevada by requiring them to: (1) register to manufacture or distribute opioids; (2) maintain effective controls against diversion of the controlled substances that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders of controlled substances, halt such unlawful sales, and report them

64

to the DEA, the Nevada Pharmacy Board, and the FDA; and (4) make sales within a limited quota set by the DEA for the overall production of Schedule II substances like opioids.

330.    The nationwide closed-system, including the establishment of quotas, was specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids from "legitimate channels of trade" to the illicit market by controlling the quantities of the basic ingredients needed for the manufacture of [controlled substances]."[4]

331.    Finding it impossible to legally achieve their ever increasing sales ambitions, members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently violated their duty under Nevada law to maintain effective controls against diversion of their drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful sales of suspicious orders, and to notify the DEA, the Nevada Board of Pharmacy, and the FDA of suspicious orders.[5] As discussed in detail below, through the Racketeering Defendants' scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of painkillers which, in turn, artificially and illegally increased the annual production   quotas throughout the United States for opioids allowed by the DEA.[282] In doing so, the Racketeering Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them to generate obscene profits.

332.    Defendants' illegal scheme was hatched by an association-in-fact enterprise between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect harmony by each of them. In particular, each of the Racketeering Defendants were associated with, and conducted or participated in, the affairs of the racketeering enterprise (defined below and referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in the unlawful sales of opioids, and to deceive the public, and federal and state regulators into believing that the Racketeering Defendants were faithfully fulfilling their statutory obligations. The Racketeering Defendants' scheme allowed them to make billions in unlawful sales of opioids and, in turn, increase and/or maintain high production quotas with the purpose of

---

[4] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[5] 21 USC § 823(a)(1), (b)(1); 21 CFR § 1301.74(b)-(c).

1    ensuring unlawfully increasing revenues, profits, and market share. As a direct result of the
2    Racketeering Defendants' deceptive scheme, course of conduct, and pattern of racketeering
3    activity, they were able to extract billions of dollars of revenue from the addicted American
4    public, while entities like Clark County, Nevada experienced tens of millions of dollars of injury
5    caused by the reasonably foreseeable consequences of the prescription opioid addiction
6    epidemic. As explained in detail below, the Racketeering Defendants' misconduct violated §
7    207.400 of the Racketeering Act and Plaintiff is entitled to treble damages for its injuries under
8    NRS § 207.410.

9        333.    Alternatively, the Racketeering Defendants were members of a legal entity
10   enterprise within the meaning of NRS § 207.380 through which the Racketeering
11   Defendants conducted their pattern of racketeering activity in Nevada and throughout the
12   United States. Specifically, the Healthcare Distribution Alliance (the "HDA")[6] is a distinct legal
13   entity that satisfies the definition of a racketeering enterprise. The HDA is a non-profit
14   corporation formed under the laws of the District of Columbia and doing business in Virginia.
15   As a non-profit corporation, HDA qualifies as an "enterprise" within the definition set out in §
16   207.380 because it is a corporation and a legal entity.

17       334.    On information and belief, each of the Racketeering Defendants is a member,
18   participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion
19   Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

20       335.    Each of the Racketeering Defendants is a legal entity separate and distinct from
21   the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the
22   Racketeering Defendants. Therefore, the HDA exists separately from the Opioid Diversion
23   Enterprise, and each of the Racketeering Defendants exists separately from the HDA.
24   Therefore, the HDA may serve as a racketeering enterprise.

25       336.    The legal and association-in-fact enterprises alleged in the previous and
26   subsequent paragraphs were each used by the Racketeering Defendants to conduct the Opioid
27   Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and
28

---

[6] Health Distribution Alliance, History, Health Distribution Alliance, (last accessed on September 15, 2017), https://www.healthcaredistribution.org/about/hda-history.

1   association- in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded

2   in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

3   ### A. THE OPIOID DIVERSION ENTERPRISE

4   337.    Throughout the United States—and within the Clark County, Nevada—the

5   Racketeering Defendants have operated at all relevant times under a "closed distribution

6   system" of quotas that governs the production and distribution of prescription opioid drugs.

7   The Opioids Diversion Enterprise is an ongoing and continuing business organization that

8   created and maintained systemic links for a common purpose: To protect and maximize their

9   profitability under this quota system through the unlawful sale of opioids. The Racketeering

10  Defendants participated in the Opioids Diversion Enterprise through a pattern of racketeering

11  activity, which includes multiple violations of Nevada state criminal law.

12  338.    Recognizing that there is a need for greater scrutiny over controlled substances

13  due to their potential for abuse and danger to public health and safety, the United States

14  Congress enacted the Controlled Substances Act in 1970.[7] The CSA and its implementing

15  regulations created a closed-system of distribution for all controlled substances and listed

16  chemicals.[8] Congress specifically designed the closed chain of distribution to prevent the

17  diversion of legally produced controlled substances into the illicit market.[9] As reflected in

18  comments from United States Senators during deliberation on the CSA, the "[CSA] is designed

19  to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof

20  balls."[10] Congress was concerned with the diversion of drugs out of legitimate channels of

21  distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled

22  substances] out of legitimate channels into the illegal market."[11] Moreover, the closed-system

23  was specifically designed to ensure that there are multiple ways of identifying and preventing

24

25  [7] Joseph T. Rannazzisi Decl. ¶4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*,
    D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

26  [8] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.

    [9] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 USC § 801(20; 21 USC §§ 821-824, 827,

27  880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

    [10] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments

28  of Sen. Dodd, Jan 23, 1970).

    [11] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate,
    May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

1     diversion through active participation by registrants within the drug delivery chain.[12] All

2     registrants – manufacturers and distributors alike – must adhere to the specific security,

3     recordkeeping, monitoring and reporting requirements that are designed to identify or prevent

4     diversion.[13] When registrants at any level fail to fulfill their obligations, the necessary checks

5     and balances collapse.[14] The result is the scourge of addiction that has occurred.

6        339.     Central to the closed-system created by the CSA was the directive that the DEA

7     determine quotas of each basic class of Schedule I and II controlled substances each year. The

8     quota system was intended to reduce or eliminate diversion from "legitimate channels of trade"

9     by controlling the "quantities of the basic ingredients needed for the manufacture of

10    [controlled substances], and the requirement of order forms for all transfers of these drugs."[15]

11    When evaluating production quotas, the DEA was instructed to consider the following

12    information:

13            a.    Information provided by the United States Department of Health and Human
                 Services;

14

15            b.    Total net disposal of the basic class by all manufacturers;

16            c.    Trends in the national rate of disposal of the basic class;

17            d.    An applicant's production cycle and current inventory position;

18

19            e.    Total actual or estimated inventories of the class and of all substances
                 manufactured from the class and trends in inventory accumulation; and

20

21            f.    Other factors such as: changes in the currently accepted medical use of
                 substances manufactured for a basic class; the economic and physical

22

---

23    [12] *See* Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States
     Senate, July 18, 2012 (available at

24    https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12- dea-
     rannazzisi.pdf).

25    [13] *Id.*; 16.19.8.13(F) NMAC (requiring anyone licensed to distribute Schedule II controlled substances in Nevada to
     "report any theft, suspected theft, diversion or other significant loss of any prescription drug or device to the board

26    and where applicable, to the DEA."); 16.19.20.48(A) NMSA ("All applicants and registrants shall provide effective
     controls and procedures to guard against theft and diversion of controlled substances.").

27    [14] Joseph T. Rannazzisi Decl. ¶ 10, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, Case No. 12-cv-
     185 (Document 14-2 February 10, 2012).

28    [15] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International
     Narcotics Control, United States Senate, May 5, 2015 (available at
     https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

availability of raw materials; yield and sustainability issues; potential disruptions to production; and unforeseen emergencies.[16]

340.　Under the CSA, as incorporated into Nevada law, it is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[17]

341.　At all relevant times, the Racketeering Defendants operated as an enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their duty under Nevada law to identify, investigate, halt or report suspicious orders of opioids and diversion of their drugs into the illicit market, *see generally* **IV.E.1** *supra*, in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The Racketeering Defendants conducted their pattern of racketeering activity in Clark County, Nevada and throughout the United States through this enterprise.

342.　The Racketeering Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the Racketeering Defendants were filling on a daily basis -- leading to the diversion of a tens of millions of doses of prescriptions opioids into the illicit market.

343.　The Racketeering Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and illegal trafficking in and distribution of prescription opioids, in violation of Nevada law.

344.　Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants

---

[16] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at
https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[17] *Id.* (citing 21 USC 842(b)); NRS § 453.385 (regulations must ensure "compliance with, but may be more stringent than required by, applicable federal law governing controlled substances and the rules, regulations and orders of any federal agency administering such law.")); NRS § 453.146 (the Nevada Board of Pharmacy may consider findings of "the federal Food and Drug Administration or the Drug Enforcement Administration as prima facie evidence relating to one or more of the determinative factors.").

had to agree to implement similar tactics regarding reports and representations about their systems for controlling against diversion, and refusal to report suspicious orders.

345.    The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, nationwide per capita purchases of methadone, hydrocodone, and oxycodone increased 13-fold, 4- fold, and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the county with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[18] On information and belief, the Opioid Diversion Enterprise has been ongoing nationally and in Clark County, Nevada for at least the last decade.[19]

346.    The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. But, it was not until recently that State and federal regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public and Clark County, Nevada and its citizens.

347.    At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each Racketeering Defendant; (b) was separate and distinct from the pattern of racketeering in which the Racketeering Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Racketeering Defendants; (d) characterized by interpersonal relationships among the Racketeering Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the Racketeering Defendants would have a larger pool of prescription opioids from which to

---

[18] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S. *Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States.* Am J Public Health. 2014;104(2):e52-9.
[19] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy- amid-drug-epidemic.

1  profit.

2      348.    The Opioid Diversion Enterprise functioned by selling prescription opioids.
3  While there may be some legitimate uses and/or needs for prescription opioids, the
4  Racketeering Defendants, through their illegal enterprise, engaged in a pattern of racketeering
5  activity that involves a fraudulent scheme to increase revenue by violating State and Federal
6  laws requiring the maintenance of effective controls against diversion of prescription opioids,
7  and the identification, investigation, and reporting of suspicious orders of prescription opioids
8  destined for the illicit drug market. The goal of Defendants' scheme was to increase profits
9  from opioid sales. But, Defendants' profits were limited by the production quotas set by the
10  DEA, so the Defendants refused to identify, investigate and/or report suspicious orders of their
11  prescription opioids being diverted into the illicit drug market. The end result of this strategy
12  was to increase and maintain artificially high production quotas of opioids so that there was a
13  larger pool of opioids for Defendants to manufacture and distribute for public consumption.

14      349.    Within the Opioid Diversion Enterprise, there were interpersonal relationships
15  and common communication by which the Racketeering Defendants shared information on a
16  regular basis. These interpersonal relationships also formed the organization of the Opioid
17  Diversion Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships
18  and communication network for the purpose of conducting the enterprise through a pattern of
19  racketeering activity.

20      350.    Each of the Racketeering Defendants had a systematic link to each other through
21  joint participation in lobbying groups, trade industry organizations, contractual relationships
22  and continuing coordination of activities. The Racketeering Defendants participated in the
23  operation and management of the Opioid Diversion Enterprise by directing its affairs, as
24  described herein. While the Racketeering Defendants participated in, and are members of, the
25  enterprise, they each have a separate existence from the enterprise, including distinct legal
26  statuses, different offices and roles, bank accounts, officers, directors, employees, individual
27  personhood, reporting requirements, and financial statements.

28      351.    The Racketeering Defendants exerted substantial control over the Opioid

71

Diversion Enterprise by their membership in the Pain Care Forum ("PCF"), the HDA, and through their contractual relationships.

352.    PCF has been described as a coalition of drugmakers, trade groups and dozens of non-profit organizations supported by industry funding. The PCF recently became a national news story when it was discovered that lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade.

353.    The Center for Public Integrity and The Associated Press obtained "internal documents shed[ding] new light on how drugmakers *and their allies* shaped the national response to the ongoing wave of prescription opioid abuse."[20] Specifically, PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[21]

354.    Not surprisingly, each of the Racketeering Defendants who stood to profit from lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[22] In 2012, membership and participating organizations included the HDA (of which all Racketeering Defendants are members), Purdue, Actavis, and Teva.[23] Each of the Manufacturer Defendants worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer Defendants were not alone. The Distributor Defendants actively participated, and continue to participate in the PCF, at a minimum, through their trade organization, the HDA.[24] Plaintiff is informed and believes that the Distributor Defendants participated directly in the PCF as well.

355.    The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis,

---

[20] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy- amid-drug-epidemic (emphasis added).
[21] *Id.*
[22] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings- Schedule-amp.pdf.
[23] *Id.* Plaintiff is informed and believes that Mallinckrodt became an active member of the PCF sometime after 2012.
[24] *Id.*

1    unless otherwise noted. Local members were "encouraged to attend in person" at the monthly

2    meetings. And, the meeting schedule indicates that the quarterly and year-end meetings

3    included a "Guest Speaker."

4    356.    The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the

5    Defendants participated in meetings on a monthly basis, either directly or through their trade

6    organization, in a coalition of drugmakers and their allies whose sole purpose was to shape

7    the national response to the ongoing prescription opioid epidemic, including the concerted

8    lobbying efforts that the PCF undertook on behalf of its members.

9    357.    Second, the HDA – or Healthcare Distribution Alliance – led to the formation

10   of interpersonal relationships and an organization between the Racketeering Defendants.

11   Although the entire HDA membership directory is private, the HDA website confirms that each

12   of the Distributor Defendants and the Manufacturer Defendants named in the Complaint,

13   including Actavis, Purdue, and Mallinckrodt, were members of the HDA.[25] The HDA and each

14   of the Distributor Defendants eagerly sought the active membership and participation of the

15   Manufacturer Defendants by advocating that one of the benefits of membership included the

16   ability to develop direct relationships between Manufacturers and Distributors at high executive

17   levels.

18   358.    In fact, the HDA touted the benefits of membership to the Manufacturer

19   Defendants, advocating that membership included the ability to, among other things, "network

20   one on one with manufacturer executives at HDA's members-only Business and Leadership

21   Conference," "networking with HDA wholesale distributor members," "opportunities to host

22   and sponsor HDA Board of Directors events," "participate on HDA committees, task forces

23   and working groups with peers and trading partners," and "make connections."[26] Clearly, the

24   HDA and the Distributor Defendants believed that membership in the HDA was an opportunity

25   to create interpersonal and ongoing organizational relationships between the Manufacturers and

26   Distributors.

27

28   [25] Manufacturer Membership, Healthcare Distribution Alliance, (accessed on September 14, 2017),
     https://www.healthcaredistribution.org/about/membership/manufacturer.
     [26] Manufacturer Membership Benefits, Healthcare Distribution Alliance, (accessed on September 14, 2017),
     https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership- benefits.ashx?la=en.

359.     The application for manufacturer membership in the HDA further indicates the level of connection that existed between the Racketeering Defendants.[27] The manufacturer membership application must be signed by a "senior company executive," and it requests that the manufacturer applicant identify a key contact and any additional contacts from within its company. The HDA application also requests that the manufacturer identify its current distribution information and its most recent year end net sales through any HDA distributors, including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[28]

360.     After becoming members, the Distributors and Manufacturers were eligible to participate on councils, committees, task forces and working groups, including:

   a.   Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."[29]

   b.   Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e- commerce." Participation in this committee includes distributors and manufacturer members.[30]

   c.   Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain." Participation in this committee includes distributors and manufacturer members.[31]

   d.   Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors

---

[27] _Manufacturer Membership Application_, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership-application.ashx?la=en.
[28] _Id._
[29] _Councils and Committees_, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees.
[30] _Id._
[31] _Id._

and manufacturer members.[32]

e. Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.[33]

f. Bar Code Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[34]

g. eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[35]

h. ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.[36]

i. Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.[37]

361.   The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

362.   The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[38] The conferences also gave the Manufacturer and Distributor

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/blc-for- manufacturers.

Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[39] The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, it is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[40]

363.    Third, the Racketeering Defendants maintained their interpersonal relationships by working together and exchanging information and driving the unlawful sales of their opioids through their contractual relationships, including chargebacks and vault security programs.

364.    The Manufacturer Defendants engaged in an industry-wide practice of paying rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[41] As reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the HDA, there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or chargebacks on their prescription opioid sales.[42] On information and belief, these contracts were negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants provided the Manufacturer Defendants with detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[43] The Manufacturer Defendants used this information to gather high-level data regarding overall distribution and direct the Distributor Defendants on how to most effectively sell the prescription opioids.

365.    The contractual relationships among the Racketeering Defendants also include

---

[39] Id.

[40] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015- distribution-management-conference.

[41] Lenny Bernstein & Scott Higham, *The government's struggle to hold opioid manufacturers accountable*, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; *see also*, Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter- manufacturers.png; Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter- manufacturers.png; Letters From Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on September 14, 2017), http://www.purduepharma.com/payers/managed- markets/.

[42] Id.

[43] Webinars, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.

vault security programs. The Racketeering Defendants are required to maintain certain security protocols and storage facilities for the manufacture and distribution of their opiates. Plaintiff is informed and believes that manufacturers negotiated agreements whereby the Manufacturers installed security vaults for Distributors in exchange for agreements to maintain minimum sales performance thresholds. Plaintiff is informed and believes that these agreements were used by the Racketeering Defendants as a tool to violate their reporting and diversion duties under Nevada law,[44] in order to reach the required sales requirements.

366. Taken together, the interaction and length of the relationships between and among the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were not two separate groups operating in isolation or two groups forced to work together in a closed system. The Racketeering Defendants operated together as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care Forum are but two examples of the overlapping relationships and concerted joint efforts to accomplish common goals and demonstrate that the leaders of each of the Racketeering Defendants were in communication and cooperation.

367. According to articles published by the Center for Public Integrity and The Associated Press, the Pain Care Forum – whose members include the Manufacturers and the Distributors' trade association – has been lobbying on behalf of the Manufacturers and Distributors for "more than a decade."[45] From 2006 to 2016 the Distributors and Manufacturers worked together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital and in all 50 statehouses on issues including opioid-related measures.[46] Similarly, the HDA has continued its work on behalf of Distributors and Manufacturers, without interruption, since at least 2000, if not longer.[47]

---

[44] *See, e.g.*, NRS § 453.231(a).
[45] Matthew Perrone & Ben Wieder, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, The Ctr. for Pub. Integrity, https://www.publicintegrity.org/2016/09/19/20201/pro ainkiller-echo-chamber-shaped-policy-amid-drug-epidemic (last updated Dec. 15, 2016, 9:09 AM).
[46] *Id.*
[47] HDA History, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/hda-history.

368.    Defendants, individually and collectively through trade groups in the industry, pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any violations of law before a suspension order can be issued.[48]

369.    As described above, the Racketeering Defendants began working together as early as 2006 through the Pain Care Forum and/or the HDA to further the common purpose of their enterprise. Plaintiff is informed and believes that the Racketeering Defendants worked together as an ongoing and continuous organization throughout the existence of their enterprise.

**CONDUCT OF THE OPIOID DIVERSION ENTERPRISE**

370.    The Racketeering Defendants conducted the Opioids Diversion Enterprise, and participated in the enterprise, by engaging in a pattern of racketeering activity, as prohibited by NRS § 207.400.

371.    During the time period alleged in this Complaint, the Racketeering Defendants exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by fraudulently failing to comply with their obligations under Nevada law (and federal law, as incorporated into Nevada law) to identify, investigate and report suspicious orders of opioids in order to prevent diversion of those highly addictive substances into the illicit market, to halt such unlawful sales as set forth below. In doing so, the Racketeering Defendants increased production quotas and generated unlawful profits.

372.    The Racketeering Defendants disseminated statements that were false and misleading – either affirmatively or through half-truths and omissions – to the general public, Clark County, Clark County consumers, and the Nevada Board of Pharmacy, claiming that they were complying with their obligations to maintain effective controls against diversion of

---

[48] *See* Bernstein & Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control, supra*; Bernstein & Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis, supra*; Eyre, *supra*.

their prescription opioids.

373.    The Racketeering Defendants disseminated statements that were false and misleading – either affirmatively or through half-truths and omissions – to the general public Clark County, Clark County consumers, and the Nevada Board of Pharmacy, claiming that they were complying with their obligations to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids.

374.    The Racketeering Defendants disseminated statements that were false and misleading – either affirmatively or through half-truths and omissions – to the general public, Clark County, Clark County consumers, and the Nevada Board of Pharmacy claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

375.    The Opioid Diversion Enterprise worked to scale back regulatory oversight by the DEA that could interfere with the Racketeering Defendants' ability to distribute their opioid drugs in Clark County, Nevada. To distribute controlled substances in Nevada, the Racketeering Defendants had to be able to demonstrate possession of a current Nevada registration. *See* NRS § 453.226. Even if they held a current registration, the Racketeering Defendants' ability to obtain a Nevada registration could be jeopardized by past suspension or revocation of their DEA registration. NRS § 453.231(1)(g).

376.    The Racketeering Defendants paid nearly $800 million dollars to influence local, state and federal governments throughout the United States and in Nevada, through joint lobbying efforts as part of the Pain Care Forum. The Racketeering Defendants were all members of the Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids—protecting the Racketeering Defendants' ability to distribute prescription opioids in Nevada.

377.    The Racketeering Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

378. The Racketeering Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[49]

379. The Racketeering Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiff is informed and believes that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, Plaintiff is informed and believes that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

380. The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the Racketeering Defendants.

381. The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the Racketeering Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[50] On information and belief, the "know your customer" questionnaires informed the Racketeering Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment

---

[49] *See* HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and- finance/hdma-now-healthcare-distribution-alliance/; Bernstein & Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control, supra*; Bernstein & Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis, supra*; Eyre, *supra*.

[50] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

382. The Racketeering Defendants refused to identify, investigate and report suspicious orders to the DEA, the Nevada Board of Pharmacy, and the FDA when they became aware of the same despite their actual knowledge of drug diversion rings. The Racketeering Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[51] and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders – all for failure to report suspicious orders.[52]

383. Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and to identify suspicious orders and report them to the DEA and State governments, including the State of Nevada.

384. The Racketeering Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and to ensure that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the Racketeering Defendants ensured that the DEA had no basis for refusing to increase, or to decrease, the production quotas for prescription opioids due to diversion of suspicious orders. The Racketeering Defendants influenced the DEA production quotas in the following ways:

      a.  The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

      b.  The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the

---

[51] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[52] *Id.*

councils, committees, task forces, and working groups;

c. The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioid prescriptions filled by the Distributor Defendants;

d. The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

e. The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[53]

f. The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

g. The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

h. The Racketeering Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

i. The Racketeering Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

j. The Racketeering Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

385. The scheme devised and implemented by the Racketeering Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, in intentional violation of Nevada law, and all designed and operated to ensure the continued unlawful sale of controlled substances.

---

[53] Harriet Ryan, et al., *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

**PATTERN OF RACKETEERING ACTIVITY**

386.    The Racketeering Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in NRS § 207.390, by at least two crimes related to racketeering (NRS § 207.360), trafficking in controlled substances (NRS §§ 207.360(22); 453.3395), multiple transactions involving deceit in the course of an enterprise (NRS §§ 207.360(35); 205.377) and distribution of controlled substances or controlled substance analogues (NRS § 453.331), and punishable by imprisonment of at least one year, with the intent of accomplishing activities prohibited by § 207.400 of the Racketeering Act.

387.    The Racketeering Defendants committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of NRS §§ 207.360), within a five-year period. The multiple acts of racketeering activity that the Racketeering Defendants committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by the Racketeering Defendants' regular use of the facilities, services, distribution channels, and employees of the Opioid Diversion Enterprise.

388.    The Racketeering Defendants committed these predicate acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the Opioids Diversion Enterprise by conducting activities prohibited by NRS §§ 207.360, 207.390, 207.400.

389.    The predicate acts all had the purpose of generating significant revenue and profits for the Racketeering Defendants while Clark County was left with substantial injury to its business through the damage that the prescription opioid epidemic caused. The predicate acts were committed or caused to be committed by the Racketeering Defendants through their participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme. The predicate acts were related and not isolated events.

390.    The pattern of racketeering activity alleged herein and the Opioid Diversion Enterprise are separate and distinct from each other. Likewise, the Racketeering Defendants

1    are distinct from the enterprise.

2    391.    The pattern of racketeering activity alleged herein is continuing as of the date
3    of this Third Amended Complaint and, upon information and belief, will continue into the
4    future unless enjoined by this Court.

5    392.    Many of the precise dates of the Racketeering Defendants' criminal actions at
6    issue here have been hidden and cannot be alleged without access to Defendants' books and
7    records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise
8    alleged herein depended upon secrecy.

9    393.    Each instance of racketeering activity alleged herein was related, had similar
10   purposes, involved the same or similar participants and methods of commission, and had
11   similar results affecting similar victims, including consumers in the Clark County, Nevada.
12   Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their
13   scheme to increase and maintain their increased profits, without regard to the effect such
14   behavior would have on Clark County, Nevada, Clark County, Nevada consumers, or other
15   Clark County, Nevada citizens. In designing and implementing the scheme, at all times
16   Defendants were cognizant of the fact that those in the manufacturing and distribution chain
17   rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to
18   provide objective and reliable information regarding Defendants' products and their
19   manufacture and distribution of those products. The Racketeering Defendants were also aware
20   that Clark County and the citizens of this jurisdiction rely on the Racketeering Defendants to
21   maintain a closed system and to protect against the non-medical diversion and use of their
22   dangerously addictive opioid drugs.

23   394.    By intentionally refusing to report and halt suspicious orders of their
24   prescription opioids, the Racketeering Defendants engaged in a deceptive scheme and unlawful
25   course of conduct constituting a pattern of racketeering activity.

26   395.    It was foreseeable to Defendants that refusing to report and halt suspicious
27   orders would harm Clark County by allowing the flow of prescription opioids from appropriate
28   medical channels into the illicit drug market.

396.    The Racketeering Defendants did not undertake the predicate acts described herein in isolation, but as part of a common scheme. Various other persons, firms, and corporations, including third-party entities and individuals not named as defendants in this Third Amended Complaint, may have contributed to and/or participated in the scheme with the Racketeering Defendants in these offenses and have performed acts in furtherance of the scheme to increase revenues, increase market share, and /or minimize the losses for the Racketeering Defendants.

397.    The Racketeering Defendants aided and abetted others in the violations of NRS §§ 207.360, 207.390, and 207.400, while sharing the same criminal intent as the principals who committed those violations, thereby rendering them indictable as principals in the offenses.

398.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

1.   **The Racketeering Defendants Conducted the Opioid Diversion Enterprise through Acts of Fraud.**

399.    Fraud consists of the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations.

400.    The Racketeering Defendants' fraudulent conduct, practices, and representations include, but are not limited to:

a.   Misrepresentations to facilitate Defendants' DEA registrations, which could be a bar to their registrations with the Nevada Board of Pharmacy;

b.   Requests for higher aggregate production quotas, individual production quotas, and procurement quotas to support Defendants' manufacture and distribution of controlled substances they knew were being or would be unlawfully diverted;

c.   Misrepresentations and misleading omissions in Defendants' records and reports that were required to be submitted to the DEA and the Nevada Board of Pharmacy pursuant to Nevada Administrative Code provisions;

d.   Misrepresentations and misleading omissions in documents and communications related to the Defendants' mandatory DEA reports that would affect Nevada registrant status; and

e.   Rebate and chargeback arrangements between the Manufacturers and the

85

Distributors that Defendants used to facilitate the manufacture and sale of controlled substances they knew were being or would be unlawfully diverted into and from Nevada.

401. Specifically, the Racketeering Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market, all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The Racketeering Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which they could profit.

402. At the same time, the Racketeering Defendants misrepresented the superior safety features of their order monitoring programs, their ability to detect suspicious orders, their commitment to preventing diversion of prescription opioids, and that they complied with all state and federal regulations regarding the identification and reporting of suspicious orders of prescription opioids.

403. The Racketeering Defendants intended to and did, through the above-described fraudulent conduct, practices, and representations, intentionally misappropriate funds from Clark County and from private insurers, in excess of $500, including, for example:

    a. Costs incurred by and resources diverted from Clark County infrastructure and health care providers;

    b. Any and all cost or payments related to benefits of Clark County employees;

404. Many of the precise dates of the fraudulent acts and practices have been deliberately hidden and cannot be alleged without access to Defendants' books and records. But, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of fraud occurred.

**The Racketeering Defendants Unlawfully Trafficked in and Distributed Controlled Substances.**

405. Defendants' racketeering activities also included violations of the Nevada Controlled Substances Act, § 453.3395, and each act is chargeable or indictable under the laws of Nevada and punishable by imprisonment for more than one year. *See* NRS § 207.360(22).

406.    Under Nevada law (NRS § 453.3395), it is unlawful to "knowingly or intentionally sell[], manufacture[], deliver[] or bring[] into this state"— prescription opioids, which are Schedule II controlled substances that are narcotic drugs, except as authorized by the Nevada Controlled Substances Act.

407.    The Racketeering Defendants intentionally trafficked in prescription opioid drugs, in violation of Nevada law, by manufacturing, selling, and/or distributing those drugs in Nevada in a manner not authorized by the Nevada Controlled Substances Act. The Racketeering Defendants failed to act in accordance with the Nevada Controlled Substances Act because they did not act in accordance with registration requirements as provided in that Act.

408.    Among other infractions, the Racketeering Defendants did not comply with 21 USC § 823 and its attendant regulations (*e.g.*, 21 CFR § 1301.74)[54] which are incorporated into Nevada state law, or the Nevada Pharmacy Board regulations. The Racketeering Defendants failed to furnish notifications and omitted required reports to the Nevada Board.

409.    Plaintiff is informed and believes that the Racketeering Defendants failed to furnish required notifications and make reports as part of a pattern and practice of willfully and intentionally omitting information from their mandatory reports to the DEA, as required by 21 CFR § 1301.74, throughout the United States.

410.    For example, the DEA and DOJ began investigating McKesson in 2013 regarding its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015, McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted to violating the CSA and agreed to pay $150 million and have some of its DEA registrations suspended on a staggered basis. The settlement was finalized on January 17, 2017.[55]

---

[54] Once again, throughout this Count and in this Complaint Plaintiff cites federal statutes and federal regulations to state the duty owed under Nevada tort law, *not* to allege an independent federal cause of action or substantial federal question. *See, e.g.*, *Herrera*, 2003-NMSC-018, ¶7.

[55] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017), http://www.mckesson.com/about-mckesson/newsroom/press- releases/2017/mckesson-finalizes-settlement-with-doj-and-dea-to-resolve-past-claims/.

411.     Purdue's experience in Los Angeles is another striking example of Defendants' willful violation of their duty to report suspicious orders of prescription opioids. In 2016, the Los Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles yet failed to alert the DEA.[56] The LA Times uncovered that Purdue began tracking a surge in prescriptions in Los Angeles, including one prescriber in particular. A Purdue sales manager spoke with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted about this?" and adding that she felt "very certain this is an organized drug ring."[57] Despite knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not tell authorities what it knew about Lake Medical until several years later when the clinic was out of business and its leaders indicted. By that time, 1.1 million pills had spilled into the hands of Armenian mobsters, the Crips gang and other criminals."[58]

412.     Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt, arguing that it ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida between 2008 and 2012.[59] After six years of DEA investigation, Mallinckrodt agreed to a settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that Mallinckrodt's response was that everyone knew what was going on in Florida, but they had no duty to report it.[60]

413.     The Racketeering Defendants' pattern and practice of willfully and intentionally omitting information from their mandatory reports is evident in the sheer volume of enforcement actions available in the public record against the Distributor Defendants.[61] For example:

---

[56] Harriet Ryan, et al., *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

[57] *Id.*

[58] *Id.*

[59] Bernstein & Higham, *The government's struggle to hold opioid manufacturers accountable, supra.* This number accounted for 66% of all oxycodone sold in the state of Florida during that time.

[60] *Id.*

[61] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

a. On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida distribution center ("Orlando Facility") alleging failure to maintain effective controls against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered into a settlement that resulted in the suspension of its DEA registration;

b. On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Auburn, Washington Distribution Center ("Auburn Facility") for failure to maintain effective controls against diversion of hydrocodone;

c. On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of hydrocodone;

d. On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Swedesboro, New Jersey Distribution Center ("Swedesboro Facility") for failure to maintain effective controls against diversion of hydrocodone;

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 CFR § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

89

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

414. These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also demonstrate, on information and belief, that the Manufacturer Defendants were aware of the enforcement against their Distributors and the diversion of the prescription opioids and a corresponding duty to report suspicious orders.

415. Many of the precise dates of Defendants' criminal actions at issue herein were hidden and cannot be alleged without access to Defendants' books and records. Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise depended upon the secrecy of the participants in that enterprise.

## SEVENTH CAUSE OF ACTION

*(Violation of the Nevada Racketeering Act against the Insys Executives)*

416. Clark County, as a "person" who has sustained injury brings this claim for civil remedies under the Racketeering Act, NRS §§207.350 to 207.520, against the Insys Executives.

417. The Insys Executives conducted business through legitimate and illegitimate means in the form of a criminal syndicate defined by NRS §207.370.

90

418. Section 207.400 of the Racketeering Act makes it unlawful "for a person . . . employed by or associated with any enterprise to conduct or participate, directly or indirectly, in: (1) The affairs of the enterprise through racketeering activity; or (2) Racketeering activity through the affairs of the enterprise." NRS § 207.400(1)(c).

419. Section 207.400 of the Racketeering Act also makes it unlawful "for a person . . . to conspire to violate any of the provisions" of the Racketeering Act. NRS §207.400(1)(j).

420. The term "criminal syndicate" is defined as "any combination of persons, so structured that the organization will continue its operation even if individual members enter or leave the organization, which engages in or has the purpose of engaging in racketeering activity."

421. Over a period years, the Insys Executives developed a scheme to bribe physicians around the country, including in Clark County, to prescribe the Insys product, Subsys, which is a Fentanyl product delivered by an oral spray. Subsys was developed and approved solely for use by cancer patients with breakthrough pain. The Insys Executives bribed doctors using Insys money, kickbacks, and other "speaker fees," to encourage increased Subsys prescriptions. If a doctor did not prescribe sufficient quantities of Subsys, as determined by the Insys Executives, the Insys Executives would threaten the doctors that they would withhold bribe money previously promised.

422. The Insys Executives falsely informed doctors and other healthcare professionals that Subsys was not addictive and could be used for off-label purposes, such as long-term management of moderate pain.

423. The Insys Executive's scheme violated NRS§ 205.377(1), which prohibits any person from, "in the course of an enterprise or occupation, knowingly and with the intent to defraud, engage in an act, practice or course of business or employ a . . . scheme which operates or would operate as a fraud or deceit upon a person by means of a false representation or omission of a material fact" on two (2), or more, occasions, utilizing the same or similar pattern, intents, or results, with an aggregate loss or intended loss of over $650. The Insys Executives knew that their representations or omissions of material facts related to the approved uses and dangers of Subsys were false or omitted. NRS § 205.377(1)(a). The Insys

91

Executives intended doctors, patients, and communities, to rely upon those false representations or omissions. NRS § 205.377(1)(b). The Insys Executives' deceptive scheme resulted in a loss to the County who relied upon the false representations or omissions. NRS § 205.377(1)(c).

424.   Each individual act of deception by the Insys Executives constitutes a separate violation of NRS §205.377. NRS § 205.377(2).

425.   The bribes provided by the Insys Executives to prescribing doctors took many forms, including, but not limited to, paying for speaking engagements that did not actually occur; paying for the salaries of the doctor's office staff; and providing doctors with exotic dances performed by Insys employees, including Sunrise Lee.

426.   The Insys Executives pushed sales representatives to get at least one prescription per day from doctors in their sales areas and to be sure that prescriptions were for high dosages.

427.   If there was ever an issue with prescription approval through insurance, the Insys Executives developed a scheme involving a call-center where the sales representatives would call insurance companies to lie in whatever way was necessary to convince the insurance companies to authorize payment for the prescriptions.

428.   The Insys Executives instructed their sales representatives to not include "cancer" in their sales pitches when discussing the appropriate use of the medication. Defendant, Michael Babich, led training seminars in which sales representatives were told to encourage pain management physicians to prescribe Subsys for off-label purposes in any way they wanted and, thus, the representatives should not discuss the Subsys use for "cancer pain."

429.   Upon reports of "pill-mills" from concerned sales representatives, the Insys Executives directed the sales representatives to increase their visits with the doctors operating the "pill-mills," to offer them additional kickbacks and bribes, and to provide additional benefits related to the increased number of Subsys prescriptions.

430.   The Insys Executives arranged speaking engagements for doctors who would be paid for their appearance. The doctors invited to speak were those with high Subsys prescription levels. Oftentimes, the speaking engagement was nothing more than a lunch or dinner with Insys Executives.

431.     The Insys Executives' actions were regular and ongoing over a period of years. Many of the precise dates of the Insys Executives' actions at issue herein were hidden and cannot be alleged without access to the Insys Executives' books and records. The full extent of the Insys Executives' fraudulent and deceptive behavior cannot be known without the benefit of discovery and is information within the Insys Executives' possession.

432.     Each violation of NRS § 205.377 was a violation of Nevada's Racketeering Act. NRS § 207.360(35).

433.     The Insys Executives' scheme in which they bribed doctors to prescribe Subsys, provided false information as to the dangerous and addictive nature of Subsys, and concealed Subsys' actual, approved purpose, caused harm to the citizens of Clark County who relied upon the representations that the drug they were prescribe was safe and appropriate for use, and harmed the County through the increase costs of law enforcement, public health, and health care services.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff prays for judgment against the Defendants as follows:

1.     General damages in an amount in excess of $15,000.00;

2.     Special damages in an amount in excess of $15,000.00;

3.     For punitive damages in such amount as will sufficiently punish Defendants for their wrongful conduct in Nevada as well as serve as an example to prevent a repetition of such conduct in Nevada in the future;

4.     For a fund establishing a medical monitoring program due to the increased susceptibility to injuries and irreparable threat to the health of opioid users resulting from their exposure to opioids, which can only be mitigated or addressed by the creation of a Court-supervised fund, financed by Defendants, and which will:

a.     Notify individuals who use or used opioids of the potential harm from opioids;

b.     Aid in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of opioid use;

93

c.   Fund studies and research of the short and long term effects of opioids and the possible cures and treatments for the detrimental effects of using opioids;

d.   Accumulate and analyze relevant medical and demographic information from opioid users, including but not limited to the results of testing performed on them;

e.   Gather and forward to treating physicians information related to the diagnosis and treatment of injuries which may result from using opioids.

5.   For restitution and reimbursement sufficient to cover all prescription costs the County has incurred related to opioids due to Defendants' wrongful conduct, with said amount to be determined at trial;

6.   For restitution and reimbursement sufficient to cover all costs expended for health care services and programs associated with the diagnosis and treatment of adverse health consequences of opioids use, including but not limited to addiction due to Defendants ' wrongful conduct, with said amount to be determined at trial;

7.   For restitution and reimbursement for all prescription costs incurred by consumers related to opioids;

8.   For such other and further extraordinary equitable, declaratory and/or injunctive relief as permitted by law as necessary to assure that the Plaintiffs have an effective remedy and to stop Defendants' promotion and marketing of opioids for inappropriate uses in Nevada, currently and in the future;

///
///
///
///
///
///
///

94

1     9.      For disgorgement;

2     10.     Costs of suit, reasonable attorney fees, interest incurred herein; and

3     11.     For such other and further relief as is just and proper.

4     DATED this _____ day of September, 2019.

5

6                          EGLET ADAMS

7

8                          ROBERT T. EGLET, ESQ.

9                          Nevada Bar No. 3402
                           ROBERT M. ADAMS, ESQ.

10                         Nevada Bar No. 6551
                           RICHARD K. HY, ESQ.

11                         Nevada Bar No. 12406
                           400 S. 7th Street, 4th Floor

12                         Las Vegas, NV 89101
                           Tel.: (702) 450-5400

13                         Fax: (702) 450-5451

14                         E-Mail  eservice@egletlaw.com

15                               -and-
                           STEVEN B. WOLFSON, ESQ.

16                         Nevada Bar No. 1565
                           Clark County District Attorney

17                         200 E. Lewis Ave
                           Las Vegas, NV 89101

18                         Tel.: 702-671-2700

19                         Email: steven.wolfson@clarkcountyda.com

20                         *Attorneys for Plaintiff, Clark County*

21

22

23

24

25

26

27

28

95

1

## **DEMAND FOR JURY TRIAL**

2    Plaintiff, by and through its attorneys of record, hereby demands a jury trial of all of the

3  issues in the above matter.

4    DATED this ___11 7TH___ day of September, 2019

5

6

7                              **EGLET ADAMS**

8

9                              ROBERT T. EGLET, ESQ.
                               Nevada Bar No. 3402
10                             ROBERT M. ADAMS, ESQ.
                               Nevada Bar No. 6551
11                             RICHARD K. HY, ESQ.
                               Nevada Bar No. 12406
12                             400 S. 7th Street, 4th Floor
                               Las Vegas, NV 89101
13                             Tel.: (702) 450-5400
14                             Fax: (702) 450-5451
                               E-Mail  eservice@egletlaw.com
15                                      -and-
                               STEVEN B. WOLFSON, ESQ.
16                             Nevada Bar No. 1565
                               Clark County District Attorney
17                             200 E. Lewis Ave
18                             Las Vegas, NV 89101
                               Tel.: 702-671-2700
19                             Email: steven.wolfson@clarkcountyda.com
20                             *Attorneys for Plaintiff, Clark County*

21

22

23

24

25

26

27

28

96

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that I am an employee of EGLET ADAMS, and that on September 12th, 2019, I caused the foregoing document entitled **THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** to be served upon those persons designated by the parties in the E-Service Master List for the above-referenced matter in the Eighth Judicial District Court eFiling System in accordance with the mandatory electronic service requirements of Administrative Order 14-2 and the Nevada Electronic Filing and Conversion Rules.

An Employee of EGLET ADAMS

97

## Case Information

A-17-765828-C | Clark County, Plaintiff(s) vs. Purdue Pharma, L.P., Defendant(s)

| Case Number | Court | Judicial Officer |
|---|---|---|
| A-17-765828-C | Department 22 | Johnson, Susan |
| File Date | Case Type | Case Status |
| 12/07/2017 | Other Tort | Open |

## Party

Special Master (Participant)
Cherry, Justice Michael

Plaintiff
Clark County

Active Attorneys ▾

Attorney
Eglet, Robert T.
Retained

Lead Attorney
Adams, Robert M
Retained

Attorney
Wolfson, Steven B
Retained

Attorney
HY, RICHARD K
Retained

Attorney
Cummings,
Cassandra

Retained

Attorney
Givens, Jessica
Retained

Defendant
Purdue Pharma, L.P.

Active Attorneys ▾
Lead Attorney
Evans, Kelly A.
Retained

Attorney
Fears, Chad R.
Retained

Attorney
Gutke, David W.
Retained

Attorney
Cheffo, Mark Steven
Retained

Attorney
Cusker Gonzalez,
Mara C
Retained

Attorney
Miller, Hayley E.
Retained

Attorney
Murphy, Matthew T.
Retained

Attorney
Coleman, Hayden
Adam
Retained

Attorney

Zanello, Lindsay
Nicole
Retained

---

Defendant
Purdue Pharma, Inc.

Active Attorneys ▾

Lead Attorney
Evans, Kelly A.
Retained

---

Attorney
Fears, Chad R.
Retained

---

Attorney
Gutke, David W.
Retained

---

Attorney
Cheffo, Mark Steven
Retained

---

Attorney
Cusker Gonzalez,
Mara C
Retained

---

Attorney
Murphy, Matthew T.
Retained

---

Attorney
Coleman, Hayden
Adam
Retained

---

Attorney
Zanello, Lindsay
Nicole
Retained

Defendant
Purdue Frederick Company, Inc.

   Aliases
   *DBA* Purdue Frederick Company Inc

Active Attorneys ▾

Lead Attorney
Evans, Kelly A.
Retained

---

Attorney
Fears, Chad R.
Retained

---

Attorney
Gutke, David W.
Retained

---

Attorney
Cheffo, Mark Steven
Retained

---

Attorney
Cusker Gonzalez,
Mara C
Retained

---

Attorney
Murphy, Matthew T.
Retained

---

Attorney
Coleman, Hayden
Adam
Retained

---

Attorney
Zanello, Lindsay
Nicole
Retained

---

Defendant
Purdue Pharmaceuticals, L.P.

Active Attorneys ▾

Lead Attorney
Evans, Kelly A.
Retained

---

Attorney
Fears, Chad R.

Retained

Attorney
Gutke, David W.
Retained

Attorney
Cheffo, Mark Steven
Retained

Attorney
Cusker Gonzalez,
Mara C
Retained

Attorney
Murphy, Matthew T.
Retained

Attorney
Coleman, Hayden
Adam
Retained

Attorney
Zanello, Lindsay
Nicole
Retained

Defendant
Teva Pharmaceuticals Usa, Inc.

Active Attorneys ▾

Lead Attorney
Hymanson, Philip M.
Retained

Attorney
Reed, Steven A.
Retained

Attorney
James, Collie, IV
Retained

**Defendant**
Cephalon, Inc.;

Active Attorneys ▾

Lead Attorney
Hymanson, Philip M.
Retained

Attorney
Fears, Chad R.
Retained

Attorney
Gutke, David W.
Retained

Attorney
Evans, Kelly A.
Retained

Attorney
Reed, Steven A.
Retained

Attorney
James, Collie, IV
Retained

**Defendant**
Johnson & Johnson

Active Attorneys ▾

Lead Attorney
Bendavid, Jeffrey A.
Retained

Attorney
Smith, Stephanie J.
Retained

Attorney
Murphy, Matthew T.
Retained

Attorney
Brody, Stephen D
Retained

Defendant
Janssen Pharmaceuticals, Inc.

Active Attorneys ▾

Lead Attorney
Bendavid, Jeffrey A.
Retained

Attorney
Gutke, David W.
Retained

Attorney
Smith, Stephanie J.
Retained

Attorney
Brody, Stephen D
Retained

Attorney
Murphy, Matthew T.
Retained

Defendant
Endo Health Solutions Inc

Active Attorneys ▾

Lead Attorney
Lundvall, Patricia K.
Retained

Attorney
Yen, Amanda C.
Retained

Attorney
Lombardo, John
David
Retained

Attorney
Miller, Jake
Retained

Defendant
Endo Pharmaceuticals, Inc

Active Attorneys ▾

Lead Attorney
Lundvall, Patricia K.
Retained

Attorney
Yen, Amanda C.
Retained

Attorney
Lombardo, John
David
Retained

Attorney
Miller, Jake
Retained

Defendant
Actavis, Inc

Aliases
*FKA* Watson Pharmaceuticals Inc

Active Attorneys ▾

Lead Attorney
Corrick, Max E
Retained

Attorney
Levy, Jennifer G.,
ESQ
Retained

Attorney
Roth, Martin Louis
Retained

Attorney
Welch, Donna Marie
Retained

Attorney
Knapp, Timothy
William
Retained

Attorney

Roth, Martin Louis
Retained

Attorney
Ciullo, Zachary A.
Retained

Attorney
Zolner, Erica B.
Retained

Defendant
Watson Laboratories, Inc

Active Attorneys ▾
Lead Attorney
Hymanson, Philip M.
Retained

Attorney
Fears, Chad R.
Retained

Attorney
Evans, Kelly A.
Retained

Attorney
Gutke, David W.
Retained

Attorney
Reed, Steven A.
Retained

Attorney
James, Collie, IV
Retained

Defendant
Actavis LLC

Active Attorneys ▾
Lead Attorney
Hymanson, Philip M.
Retained

Attorney
Fears, Chad R.
Retained

---

Attorney
Evans, Kelly A.
Retained

---

Attorney
Gutke, David W.
Retained

---

Attorney
Roth, Martin Louis
Retained

---

Attorney
Reed, Steven A.
Retained

---

Attorney
James, Collie, IV
Retained

---

Defendant
Actavis Pharma, Inc

    Aliases
    *FKA* Watson Pharma Inc

Active Attorneys ▾

Lead Attorney
Hymanson, Philip M.
Retained

---

Attorney
Fears, Chad R.
Retained

---

Attorney
Evans, Kelly A.
Retained

---

Attorney
Gutke, David W.
Retained

Attorney
Roth, Martin Louis
Retained

Attorney
Reed, Steven A.
Retained

Attorney
James, Collie, IV
Retained

Defendant
Amerisourcebergen Drug Corporation

Active Attorneys ▾

Attorney
Semenza, Lawrence
J., III
Retained

Attorney
Kircher, Christopher
D.
Retained

Lead Attorney
Rickard, Jarrod L.
Retained

Attorney
Boranian, Steven J.
Retained

Attorney
Johansen, Sarah B.
Retained

Defendant
Cardinal Health, Inc

Active Attorneys ▾

Attorney
Jorgensen, J.
Christopher
Retained

Attorney
Polsenberg, Daniel F.
Retained

Lead Attorney
Polsenberg, Daniel F.
Retained

Attorney
Henriod, Joel D.
Retained

Attorney
Smith, Abraham G.
Retained

Attorney
Hardin, Ashley W.
Retained

Attorney
Pyser, Steven M.
Retained

Defendant
McKesson Corporation

Active Attorneys ▾

Lead Attorney
Morris, Steve L.
Retained

Attorney
Solis-Rainey, Rosa
Retained

Attorney
Pistilli, Christian J.
Retained

Attorney
Shafroth, Nathan
Retained

Defendant
Masters Pharmaceutical, Llc

   Aliases
   *FKA* Masters Pharmaceutical Inc

Active Attorneys ▾

Lead Attorney
Terry, Brian K.
Retained

Attorney
Smith, John Andrew
Retained

---

Defendant
C & R Pharmacy

   Aliases
   *DBA* Ken's Pharmacy
   *FKA* Lam's Pharmacy Inc

Active Attorneys ▾

Lead Attorney
Daehnke, Patricia
Egan
Retained

Attorney
Rosenthal, Amanda
E.
Retained

Attorney
Lucero, Laura S.
Retained

---

Defendant
Teva Pharmaceuticals Industries LTD

Active Attorneys ▾

Lead Attorney
Evans, Kelly A.
Retained

Attorney
Fears, Chad R.
Retained

Attorney
Gutke, David W.
Retained

Defendant
Insys Therapeutics Inc

Active Attorneys ▾

Lead Attorney
Vigil, Abran E.
Retained

Attorney
Donohue, John Matthew
Retained

Attorney
Franco, Joseph Lee
Retained

Attorney
Rubin, Stacy H,
Retained

Attorney
Nadel, Heidi
Retained

Defendant
Mallinckrodt LLC

Active Attorneys ▾

Lead Attorney
Guinn, Steven E
Retained

Attorney
Leary, Ryan William
Retained

Attorney
Tsai, Rocky Chiu-Feng
Retained

Attorney
Davison, William Thomas
Retained

Defendant
Maxsam, Aida B

Active Attorneys ▾

Lead Attorney
Barr, Jeffrey F.
Retained

Attorney
Cohen, Joseph D.
Retained

Attorney
Summers, Jonna
Retained

Defendant
Holper, Steven A, M.D.

Active Attorneys ▾

Lead Attorney
Bohn, Michael F
Retained

Attorney
Trippiedi, Adam R.
Retained

Defendant
Holper Out-Patients Medical Center LTD

Active Attorneys ▾

Lead Attorney
Bohn, Michael F
Retained

Attorney
Trippiedi, Adam R.
Retained

Defendant
Steven A. Holper, M.D., Professional Corporation

Active Attorneys ▾

Lead Attorney
Bohn, Michael F
Retained

Attorney
Trippiedi, Adam R.
Retained

Defendant
Cardinal Health 6 Inc

Active Attorneys ▾

Attorney
Jorgensen, J.
Christopher
Retained

Attorney
Polsenberg, Daniel
F.
Retained

Lead Attorney
Smith, Abraham G.
Retained

Attorney
Henriod, Joel D.
Retained

Attorney
Hardin, Ashley W.
Retained

Attorney
Pyser, Steven M.
Retained

Defendant
Cardinal Health Technologies LLC

Active Attorneys ▾

Attorney
Jorgensen, J.
Christopher
Retained

Attorney
Polsenberg, Daniel
F.
Retained

Lead Attorney
Smith, Abraham G.
Retained

Attorney
Henriod, Joel D.
Retained

Attorney
Hardin, Ashley W.
Retained

Attorney
Pyser, Steven M.
Retained

Defendant
Cardinal Health 414 LLC

Active Attorneys ▼

Attorney
Jorgensen, J.
Christopher
Retained

Attorney
Polsenberg, Daniel
F.
Retained

Lead Attorney
Smith, Abraham G.
Retained

Attorney
Henriod, Joel D.
Retained

Attorney
Hardin, Ashley W.
Retained

Attorney
Pyser, Steven M.
Retained

Defendant
Cardinal Health 200 LLC

Active Attorneys ▾

Attorney
Jorgensen, J.
Christopher
Retained

Attorney
Polsenberg, Daniel
F.
Retained

Lead Attorney
Smith, Abraham G.
Retained

Attorney
Henriod, Joel D.
Retained

Attorney
Hardin, Ashley W.
Retained

Attorney
Pyser, Steven M.
Retained

Defendant
Allergan Inc

Active Attorneys ▾

Lead Attorney
Ciullo, Zachary A.
Retained

Attorney
Zolner, Erica B.
Retained

Defendant
Allergan USA Inc

Active Attorneys ▾

Lead Attorney
Corrick, Max E
Retained

Attorney
Knapp, Timothy
William
Retained

Attorney
Levy, Jennifer G.,
ESQ
Retained

Attorney
Welch, Donna Marie
Retained

Attorney
Roth, Martin Louis
Retained

Attorney
Ciullo, Zachary A.
Retained

Attorney
Zolner, Erica B.
Retained

Defendant
Allergan Finance, LLC

Active Attorneys ▾

Lead Attorney
Corrick, Max E
Retained

Attorney
Knapp, Timothy
William
Retained

Attorney
Levy, Jennifer G.,
ESQ
Retained

Attorney
Welch, Donna Marie

Retained

Attorney
Roth, Martin Louis
Retained

Attorney
Ciullo, Zachary A.
Retained

Attorney
Zolner, Erica B.
Retained

Defendant
SpecGX LLC

Defendant
Sackler, Richard S.

Defendant
Sackler, Jonathan D

Defendant
Sackler, Mortimer D.A.

Defendant
Sackler, Kathe A.

Defendant
Sackler Lefcourt, Ilene

Defendant
Sackler, David

Defendant
Sackler, Beverly

Defendant
Sackler, Theresa

Defendant
PLP Associates Holdings L.P.

Defendant
Rosebay Medical Company L.P

Defendant
Beacon Company

Defendant
Par Pharmaceutical Inc

Defendant
Par Pharmaceutical Companies Inc

Defendant
Kapoor, John

Defendant
Simon, Richard M

Defendant
Lee, Sunrise

Defendant
Rowan, Joseph A.

Defendant
Gurry, Michael J

Defendant
Babich, Michael

Defendant
Burlakoff, Alec

Defendant
Walgreens Boots Alliance Inc

Defendant
Walgreen Co.

Defendant
Walgreen Eastern Co Inc

Defendant
Walmart Inc

Defendant
CVS Health Corporation

Defendant
CVS Pharmacy Inc

Defendant
CVS Indiana L.L.C

Defendant
CVS RX Services Inc

Aliases
*DBA* CVS Pharmacy Distribution

Defendant
CVS Tennessee Distrubution L.L.C

Defendant
Express Scripts Holding Company

Defendant
Express Scripts INC

## Disposition Events

06/25/2018 Judgment ⏷

Judicial Officer
Williams, Timothy C.

Judgment Type
Voluntary Dismissal

Monetary Judgment

    Debtors: Adare Pharmaceuticals Inc (Defendant)

    Creditors: Clark County (Plaintiff)

    Judgment: 06/25/2018 Docketed: 07/02/2018

---

07/06/2018 Judgment ▾

---

Judicial Officer
Williams, Timothy C.

Judgment Type
Voluntary Dismissal

---

Monetary Judgment

    Debtors: Mallinckrodt PLC (Defendant)

    Creditors: Clark County (Plaintiff)

    Judgment: 07/06/2018 Docketed: 07/13/2018

---

08/01/2018 Judgment ▾

---

Judicial Officer
Williams, Timothy C.

Judgment Type
Voluntary Dismissal

---

Monetary Judgment

    Debtors: Mylan Pharmaceuticals Inc (Defendant)

    Creditors: Clark County (Plaintiff)

    Judgment: 08/01/2018 Docketed: 08/02/2018

---

08/01/2018 Judgment ▾

---

Judicial Officer
Williams, Timothy C.

Judgment Type
Voluntary Dismissal

Monetary Judgment

Debtors: Mylan Technologies Inc (Defendant)

Creditors: Clark County (Plaintiff)

Judgment: 08/01/2018 Docketed: 08/02/2018

10/22/2018 Judgment ⏷

Judicial Officer
Williams, Timothy C.

Judgment Type
Voluntary Dismissal

Monetary Judgment

Debtors: Abbvie Inc (Defendant), Abbvie US LLC (Defendant)

Creditors: Clark County (Plaintiff)

Judgment: 10/22/2018 Docketed: 10/23/2018

10/24/2018 Judgment ⏷

Judicial Officer
Williams, Timothy C.

Judgment Type
Voluntary Dismissal

Monetary Judgment

Debtors: Daiichi Sankyo Inc (Defendant), Allison Foster (Defendant)

Creditors: Clark County (Plaintiff)

Judgment: 10/24/2018 Docketed: 10/24/2018

07/01/2019 Judgment ▾

Judicial Officer
Williams, Timothy C.

Judgment Type
Order of Dismissal Without Prejudice

Monetary Judgment

    Debtors: Clark County (Plaintiff)

    Creditors: Depomed Inc (Defendant)

    Judgment: 07/01/2019 Docketed: 07/01/2019

07/01/2019 Judgment ▾

Judicial Officer
Williams, Timothy C.

Judgment Type
Order of Dismissal Without Prejudice

Monetary Judgment

    Debtors: Clark County (Plaintiff)

    Creditors: Johnson & Johnson (Defendant), Janssen Pharmaceuticals, Inc. (Defendant), Janssen Pharmaceutica, Inc. (Defendant), Ortho-Mcneil-Janssen Pharmaceuticals, Inc. (Defendant)

    Judgment: 07/01/2019 Docketed: 07/02/2019

07/08/2019 Judgment ▾

Judicial Officer
Williams, Timothy C.

Judgment Type
Order of Dismissal Without Prejudice

Monetary Judgment

Debtors: James Kumle (Defendant)

Creditors: Clark County (Plaintiff)

Judgment: 07/08/2019 Docketed: 07/09/2019

## Events and Hearings

12/07/2017 Complaint With Jury Demand ▾

Comment
Complaint and Demand for Jury Trial

03/21/2018 Ex Parte Application to Extend Time for Service ▾

Comment
Ex-Parte Application for Enlargement of Time to Serve Summons
and Complaint

03/22/2018 Order ▾

Comment
Order Granting Plaintiff's Ex Parte Application for Enlargement of
Time to Serve Summons and Complaint

03/23/2018 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Granting Plaintiff's Ex Parte Application for
Enlargement of Time to Serve Summons and Complaint

05/16/2018 Amended Complaint ▾

Comment
First Amended Complaint and Demand for Jury Trial

05/17/2018 Summons Electronically Issued - Service Pending ▾

Comment
Summons

05/18/2018 Summons ▾

Comment
Summons

05/21/2018 Motion ▾

Comment
Motion To Preserve Evidence As To Defendants C&R Pharmacy
d/b/a Kens Pharmacy f/k/a Lam's Pharmacy, Inc. On An Order
Shortening Time

05/31/2018 Affidavit of Service ▾

Comment
Affidavit of Service of Motion to Preserve Evidence as to Defendants
C&R Pharmacy d/b/a Kens Pharmacy f/k/a Lam's Pharmacy, Inc. on
an Order Shortening Time

06/05/2018 Motion ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Vacate

Comment
Plaintiff's Motion to Preserve Evidence as to Defendant's C & R Pharmacy
d/b/a Ken's Pharmacy f/k/a Lam's Pharmacy, Inc. on an Order Shortening
Time

06/05/2018 Motion ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Cancel Reason
Vacated - Duplicate Entry

Comment
Motion To Preserve Evidence As To Defendants C&R Pharmacy d/b/a
Kens Pharmacy f/k/a Lam's Pharmacy, Inc. On An Order Shortening Time

06/05/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Continue the Hearing on Plaintiff's Motion to
Preserve Evidence as to Defendant C&R Pharmacy d/b/a Ken's

Pharmacy f/k/a Lam's Pharmacy, Inc.

06/11/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure (NRS Chapter 19)

06/11/2018 Opposition ▾

Comment
Specially Appearing Defendant C&R Pharmacy d/b/a Ken's
Pharmacy f/k/a Lam's Pharmacy, Inc.'s Opposition to Motion to
Preserve Evidence as to Defendants C&R Pharmacy d/b/a Ken's
Pharmacy f/k/a Lam's Pharmacy, Inc. on an Order Shortening Time

06/11/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Continue the Hearing on
Plaintiff's Motion to Preserve Evidence as to Defendant C&R
Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's Pharmacy. Inc.

06/11/2018 Summons Electronically Issued - Service Pending ▾

Comment
Summons_Watson Laboratories Inc.

06/11/2018 Summons Electronically Issued - Service Pending ▾

Comment
Summons

06/11/2018 Summons Electronically Issued - Service Pending ▾

Comment
Summons

06/11/2018 Reply ▾

Comment
Reply in Support of Motion to Preserve Evidence as to Defendants
C&R Pharmacy d/b/a Kens Pharmacy f/k/a LAM"s Pharmacy, Inc. on
an Order Shortening Time

06/12/2018 Summons Electronically Issued - Service Pending ▾

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▾

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Mylan Pharmaceuticals Inc.

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_McKesson Corporation

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Masters Pharmaceutical, LLC. f/k/a Masters
Pharmaceutical, Inc.

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Cardinal Health 414, LLC

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons_Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons_Amerisourcebergen Drug Corporation**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons_Cardinal Health 200, LLC**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
**Summons_Steven A. Holper, M.D., Professional Corporation**

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Holper Out-Patients Medical Center, Ltd.

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Mallinckrodt LLC

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Johnson & Johnson

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Janssen Pharmaceuticals, Inc.

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Janssen Pharmaceutica, Inc. n/k/a Janssen
Pharmaceuticals, Inc.

---

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons

---

06/12/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_James Kumle

---

06/15/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Allergan PLC f/k/a Actavis PLC

---

06/15/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Allison Foster

---

06/15/2018 Summons Electronically Issued - Service Pending ▼

Comment
Summons_Ortho-McNeil-Janssen Pharmaceuticals Inc. n/k/a
Janssen Pharmaceuticals Inc.

---

06/22/2018 Summons ▼

Comment
Summons - Purdue Pharam LP

---

06/22/2018 Summons ▼

Comment
Summons - Teva Pharmaceuticals USA

---

06/22/2018 Summons ▼

Comment
Summons - Cephalon, Inc.

---

06/22/2018 Summons ▼

Comment
Summons - Actavis, LLC

---

06/22/2018 Summons ▼

Comment
Summons - Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.

06/22/2018 Summons ▼

Comment
Summons - The Purdue Frederick Company, Inc. d/b/a The Purdue
Frederick Co.

06/22/2018 Summons ▼

Comment
Summons - Purdue Pharmaceuticals, LP

06/22/2018 Summons ▼

Comment
Summons - Ends Health Solutions, Inc.

06/22/2018 Summons ▼

Comment
Summons - Adare Pharmaceuticals, Inc.

06/22/2018 Summons ▼

Comment
Summons - Cardinal Health 200, LLC

06/22/2018 Summons ▼

Comment
Summons - Abbvie US, LLC

06/22/2018 Summons ▼

Comment
Summons - Daiichi Sankyo, Inc.

06/22/2018 Summons ▼

Comment
Summons - Cardinal Health Technologies, LLC

06/22/2018 Summons ▼

Comment
Summons - Cardinal Health 414 LLC

06/22/2018 Summons ▼

Comment
Summons - Cardinal Health 6 Inc.

06/22/2018 Summons ▾

Comment
Summons - Purdue Pharma, Inc.

06/22/2018 Summons ▾

Comment
Summons - Endo Pharmaceuticals, Inc.

06/22/2018 Summons ▾

Comment
Summons - Mallinckrodt, LLC

06/22/2018 Summons ▾

Comment
Summons - Amerisourcebergen Drug Corporation

06/22/2018 Summons ▾

Comment
Summons - Allergan, PLC f/k/a Actavis, PLC

06/22/2018 Summons ▾

Comment
Summons - Masters Pharmaceutical, LLC f/k/a Masters
Pharmaceutical Inc

06/22/2018 Summons ▾

Comment
Summons - Janssen Pharmaceutica, Inc. n/k/a Janssen
Pharmaceuticals, Inc.

06/22/2018 Summons ▾

Comment
Summons - Ortho-McNeil-Janssen Pharmaceuticals, Inc n/k/a
Janssen Pharmaceuticals, Inc.

06/22/2018 Summons ▾

Comment
Summons - Cardinal Health, Inc.

06/22/2018 Summons ▾

Comment
Summons - Abbvie, Inc.

06/22/2018 Summons ▼

Comment
Summons - Janssen Pharmaceuticals Inc

06/25/2018 Notice of Voluntary Dismissal Without Prejudice ▼

Comment
Notice of Voluntary Dismissal of All Claims Against Defendant Adare
Pharmaceuticals Inc. Without Prejudice

06/27/2018 Summons ▼

Comment
Summons - Watson Laboratories Inc

06/27/2018 Summons ▼

Comment
Summons - Steven A. Holper, M.D.

06/27/2018 Summons ▼

Comment
Summons - Steven A. Holper, M.D., Professional Corporation

06/27/2018 Summons ▼

Comment
Summons - Mylan Technologies, Inc.

06/27/2018 Summons ▼

Comment
Summons - Mylan Pharmaceuticals, Inc.

06/27/2018 Summons ▼

Comment
Summons - McKesson Corporation

06/27/2018 Summons ▼

Comment
Summons - Holper Out-Patients Medical Center, Ltd.

06/27/2018 Summons ▼

Comment
Summons - Aida B. Maxsam

06/27/2018 Summons ▾

Comment
Summons - James Kumle

07/02/2018 Answer to Amended Complaint ▾

Comment
Answer to First Amended Complaint

07/02/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

07/06/2018 Request for Exemption From Arbitration ▾

Comment
Plaintiff's Petition for Exemption from Arbitration

07/06/2018 Summons ▾

Comment
Summons - Depomed, Inc.

07/06/2018 Summons ▾

Comment
Summons - JohnsonJohnson

07/06/2018 Summons ▾

Comment
Summons - Insys Therapeutics, Inc.

07/06/2018 Summons ▾

Comment
Summons - Actvis Inc f/k/a Watson Pharmaceuticals Inc

07/06/2018 Notice of Voluntary Dismissal Without Prejudice ▾

Comment
Notice of Voluntary Dismissal of all Claims Against Defendant
Mallinckrodt, PLC without Prejudice

07/06/2018 Summons ▾

Comment
Summons - Allison Foster

07/16/2018 Order ▾

Comment
Order Granting Plaintiff's Motion to Preserve Evidence as to
Defendants C&R Pharmacy d/b/a Kens Pharmacy f/k/a Lam's
Pharmacy, Inc. on an Order Shortening Time

07/19/2018 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Granting Plaintiff's Motion to Preserve
Evidence as to Defendants C&R Pharmacy d/b/a Kens Pharmacy
f/k/a Lam's Pharmacy, Inc. on an Order Shortening Time

07/23/2018 Commissioners Decision on Request for Exemption - Granted ▾

Comment
Commissioner's Decision on Request For Exemption - GRANTED

07/27/2018 Demand for Jury Trial ▾

Comment
Defendant C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's
Pharmacy, Inc.'s Demand for Jury Trial

08/01/2018 Notice of Voluntary Dismissal With Prejudice ▾

Comment
Notice of Voluntary Dismissal of All Claims Against Defendant Mylan
Pharmaceuticals, Inc. With Prejudice

08/01/2018 Notice of Voluntary Dismissal With Prejudice ▾

Comment
Notice of Voluntary Dismissal of All Claims Against Defendant Mylan
Technologies, Inc. With Prejudice

08/08/2018 Notice of Change of Address ▾

Comment
Notice of Change of Address

08/10/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

08/12/2018 Motion ▾

Comment
Motion to Strike Peremptory Challenge

08/13/2018 Notice of Department Reassignment ▾

Comment
Notice of Department Reassignment

08/22/2018 Motion ▾

Comment
Plaintiff's Motion for Reassignment on an Order Shortening Time

08/23/2018 Disclosure Statement ▾

Comment
NRCP 7.1 Disclosure

08/23/2018 Notice of Appearance ▾

Comment
Notice of Appearance

08/23/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

08/24/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

08/24/2018 Notice of Appearance ▾

Comment
Notice of Appearance

08/27/2018 Opposition to Motion ▾

Comment
Manufacturer Defendants' Opposition to Plaintiff Clark County's
Motion for Reassignment on Order Shortening Time

08/27/2018 Appendix ▾

Comment
Exhibits to Manufacturer Defendants' Opposition to Plaintiff Clark
County's Motion for Reassignment on Order Shortening Time

08/27/2018 Reply in Support ▾

Comment
Reply In Support of Motion for Reassignment on an Order Shortening
Time

08/27/2018 Initial Appearance Fee Disclosure ▼

Comment
Initial Appearance Fee Disclosure

08/27/2018 Opposition to Motion ▼

Comment
Manufacturer Defendants' Opposition To Plaintiff Clark County's
Motion To Strike Peremptory Challenge

08/27/2018 Appendix ▼

Comment
Exhibits To Manufacturer Defendants' Opposition To Plaintiff Clark
County's Motion To Strike Peremptory Challenge

08/27/2018 Receipt of Copy ▼

Comment
Receipt of Copy of Manufacturer Defendants' Opposition and
Exhibits to Plaintiff Clark County's Motion for Reassignment on an
Order Shortening Time

08/28/2018 Motion ▼

Judicial Officer
Bell, Linda Marie

Hearing Time
9:00 AM

Result
Denied

Comment
Plaintiff's Motion for Reassignment on an Order Shortening Time

Parties Present▲
  Plaintiff

    Attorney: Eglet, Robert T.

    Attorney: Adams, Robert M

  Defendant

    Attorney: Fears, Chad R.

  Defendant

    Attorney: Fears, Chad R.

  Defendant

Attorney: Fears, Chad R.

Defendant

  Attorney: Fears, Chad R.

Defendant

  Attorney: Fears, Chad R.

Defendant

  Attorney: Fears, Chad R.

Defendant

  Attorney: Fears, Chad R.

Defendant

  Attorney: Fears, Chad R.

Defendant

  Attorney: Daehnke, Patricia Egan

Defendant

  Attorney: Fears, Chad R.

Defendant

  Attorney: Trippiedi, Adam R.

Defendant

  Attorney: Trippiedi, Adam R.

Defendant

  Attorney: Trippiedi, Adam R.

---

08/30/2018 Reporters Transcript ▾

Comment
Reporters Transcrpt of Plaintiffs Motion for Reassignment on An
Order Shortening Time Heard On 8-28-18

---

08/31/2018 Decision and Order ▾

Comment
Decision and Order

---

09/07/2018 Motion to Dismiss ▾

Comment
Defendant Aida Maxsam's Motion to Dismiss

---

09/07/2018 Initial Appearance Fee Disclosure ▾

Comment
Defendant Aida Maxsam's Initial Appearance Fee Disclosure

---

09/07/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

09/07/2018 Notice of Appearance ▾

Comment
Notice Of Appearance

09/11/2018 Notice of Entry of Decision and Order ▾

Comment
Notice of Entry of Decision and Order

09/11/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Continue the Hearing on Plaintiff's Motion to
Strike Peremptory Challenge

09/13/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Continue the Hearing on
Plaintiff's Motion to Strike Peremptory Challenge

09/25/2018 Reply in Support ▾

Comment
Plaintiff's Reply in Support of Motion to Strike Peremptory Challenge

09/26/2018 Disclosure Statement ▾

Comment
NRCP Rule 7.1 Disclosure Statement

09/26/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

09/26/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel (Joseph L. Franco)

09/26/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel (Heidi A. Nadel)

09/26/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel (J. Matthew Donohue)

09/26/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

09/26/2018 Brief ▾

Comment
Hearing Brief Regarding Peremptory Challenge

09/28/2018 Motion ▾

Comment
Plaintiff Clark County's Motion To Strike Defendant Cardinal Health,
Inc's Hearing Brief Regarding Peremptory Challenge

10/01/2018 Disclosure Statement ▾

Comment
Defendants Purdue Pharma L.P., Purdue Pharma Inc., The Purdue
Frederick Company Inc., and Purdue Pharmaceuticals L.P.'s
Disclosure Statement (NRCP 7.1)

10/02/2018 Motion to Strike ▾

Judicial Officer
Crockett, Jim

Hearing Time
9:00 AM

Result
Granted

Comment
Plaintiff's Motion to Strike Peremptory Challenge

Parties Present▲
Plaintiff

Attorney: Eglet, Robert T.

Attorney: Adams, Robert M

Defendant

Attorney: Fears, Chad R.

Defendant

Attorney: Fears, Chad R.

Defendant

Attorney: Fears, Chad R.

Defendant

    Attorney: Fears, Chad R.

Defendant

    Attorney: Hymanson, Philip M.

Defendant

    Attorney: Hymanson, Philip M.

    Attorney: Fears, Chad R.

Defendant

    Attorney: Hymanson, Philip M.

    Attorney: Fears, Chad R.

Defendant

    Attorney: Hymanson, Philip M.

    Attorney: Fears, Chad R.

Defendant

    Attorney: Hymanson, Philip M.

    Attorney: Fears, Chad R.

Defendant

    Attorney: Polsenberg, Daniel F.

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Daehnke, Patricia Egan

    Attorney: Lucero, Laura S.

Defendant

    Attorney: Fears, Chad R.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

10/02/2018 Opposition ▾

    Comment
    Plaintiff's Opposition to Defendant Aida Maxam's Motion to Dismiss

10/08/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel - Joseph D Cohen

10/08/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

10/08/2018 Motion to Associate Counsel ▾

Comment
(10/9/18 Please see Errata )Motion to Associate Counsel - Steven A
Reed

10/09/2018 Errata ▾

Comment
Errata to Motion to Associate Counsel - Steve A Reed

10/16/2018 Notice of Department Reassignment ▾

Comment
Notice of Department Reassigment

10/19/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

10/19/2018 Notice of Appearance ▾

Comment
Notice of Appearance

10/19/2018 Motion to Dismiss ▾

Comment
Defendant James Kumle's Motion to Dismiss the First Amended
Complaint and Demand for Jury Trial

10/19/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

10/19/2018 Motion to Dismiss ▾

Comment
Allergan Finance, LLC and Allergan PLC's Motion to Dismiss the
Amended Complaint

10/19/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

10/19/2018 Motion to Dismiss ▾

Comment
Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.'s Motion
to Dismiss First Amended Complaint

10/19/2018 Motion to Dismiss ▾

Comment
Manufacturer Defendants' Joint Motion to Dismiss

10/19/2018 Disclosure Statement ▾

Comment
Defendant Mallinckrodt LLC's NRCP 7.1 Disclosure

10/19/2018 Disclosure Statement ▾

Comment
Disclosure Statement Pursuant to NRCP 7.1

10/19/2018 Motion to Dismiss ▾

Comment
Defendant Assertio Therapeutics, Inc. f/k/a Depomed, Inc,'s Motion
to Dismiss

10/19/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel - Mara Caitlin Cusker Gonzalez, Esq.

10/19/2018 Motion to Dismiss ▾

Comment
Defendant Insys Therapeutics, Inc.'s Motion to Dismiss Plaintiff's
First Amended Complaint (and Joinder)

10/19/2018 Motion to Dismiss ▾

Comment
Motion to Dismiss of Defendants Watson Laboratories, Inc., Actavis
LLC and Actavis Pharma Inc.

10/19/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel - Mark Steven Cheffo, Esq.

10/19/2018 Motion to Dismiss ▼

Comment
Motion to Dismiss of Defendants Cephalon, Inc. and Teva
Pharmaceuticals USA Inc.

10/19/2018 Notice of Appearance ▼

Comment
Notice of Appearance - McKesson Corporation

10/19/2018 Initial Appearance Fee Disclosure ▼

Comment
Initial Appearance Fee Disclosure - McKesson Corporation

10/19/2018 Disclosure Statement ▼

Comment
McKesson Corporation's NRCP 7.1 Disclosure Statement

10/19/2018 Joinder To Motion ▼

Comment
Defendant Mallinckrodt LLC's Joinder to Manufacturer Defendants'
Joint Motion to Dismiss

10/19/2018 Motion to Dismiss ▼

Comment
Janssen Pharmaceuticals, Inc. and Johnson and Johnson's Joint
Motion to Dismiss

10/19/2018 Initial Appearance Fee Disclosure ▼

Comment
Initial Appearance Fee Disclosure

10/19/2018 Motion to Dismiss ▼

Comment
Distributors' Joint Motion to Dismiss First Amended Complaint

10/22/2018 Findings of Fact, Conclusions of Law and Order ▼

Comment
Findings of Fact, Conclusions of Law, and Order Granting Plaintiff's
Motion to Strike Peremptory Challenge

10/22/2018 Notice of Motion ▼

Comment

Notice of Motion to Dismiss of Defendants Cephalon, Inc. and Teva
Pharmaceuticals USA Inc

---

10/22/2018 Notice of Motion ▼

Comment

Notice of Motion to Dismiss of Defendants Watson Laboratories, Inc.,
Actavis LLC and Actavis Pharma Inc

---

10/22/2018 Notice of Voluntary Dismissal Without Prejudice ▼

Comment

Notice of Voluntary Dismissal of All Claims Against Defendants
Abbvie US, LLC and Abbvie, Inc Without Prejudice

---

10/23/2018 Stipulation and Order ▼

Comment

Plaintiff and Manufacturer Defendants' Joint Stipulation and Order

---

10/23/2018 Notice of Voluntary Dismissal With Prejudice ▼

Comment

Notice of Voluntary Dismissal of all Claims Against Defendants
Daiichi Sankyo, Inc. and Allison Foster Without Prejudice

---

10/24/2018 Notice of Entry of Stipulation and Order ▼

Comment

Notice of Entry of Plaintiff and Manufacturer Defendants' Joint
Stipulation and Order

---

10/24/2018 Motion to Associate Counsel ▼

Comment

Motion to Associate Out-of-State Counsel on Order Shortening Time
- Jennifer Levy

---

10/26/2018 Joinder ▼

Comment

Defendant James Kumle's Joinder in the Manufacturer Defendant's
Joint Motion to Dismiss

---

11/01/2018 Notice of Entry of Order ▼

Comment

Notice of Entry of Findings of Fact, Conclusions of Law, and Order
Granting Plaintiff's Motion to Strike Peremptory Challenge

---

11/01/2018 Joinder ▼

Comment
Defendant C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's
Pharmacy, Inc.'s Joinder to Distributors' Joint Motion to Dismiss First
Amended Complaint

---

11/01/2018 Joinder ▾

Comment
Defendant C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's
Pharmacy, Inc.'s Joinder to Manufacturer Defendants' Joint Motion to
Dismiss

---

11/01/2018 Motion to Dismiss ▾

Comment
Defendant C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's
Pharmacy, Inc.'s Motion to Dismiss First Amended Complaint

---

11/05/2018 Non Opposition ▾

Comment
Notice of Non-Opposition to Motion to Associate Counsel (J. Matthew
Donohue)

---

11/05/2018 Non Opposition ▾

Comment
Notice of Non-Opposition to Motion to Associate Counsel (Joseph
Franco)

---

11/05/2018 Non Opposition ▾

Comment
Notice of Non-Opposition to Motion to Associate Counsel (Heidi A.
Nadel)

---

11/08/2018 Stipulation and Order ▾

Comment
Stipulation and Order Re: Allergan s Motion to Associate Out-of-state
Counsel

---

11/08/2018 Notice of Entry of Stipulation and Order ▾

Comment
Notice of Entry of Stipulation and Order Re: Allergan s Motion to
Associate Out-of-state Counsel

---

11/09/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Extend Briefing Schedules and Continue
Hearings on Motions to Dismiss Filed by Manufacturer Defendants

11/09/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Extend Briefing Schedule and Continue the
Hearing on Allergan Finance LLC and Allergan PLC's Motion to
Dismiss the Amended Complaint

---

11/09/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Extend Briefing Schedule and Continue the
Hearing on the Distributor Defendants' Joint Motion to Dismiss

---

11/09/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Extend Briefing Schedule and Continue the
Hearing on James Kumle's Motion to Dismiss the Amended
Complaint

---

11/09/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Continue Reply Deadline and the Hearing on
Aida Maxsam's Motion to Dismiss the Amended Complaint

---

11/13/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Extend Briefing Schedule
and Continue the Hearing on James Kumle's Motion to Dismiss the
Amended Complaint

---

11/13/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Extend Briefing Schedules
and Continue Hearings on Motions to Dismiss filed by Manufacturer
Defendants

---

11/13/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Extend Briefing Schedule
and Continue the Hearing on Allergan Finance, LLC and Allergan
PLC's Motion to Dismiss the Amended Complaint

---

11/13/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Extend Briefing Schedule
and Continue the Hearing on the Distributor Defendants' Joint Motion
to Dismiss

11/13/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Continue Reply Deadline
and the Hearing on Aida Maxsam's Motion to Dismiss the Amended
Complaint

11/14/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Cancel Reason
Vacated - per Stipulation and Order

Comment
Defendants Actavis' Motion to Associate Out of State Counsel on Order
Shortening Time (Jennifer Gardner Levy, Esq., Martin Louis Roth, Esq.,
Donna Marie Welch, Esq. and Timothy William Knapp, Esq.)

11/15/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel Tiffany Miyumi Ikeda

11/15/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel Jake Redon Miller

11/15/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel John David Lombardo

11/16/2018 Initial Appearance Fee Disclosure ▾

Comment
Initial Appearance Fee Disclosure

11/16/2018 Joinder ▾

Comment
Masters Pharmaeutical's Joinder To Distributors Joint Motion To
Dismiss First Amended Complaint

11/19/2018 Stipulation and Order ▾

Comment
Stipulation and Order to Extend Briefing Schedule and Continue the
Hearing on C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's
Pharmacy Inc.'s Motion to Dismiss the Amended Complaint

---

11/19/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel - Rocky Chiu-Feng Tsai and William
Davidson

---

11/20/2018 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Extend Briefing Schedule
and Continue the Hearing on C&R Pharmacy d/b/a Ken's Pharmacy
f/k/a Lam's Pharmacy Inc.'s Motion to Dismiss the Amended
Complaint

---

11/26/2018 Notice of Rescheduling of Hearing ▾

Comment
Notice of Rescheduling of Hearing on Motion to Associate Counsel
Steven A. Reed

---

11/27/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel Adeyemi O. Adenrele

---

11/28/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel Michael A. Battle

---

11/29/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Joseph L Franco

---

11/29/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Heidi A Nadel

---

11/29/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel J Matthew Donohue

---

11/29/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Joseph David Cohen

---

11/29/2018 All Pending Motions ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Matter Heard

Parties Present▲
  Plaintiff

    Attorney: Eglet, Robert T.

    Attorney: Adams, Robert M

  Defendant

    Attorney: Vigil, Abran E.

11/29/2018 Order Admitting to Practice ▼

Comment
Order Admitting to Practice - Joseph David Cohen Esq

11/29/2018 Order Admitting to Practice ▼

Comment
Order Admitting to Practice (Heidi A. Nadel)

11/29/2018 Order Admitting to Practice ▼

Comment
Order Admitting to Practice (Joseph L. Franco)

11/29/2018 Order Admitting to Practice ▼

Comment
Order Admitting to Practice (J. Matthew Donohue)

11/29/2018 Notice of Entry of Order ▼

Comment
Notice of Entry of Order (Admitting to Practice)

11/29/2018 Motion to Associate Counsel ▼

Comment
Motion to Associate Counsel - Collie Fitch James IV

11/29/2018 Notice of Entry of Order ▼

Comment
Notice of Entr of Order

11/29/2018 Notice of Entry of Order ▼

Comment
Notice of Entry of Order

11/29/2018 Notice of Entry of Order ▼

Comment
Notice of Entry of Order

12/04/2018 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Steven A. Reed

---

12/04/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Mara Catilin Cusker Gonzalez, Esq.

---

12/04/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Mark Steven Cheffo, Esq.

---

12/04/2018 All Pending Motions ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Matter Heard

Parties Present▴
  Plaintiff

    Attorney: Eglet, Robert T.

  Defendant

    Attorney: Fears, Chad R.

  Defendant

    Attorney: Fears, Chad R.

Defendant

   Attorney: Fears, Chad R.

Defendant

   Attorney: Fears, Chad R.

Defendant

   Attorney: Hymanson, Philip M.

Defendant

   Attorney: Hymanson, Philip M.

   Attorney: Fears, Chad R.

Defendant

   Attorney: Hymanson, Philip M.

   Attorney: Fears, Chad R.

Defendant

   Attorney: Hymanson, Philip M.

   Attorney: Fears, Chad R.

Defendant

   Attorney: Hymanson, Philip M.

   Attorney: Fears, Chad R.

Defendant

   Attorney: Fears, Chad R.

---

12/04/2018 Order Admitting to Practice ▾

   Comment
   Order Admitting to Practice - Mark Steven Cheffo, Esq.

---

12/04/2018 Order Admitting to Practice ▾

   Comment
   Order Admitting to Practice - Mara Caitlin Cusker Gonzalez, Esq.

---

12/04/2018 Order Admitting to Practice ▾

   Comment
   Order Admitting to Practice

---

12/04/2018 Notice of Entry of Order ▾

   Comment
   NOTICE OF ENTRY OF ORDER ADMITTING TO PRACTICE -
   MARA CAITLIN CUSKER GONZALEZ, ESQ.

---

12/04/2018 Notice of Entry of Order ▾

Comment

NOTICE OF ENTRY OF ORDER ADMITTING TO PRACTICE -
MARK STEVEN CHEFFO, ESQ.

12/04/2018 Notice of Entry of Order ▾

Comment

Notice of Entry of Order Granting Motion to Associate Counsel
Steven A. Reed

12/05/2018 Opposition ▾

Comment

Clark County's Opposition to Defendant Mallinckrodt's Joinder to
Manufacturer Defendants' Joint Motion to Dismiss

12/05/2018 Opposition ▾

Comment

Clark County's Opposition to Endo Health Solutions Inc. and Endo
Pharmaceutical Inc.'s Motion to Dismiss First Amended Complaint

12/05/2018 Opposition ▾

Comment

Clark County's Opposition to Defendant C&R Pharmacy d/b/a Ken's
Pharmacy f/k/a Lam's Pharmacy, Inc.'s Motion to Dismiss First
Amended Complaint

12/05/2018 Opposition ▾

Comment

Clark County's Opposition to Defendant Assertio Therapeutics, Inc.
f/k/a Deposed, Inc.'s Motion to Dismiss

12/05/2018 Opposition ▾

Comment

Clark County's Opposition to Defendant James Kumle's Motion to
Dismiss First Amended Complaint

12/05/2018 Opposition ▾

Comment

Clark County's Opposition to the Motion to Dismiss of Defendants
Watson Laboratories, Inc., Actaves LLC, and Actaves Pharma, Inc.

12/05/2018 Opposition ▾

Comment

Clark County's Opposition to Janssen Pharmaceuticals, Inc. and
Johnson & Johnson's Joint Motion to Dismiss

12/05/2018 Opposition ▾

Comment
Clark County's Opposition to Manufacturer Defendants' Joint Motion to Dismiss and All Joinders Thereto

12/05/2018 Opposition ▾

Comment
Clark County's Opposition to Defendant Allergan Finance, LLC's Motion to Dismiss; and Countermotion for Leave to Amend

12/06/2018 Opposition ▾

Comment
Clark County's Opposition to the Motion to Dismiss of Defendants Cephalon, Inc. and Teva Pharmaceuticals USA, Inc.

12/06/2018 Opposition ▾

Comment
Clark County's Opposition to Defendant Insys Therapeutics, Inc.'s Motion to Dismiss Plaintiff's First Amended Complaint

12/07/2018 Opposition ▾

Comment
Clark County's Opposition to Distributors' Joint Motion to Dismiss and all Joinders Thereto

12/11/2018 Stipulation and Order ▾

Comment
Joint Stipulation and Order to Combine and Reschedule Hearings on Motions to Dismiss

12/12/2018 Notice of Entry of Order ▾

Comment
Notice of Entry of Order to Combine and Reschedule Hearings on Motions to Dismiss

12/13/2018 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel, John Andrew Smith

12/19/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Tiffany Miyumi Ikeda

---

12/19/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Jake Redon Miller

---

12/19/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel John David Lombardo

---

12/19/2018 All Pending Motions ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Matter Heard

Parties Present ▴
    Plaintiff

        Attorney: Eglet, Robert T.

---

12/19/2018 Order Granting Motion ▾

    Comment
    Order Granting Motion to Associate Counsel Tiffany Miyumi Ikeda

12/19/2018 Order Granting Motion ▾

Comment
Order Granting Motion to Associate Counsel John David Lombardo

---

12/19/2018 Order ▾

Comment
Order Granting Motion to Associate Counsel Jake Redon Miller

---

12/19/2018 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Granting Motion to Associate Counsel Jake Redon Miller

---

12/19/2018 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Granting Motion to Associate Counsel Tiffany Miyumi Ikeda

---

12/19/2018 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Granting Motion to Associate Counsel John David Lombardo

---

12/20/2018 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

---

12/27/2018 Order Granting Motion ▾

Comment
Order granting Motion to Associate Rocky Tsai and William Davison

---

12/28/2018 Notice of Entry of Order ▾

Comment
Notice of Entry of Order

---

01/07/2019 Reply in Support ▾

Comment
Defendant Aida Maxsam's Reply in Support of Her Motion to Dismiss

01/08/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Adeyemlo Adenrele

01/08/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Michael A. Battle

01/08/2019 All Pending Motions ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Matter Heard

01/08/2019 Order ▼

Comment
Order Admitting to Practice Adeyemi O. Adenrele

01/08/2019 Notice of Entry ▼

Comment
Notice of Entry of Order - Order Admitting to Practice

01/09/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time

9:00 AM

Result

Motion Granted

Comment

Motion to Associate Counsel - Collie Fitch James IV

---

01/10/2019 Order ▾

Comment

Order Admitting to Practice Michael A. Battle

---

01/11/2019 Notice of Entry ▾

Comment

Notice of Entry of Order - Order Admitting to Practice Michael A. Battle

---

01/14/2019 Reply in Support ▾

Comment

Reply in Support of Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.'s Motion to Dismiss First Amended Complaint

---

01/14/2019 Reply in Support ▾

Comment

Insys Therapeutics, Inc.'s Reply in Support of its Motion to Dismiss

---

01/14/2019 Reply in Support ▾

Comment

Allergan Finance, LLC and Allergan PLC s Reply Memorandum in Support of Motion to Dismiss the Amended Complaint

---

01/14/2019 Reply in Support ▾

Comment

Defendant Assertio Therapeutics, Inc. F/K/A Depomed, Inc.'s Reply in Support of Motion to Dismiss

---

01/14/2019 Reply ▾

Comment

James Kumle's Reply to Clark County's Opposition to Motion to Dismiss First Amended Complaint

---

01/14/2019 Reply in Support ▾

Comment

Reply in Support of Manufacturer Defendants' Joint Motion to Dismiss

01/14/2019 Reply in Support ▾

Comment
Reply in Support of Distributors' Joint Motion to Dismiss First
Amended Complaint

01/14/2019 Reply in Support ▾

Comment
Defendant Mallinckrodt LLC's Reply in Support of Its Joinder to
Manufacturer Defendants' Joint Motion to Dismiss

01/14/2019 Reply in Support ▾

Comment
Reply Memorandum In Support Of Motion To Dismiss Of Defendants
Cephalon, Inc. And Teva Pharmaceuticals USA, Inc.

01/14/2019 Reply in Support ▾

Comment
Reply In Support Of Motion To Dismiss Of Defendants Watson
Laboratories, Inc., Actavis LLC, And Actavis Pharma, Inc.

01/14/2019 Reply ▾

Comment
Jansseen Pharmaceuticals Inc. and Johnson & Johnson's Reply in
support of their Joint Motion to Dismiss

01/14/2019 Reply ▾

Comment
Defendant C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's
Pharmacy, Inc.'s Reply to Clark County's Opposition to Motion to
Dismiss First Amended Complaint

01/15/2019 Notice of Change of Address ▾

Comment
Notice of Change of Address

01/15/2019 Joinder ▾

Comment
Masters Pharmaceutical, LLC f/k/a Masters Pharmaceutical, Inc.'s
Joinder to the Reply in Support of Distributors' Joint Motion to
Dismiss First Amended Complaint

01/17/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel, John Andrew Smith

---

01/17/2019 Order Admitting to Practice ▾

Comment
Order Admitting to Practice, John Andrew Smith

---

01/22/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order

---

01/22/2019 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel Charles Lifland, Esq.

---

01/28/2019 Errata ▾

Comment
Errata to Reply in Support of Manufacturer Defendants' Joint Motion
to Dismiss

---

01/29/2019 Notice of Rescheduling ▾

Comment
Notice of Change of Time and Location for Hearings

---

01/29/2019 Order Admitting to Practice ▾

Comment
Order Admitting to Practice

---

01/29/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order on Motion to Associate Counsel Collie
James

---

01/29/2019 Motion to Associate Counsel ▾

Comment
MOTION TO ASSOCIATE SCOTT D. POWERS AS COUNSEL; EX
PARTE APPLICATION FOR ORDER SHORTENING TIME

01/30/2019 Motion to Associate Counsel ▾

Comment

(Jessica Kramer Givens Esq.) Motion to Associate Counsel

02/12/2019 Motion to Associate Counsel ▾

Comment

Motion to Associate Counsel Ashley W. Hardin (On Order Shortening Time)

02/13/2019 Motion to Associate Counsel ▾

Comment

Motion to Associate Stephen J. Boranian, Esq. as Counsel on Order Shortening Time

02/15/2019 Motion to Associate Counsel ▾

Comment

Motion to Associate Counsel Christian J. Pistilli and Ex-Parte MTC on OST

02/19/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Scott D. Powers as Counsel ; Ex Parte Application for Order Shortening Time

02/19/2019 Order Granting Motion ▾

Comment

ORDER GRANTING MOTION TO ASSOCIATE SCOTT D. POWERS AS COUNSEL

02/19/2019 Notice of Entry of Order ▾

Comment

NOTICE OF ENTRY OF ORDER

02/21/2019 Motion to Associate Counsel ▾

Comment

Motion to Associate Hayden Adam Coleman, Esq. as Counsel; Ex Parte Application for Order Shortening Time

02/22/2019 Motion ▾

Comment

Motion to Associate Counsel Matthew T. Murphy, Esq. on Order
Shortening Time

02/26/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Continued

Comment
Manufacturer Defendants' Joint Motion to Dismiss

02/26/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Continued

Comment
Defendant Mallinckrodt LLC Joinder to Manufacturer Defendants' Joint
Motion to Dismiss

02/26/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Continued

Comment
Distributors' Joint Motion to Dismiss First Amended Complaint

02/26/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Continued

Comment
Defendant James Kumle's Joinder in the Manufacturer Defendant's Joint
Motion to Dismiss

02/26/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Continued

Comment
Defendant C&R Pharmacy dba Ken's Pharmacy fka Lam's Pharmacy Inc's
Joinder to Distributors' Joint Motion to Dismiss First Amended Complaint

02/26/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Continued

Comment
Defendant C&R Pharmacy dba Ken's Pharmacy fka Lam's Pharmacy Inc's
Joinder to Manufacturer Defendants' Joint Motion to Dismiss

02/26/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Continued

Comment
Masters Pharmaceutical's Joinder To Distributors Joint Motion To Dismiss
First Amended Complaint

02/26/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Ashley W. Hardin on Order Shortening Time

---

02/26/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Granted

Comment
Motion to Associate Stephen J. Boranian, Esq. as Counsel on Order Shortening Time

---

02/26/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Christian J Pistilli and Ex Parte Motion to Consider Motion to Associate on Shortened Time

---

02/26/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Granted

Comment
Motion to Associate Hayden Adam Coleman, Esq. as Counsel; Ex Parte Application for Order Shortening Time

02/26/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Matthew T. Murphy, Esq. on Order
Shortening Time

02/26/2019 All Pending Motions ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Heard

Parties Present▲
  Plaintiff

    Attorney: Eglet, Robert T.

    Attorney: Adams, Robert M

  Defendant

    Attorney: Fears, Chad R.

  Defendant

    Attorney: Fears, Chad R.

  Defendant

    Attorney: Fears, Chad R.

  Defendant

    Attorney: Fears, Chad R.

  Defendant

    Attorney: Hymanson, Philip M.

    Attorney: James, Collie, IV

  Defendant

    Attorney: Hymanson, Philip M.

    Attorney: Fears, Chad R.

    Attorney: James, Collie, IV

  Defendant

    Attorney: Smith, Stephanie J.

Defendant

Attorney: Smith, Stephanie J.

Defendant

Attorney: Lundvall, Patricia K.

Attorney: Lombardo, John David

Defendant

Attorney: Lundvall, Patricia K.

Attorney: Lombardo, John David

Defendant

Attorney: Corrick, Max E

Attorney: Levy, Jennifer G., ESQ

Attorney: Welch, Donna Marie

Defendant

Attorney: Hymanson, Philip M.

Attorney: Fears, Chad R.

Attorney: James, Collie, IV

Defendant

Attorney: Hymanson, Philip M.

Attorney: Fears, Chad R.

Attorney: James, Collie, IV

Defendant

Attorney: Hymanson, Philip M.

Attorney: Fears, Chad R.

Attorney: James, Collie, IV

Defendant

Attorney: Rickard, Jarrod L.

Defendant

Attorney: Polsenberg, Daniel F.

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Solis-Rainey, Rosa

Attorney: Pistilli, Christian J.

Defendant

Attorney: Daehnke, Patricia Egan

Defendant

Attorney: Fears, Chad R.

Defendant

Attorney: Vigil, Abran E.

Defendant

   Attorney: Guinn, Steven E

   Attorney: Tsai, Rocky Chiu-Feng

Defendant

   Attorney: Polsenberg, Daniel F.

Defendant

   Attorney: Polsenberg, Daniel F.

Defendant

   Attorney: Polsenberg, Daniel F.

Defendant

   Attorney: Polsenberg, Daniel F.

Defendant

   Attorney: Corrick, Max E

   Attorney: Levy, Jennifer G., ESQ

   Attorney: Welch, Donna Marie

Defendant

   Attorney: Corrick, Max E

   Attorney: Levy, Jennifer G., ESQ

   Attorney: Welch, Donna Marie

---

02/26/2019 All Pending Motions ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Cancel Reason
Vacated - On in Error

---

02/26/2019 Order Granting Motion ▾

Comment
Order Granting Motion to Associate Stephen J. Boranian, Esq. as Counsel

---

02/26/2019 Order Granting Motion ▾

Comment
Order Granting Motion to Associate Counsel Christian J. Pistilli

---

02/26/2019 Notice of Entry of Order ▾

9/13/2019

Comment
Notice of Entry of Order Granting Motion to Associate Counsel
Christian J. Pistilli

02/26/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Granting Motion to Associate Stephen J.
Boranian, Esq. as Counsel

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Defendant Aida Maxsam's Motion to Dismiss

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Defendant James Kumle's Motion to Dismiss the First Amended Complaint
and Demand for Jury Trial

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Allergan Finance, LLC and Allergan PLC's Motion to Dismiss the Amended
Complaint

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.'s Motion to
Dismiss First Amended Complaint

---

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Defendant Assertio Therapeutics Inc fka Depomed Inc's Motion to Dismiss

---

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Defendant Insys Therapeutics Inc's Motion to Dismiss Plaintiff's First
Amended Complaint (and Joinder)

---

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Janssen Pharmaceuticals Inc and Johnson & Johnson's Joint Motion to
Dismiss

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Notice of Motion to Dismiss of Defendants Cephalon, Inc. and Teva
Pharmaceuticals USA Inc

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Notice of Motion to Dismiss of Defendants Watson Laboratories, Inc.,
Actavis LLC and Actavis Pharma Inc

02/27/2019 Motion to Dismiss ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Denied

Comment
Defendant C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's Pharmacy,
Inc.'s Motion to Dismiss First Amended Complaint

02/27/2019 Opposition and Countermotion ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Granted

Comment
Clark County's Opposition to Defendant Allergan Finance, LLC's Motion to Dismiss; and Countermotion for Leave to Amend

02/27/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Charles Lifland, Esq.

02/27/2019 All Pending Motions ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:15 AM

Result
Matter Heard

Parties Present▲
  Plaintiff

      Attorney: Eglet, Robert T.

      Attorney: Adams, Robert M

    Defendant

      Attorney: Hymanson, Philip M.

    Defendant

      Attorney: Hymanson, Philip M.

    Defendant

      Attorney: Smith, Stephanie J.

    Defendant

      Attorney: Smith, Stephanie J.

    Defendant

      Attorney: Lundvall, Patricia K.

      Attorney: Lombardo, John David

    Defendant

      Attorney: Lundvall, Patricia K.

      Attorney: Lombardo, John David

    Defendant

Attorney: Corrick, Max E

Attorney: Levy, Jennifer G., ESQ

Defendant

Attorney: Hymanson, Philip M.

Defendant

Attorney: Hymanson, Philip M.

Defendant

Attorney: Hymanson, Philip M.

Defendant

Attorney: Rickard, Jarrod L.

Attorney: Boranian, Steven J.

Defendant

Attorney: Polsenberg, Daniel F.

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Solis-Rainey, Rosa

Defendant

Attorney: Terry, Brian K.

Defendant

Attorney: Daehnke, Patricia Egan

Defendant

Attorney: Vigil, Abran E.

Defendant

Attorney: Guinn, Steven E

Attorney: Tsai, Rocky Chiu-Feng

Defendant

Attorney: Barr, Jeffrey F.

Attorney: Cohen, Joseph D.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Corrick, Max E

Attorney: Levy, Jennifer G., ESQ

Defendant

Attorney: Corrick, Max E

Attorney: Levy, Jennifer G., ESQ

---

02/27/2019 Order ▼

Comment

Order Granting Motion to Associate Counsel Matthew T. Murphy,
Esq. on Order Shortening Time

---

02/28/2019 Order Admitting to Practice ▼

Comment

Order Granting "Motion to Associate Counsel Ashley W. Hardin (on
Order Shortening Time)

---

02/28/2019 Media Request and Order ▼

Comment

Media Request And Order Allowing Camera Access To Court
Proceedings

---

03/01/2019 Order Scheduling Status Check ▼

Comment

Order Scheduling Status Check

---

03/04/2019 Amended Complaint ▼

Comment

Second Amended Complaint and Demand for Jury Trial

---

03/04/2019 Order ▼

Comment

Order Granting Motion to Associate Counsel, Charles Lifland, Esq.

---

03/05/2019 Motion to Associate Counsel ▼

Comment

MOTION TO ASSOCIATE DAVID T. ARLINGTON AS COUNSEL

---

03/05/2019 Motion to Associate Counsel ▼

Comment

MOTION TO ASSOCIATE KEVIN M. SADLER AS COUNSEL

---

03/06/2019 Order Admitting to Practice ▼

Comment
ORDER GRANTING MOTION TO ASSOCIATE COUNSEL -
HAYDEN ADAM COLEMAN, ESQ.

03/06/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Admitting to Practice - Hayden Adam
Coleman, Esq.

03/07/2019 Notice of Entry of Order ▾

Comment
Notice of Entry "Order Granting Motion to Associate Counsel Ashley
W. Hardin "(On Order Shortening Time)"

03/11/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

03/11/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

03/12/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Jessica Givens, Esq.

03/13/2019 Notice of Change of Address ▾

Comment
Notice of Change of Address

03/14/2019 Order ▾

Comment
Order Admitting to Practice Jessica Givens

03/15/2019 Notice ▾

Comment
Notice of Topic of Discussion at the March 20, 2019 Status Check

03/15/2019 Notice of Entry ▾

Comment
Notice of Entry of Order Admitting to Practice Charles Lifland, Esq.

03/15/2019 Notice of Entry ▾

Comment
Notice of Entry of Order Admitting to Practice Matthew T. Murphy,
Esq.

03/15/2019 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel Nathan E. Shafroth on OST

03/19/2019 Order ▾

Comment
Order Regarding Defendants' Motions to Dismiss

03/19/2019 Notice of Entry ▾

Comment
Notice of Entry of Order Regarding Defendants' Motions to Dismiss

03/19/2019 Notice of Entry ▾

Comment
Notice of Entry of Order Admitting to Practice

03/20/2019 Status Check ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
1:30 PM

Result
Matter Heard

Comment
Status Check re Status of Case

03/20/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
1:30 PM

Result
Motion Granted

Comment
Motion To Associate Kevin M. Sadler As Counsel

---

03/20/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
1:30 PM

Result
Motion Granted

Comment
Motion To Associate David T. Arlington As Counsel

---

03/20/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
1:30 PM

Result
Motion Granted

Comment
Motion to Associate Counsel Nathan E. Shafroth and Ex-Parte Motion to Consider Motion to Associate on Shortened Time

---

03/20/2019 All Pending Motions ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
1:30 PM

Result
Matter Heard

Parties Present ▴
  Plaintiff

    Attorney: Eglet, Robert T.

    Attorney: Adams, Robert M

  Defendant

    Attorney: Miller, Hayley E.

  Defendant

    Attorney: Smith, Stephanie J.

Defendant

 Attorney: Smith, Stephanie J.

Defendant

 Attorney: Lundvall, Patricia K.

Defendant

 Attorney: Lundvall, Patricia K.

Defendant

 Attorney: Corrick, Max E

 Attorney: Levy, Jennifer G., ESQ

Defendant

 Attorney: Rickard, Jarrod L.

 Attorney: Boranian, Steven J.

Defendant

 Attorney: Polsenberg, Daniel F.

 Attorney: Polsenberg, Daniel F.

Defendant

 Attorney: Solis-Rainey, Rosa

Defendant

 Attorney: Terry, Brian K.

Defendant

 Attorney: Daehnke, Patricia Egan

Defendant

 Attorney: Guinn, Steven E

Defendant

 Attorney: Barr, Jeffrey F.

 Attorney: Cohen, Joseph D.

Defendant

 Attorney: Polsenberg, Daniel F.

Defendant

 Attorney: Polsenberg, Daniel F.

Defendant

 Attorney: Polsenberg, Daniel F.

Defendant

 Attorney: Polsenberg, Daniel F.

Defendant

 Attorney: Corrick, Max E

 Attorney: Levy, Jennifer G., ESQ

Defendant

Attorney: Corrick, Max E

Attorney: Levy, Jennifer G., ESQ

---

03/20/2019 Order Granting Motion ▼

Comment
Order Granting Motion to Associate Counsel Nathan Evans Shafroth

---

03/20/2019 Notice of Entry of Order ▼

Comment
Notice of Entry of Order Granting Motion to Associate Counsel
Nathan Evans Shafroth

---

03/25/2019 Motion to Associate Counsel ▼

Comment
Motion to Associate Counsel Stephen D. Brody, Esq.

---

03/28/2019 Motion to Associate Counsel ▼

Comment
Motion to Associate Out-of-State Counsel Erica Zolner, Esq. and Zac
Ciullo, Esq.

---

03/29/2019 Motion to Reconsider ▼

Comment
Manufacturer Defendants' Motion for Partial Reconsideration of
Order Denying Manufacturer Defendants' Joint Motion to Dismiss
First Amended Complaint

---

03/29/2019 Appendix ▼

Comment
Appendix of Exhibits in Support of Manufacturer Defendants' Motion
for Partial Reconsideration of Order Denying Manufacturer
Defendants' Joint Motion to Dismiss First Amended Complaint

---

03/29/2019 Motion ▼

Comment
Distributors' Motion for Partial Reconsideration of Order Denying
Distributors' Joint Motion to Dismiss First Amended Complaint

---

04/01/2019 Clerk's Notice of Hearing ▼

Comment
Notice of Hearing

---

04/02/2019 Clerk's Notice of Hearing ▼

Comment
Notice of Hearing

04/02/2019 Errata ▾

Comment
Errata to Motion to Associate Out-Of-State Counsel Erica Zolner,
Esq. and Zac Ciullo, Esq.

04/02/2019 Joinder ▾

Comment
DEFENDANT C&R PHARMACY D/B/A KEN S PHARMACY F/K/A
LAM S PHARMACY, INC. S JOINDER TO MANUFACTURER
DEFENDANTS MOTION FOR PARTIAL RECONSIDERATION OF
ORDERS DENYING MANUFACTURER DEFENDANTS JOINT
MOTION TO DISMISS FIRST AMENDED COMPLAINT

04/02/2019 Joinder ▾

Comment
Defendant James Kumle's Joinder in the Manufacturer Defendants'
Joint Motion for Partial Reconsideration of Orders Denying
Manufacturer Defendant's Joint Motion to Dismiss First Amended
Complaint

04/03/2019 Joinder ▾

Comment
Defendant Masters Pharmaceutical, LLC f/k/a Masters
Pharmaceutical, Inc. s Joinder To Distributors Motion For Partial
Reconsideration Of Order Denying Distributors Joint Motion To
Dismiss First Amended Complaint

04/04/2019 Order Admitting to Practice ▾

Comment
ORDER GRANTING MOTION TO ASSOCIATE KEVIN M. SADLER
AS COUNSEL

04/04/2019 Order Admitting to Practice ▾

Comment
ORDER GRANTING MOTION TO ASSOCIATE DAVID T.
ARLINGTON AS COUNSEL

04/04/2019 Notice of Entry of Order ▾

Comment
NOTICE OF ENTRY OF ORDER - Arlington

04/04/2019 Notice of Entry of Order ▾

Comment
NOTICE OF ENTRY OF ORDER - Sadler

04/09/2019 Opposition ▾

Comment
Clark County's Opposition to Manufacturers' and Distributors'
Motions for Partial Reconsideration of Order Denying Defendants'
Motions to Dismiss First Amended Complaint and All Joinders
Thereto

04/10/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

04/18/2019 Answer to Amended Complaint ▾

Comment
Defendants Purdue Pharma L.P., Purdue Pharma Inc., The Purdue
Frederick Company Inc., and Purdue Pharmaceuticals L.P.'s Answer
and Affirmative Defenses to Plaintiff's Second Amended Complaint

04/18/2019 Answer ▾

Comment
Answer to Second Amended Compaint

04/18/2019 Answer ▾

Comment
Defendant Aida Maxsam's Answer to Second Amended Complaint

04/18/2019 Answer ▾

Comment
AmerisourceBergen Drug Corporation's Answer to Plaintiff's Second
Amended Complaint

04/18/2019 Disclosure Statement ▾

Comment
Defendants Johnson & Johnson and Janssen Pharmaceuticals, Inc.'s
NRCP 7.1 Disclosures

04/18/2019 Answer to Amended Complaint ▾

Comment
Janssen Pharmaceuticals, Inc. and Johnson and Johnson's Answer
to Plaintiff's Second Amended Complaint

04/18/2019 Answer ▾

Comment

Defendant James Kumle's Answer to Plaintiff's Second Amended
Complaint and Demand for Jury Trial

04/18/2019 Answer to Amended Complaint ▼

Comment

Defendant Mallinckrodt LLC's Answer to Plaintiff's Second Amended
Complaint

04/18/2019 Amended Answer ▼

Comment

Defendant McKesson Corporation's Answer and Affirmative
Defenses to Plaintiff's Second Amended Complaint

04/18/2019 Answer to Amended Complaint ▼

Comment

Teva Pharmaceuticals Usa, Inc. s Answer To Plaintiff s Second
Amended Complaint And Demand For Jury Trial

04/18/2019 Answer to Amended Complaint ▼

Comment

Cephalon, Inc. s Answer To Plaintiff s Second Amended Complaint
And Demand For Jury Trial

04/18/2019 Answer to Amended Complaint ▼

Comment

Actavis LLC, Actavis Pharma, Inc., And Watson Laboratories, Inc. s
Answer To Plaintiff s Second Amended Complaint And Demand For
Jury Trial

04/18/2019 Answer to Amended Complaint ▼

Comment

Answer, Defenses, and Demand for Jury Trial of Defendants
Allergan, Inc., Allergan USA, Inc., and Allergan Finance, LLC f/k/a
Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. to Plaintiff s Second
Amended Complaint

04/18/2019 Answer to Amended Complaint ▼

Comment

DEFENDANT ASSERTIO THERAPEUTICS, INC. F/K/A DEPOMED,
INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF S
SECOND AMENDED COMPLAINT AND DEMAND FOR JURY
TRIAL

04/18/2019 Motion to Associate Counsel ▼

Comment
Motion to Associate Sarah Barr Johansen, Esq. as Counsel on Order
Shortening Time

04/18/2019 Answer ▼

Comment
Answer to Second Amended Complaint

04/18/2019 Answer ▼

Comment
Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.'s Answer
and Affirmative Defenses to Plaintiff's Second Amended Complaint
and Jury Demand

04/18/2019 Disclosure Statement ▼

Comment
Insys Therapeutics, Inc.'s Corporate Disclosure Statement

04/18/2019 Answer to Amended Complaint ▼

Comment
Insys Therapeutics, Inc.'s Answer to Plaintiff's Second Amended
Complaint and Demand for Jury Trial

04/18/2019 Answer ▼

Comment
C&R PHARMACY D/B/A KEN S PHARMACY F/KA/ LAM S
PHARMACY, INC. S ANSWER TO PLAINTIFF S SECOND
AMENDED COMPLAINT

04/18/2019 Answer ▼

Comment
Answer to Second Amended Compaint

04/19/2019 Answer ▼

Comment
Answer and Affirmative Defenses of Cardinal Health, Inc., Cardinal
Health 6, Inc., Cardinal Technologies, LLC, Cardinal Health 414, LLC
and Cardinal Health 200, LLC

04/24/2019 Reply in Support ▼

Comment
Reply in Support of Manufacturer Defendants' Motion for Partial
Reconsideration of Order Denying Manufacturer Defendants' Joint
Motion to Dismiss First Amended Complaint

04/25/2019 Status Check ⏷

Judicial Officer
Williams, Timothy C.

Hearing Time
11:00 AM

Result
Matter Heard

Comment
Status Check: Discovery Protocol/Complex Case/Special Master

Parties Present ⏶
  Plaintiff

    Attorney: Eglet, Robert T.

    Attorney: Adams, Robert M

    Attorney: Cummings, Cassandra

  Defendant

    Attorney: Gutke, David W.

  Defendant

    Attorney: Gutke, David W.

  Defendant

    Attorney: Gutke, David W.

  Defendant

    Attorney: Gutke, David W.

  Defendant

    Attorney: Hymanson, Philip M.

  Defendant

    Attorney: Hymanson, Philip M.

    Attorney: Gutke, David W.

  Defendant

    Attorney: Smith, Stephanie J.

  Defendant

    Attorney: Gutke, David W.

    Attorney: Smith, Stephanie J.

  Defendant

    Attorney: Lundvall, Patricia K.

    Attorney: Miller, Jake

  Defendant

    Attorney: Lundvall, Patricia K.

Attorney: Miller, Jake

Defendant

Attorney: Corrick, Max E

Defendant

Attorney: Hymanson, Philip M.

Attorney: Gutke, David W.

Defendant

Attorney: Hymanson, Philip M.

Attorney: Gutke, David W.

Defendant

Attorney: Hymanson, Philip M.

Attorney: Gutke, David W.

Defendant

Attorney: Rickard, Jarrod L.

Defendant

Attorney: Polsenberg, Daniel F.

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Shafroth, Nathan

Defendant

Attorney: Gutke, David W.

Defendant

Attorney: Barr, Jeffrey F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Corrick, Max E

Defendant

Attorney: Corrick, Max E

04/25/2019 Motion to Associate Counsel ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
11:00 AM

Result
Motion Granted

Comment
Motion to Associate Out-of-State Counsel Erica Zolner Esq and Zac Ciullo
Esq

---

04/25/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
11:00 AM

Result
Motion Granted

Comment
Motion to Associate Sarah Barr Johansen, Esq. as Counsel on Order
Shortening Time

---

04/25/2019 Order ▾

Comment
Order Granting Motion to Associate Counsel Stephen D. Brody, Esq.

---

04/25/2019 Reply to Motion ▾

Comment
Reply in Support of Distributors' Motion for Partial Reconsideration of
Order Denying Distributors' Joint Motion to Dismiss First Amended
Complaint

---

05/02/2019 Motion For Reconsideration ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Denied

Comment
Manufacturer Defendants' Motion for Partial Reconsideration of Order
Denying Manufacturer Defendants' Joint Motion to Dismiss First Amended
Complaint

05/02/2019 Motion For Reconsideration ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Denied

Comment
Distributors' Motion for Partial Reconsideration of Order Denying
Distributors' Joint Motion to Dismiss First Amended Complaint

05/02/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Denied

Comment
Defendant C&R Pharmacy d/b/a Ken's Pharmacy f/k/a Lam's Pharmacy
Inc's Joinder to Manufacturer Defendants Motion for Partial
Reconsideration of Orders Denying Manufacturer Defendants Joint Motion
to Dismiss First Amended Complaint

05/02/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Denied

Comment
Defendant James Kumle's Joinder in the Manufacturer Defendants' Joint
Motion for Partial Reconsideration of Orders Denying Manufacturer
Defendant's Joint Motion to Dismiss First Amended Complaint

05/02/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Denied

Comment

Defendant Masters Pharmaceutical, LLC f/k/a Masters Pharmaceutical, Inc. s Joinder To Distributors Motion For Partial Reconsideration Of Order Denying Distributors Joint Motion To Dismiss First Amended Complaint

05/02/2019 All Pending Motions ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Matter Heard

Parties Present▲
Plaintiff

    Attorney: Eglet, Robert T.

    Attorney: Adams, Robert M

    Attorney: HY, RICHARD K

    Attorney: Cummings, Cassandra

Defendant

    Attorney: Hymanson, Philip M.

Defendant

    Attorney: Hymanson, Philip M.

Defendant

    Attorney: Smith, Stephanie J.

Defendant

    Attorney: Smith, Stephanie J.

Defendant

    Attorney: Lundvall, Patricia K.

    Attorney: Miller, Jake

Defendant

    Attorney: Lundvall, Patricia K.

    Attorney: Miller, Jake

Defendant

    Attorney: Corrick, Max E

Defendant

    Attorney: Hymanson, Philip M.

Defendant

    Attorney: Hymanson, Philip M.

Defendant

Attorney: Hymanson, Philip M.

Defendant

Attorney: Rickard, Jarrod L.

Defendant

Attorney: Polsenberg, Daniel F.

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Guinn, Steven E

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Polsenberg, Daniel F.

Defendant

Attorney: Corrick, Max E

Defendant

Attorney: Corrick, Max E

---

05/02/2019 Brief ▼

Comment
Brief Regarding Appointment of Special Master

---

05/03/2019 Notice of Appearance ▼

Comment
Notice of Appearance

---

05/03/2019 Notice ▼

Comment
Notice of Disassociation

---

05/03/2019 Reporters Transcript ▼

Comment
Court Reporters transcript of Proceedings (Civil) 5-2-19

---

05/03/2019 Order Admitting to Practice ▼

Comment
Order Admitting to Practice - Zolner & Ciullo

05/03/2019 Response ▾

Comment
Distributors' Response to Plaintiff's Brief Regarding Appointment of
Special Master

05/06/2019 Order Granting ▾

Comment
Order Granting Motion to Associate Sarah Barr Johansen, Esq. as
Counsel

05/06/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order

05/06/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Granting Motion to Associate Sarah Barr
Johansen, Esq., as Counsel

05/06/2019 Order ▾

Comment
Order Designating Case Complex Pursuant to NRCP 16.1(f)

05/07/2019 Notice of Entry ▾

Comment
Notice of Entry of Order Designating Case Complex Pursuant to
NRCP 16.1(f)

05/07/2019 Notice of Entry ▾

Comment
Notice of Entry Order Admitting to Practice Stephen D. Brody

05/08/2019 Motion to Associate Counsel ▾

Comment
Motion to Associate Counsel Steven M. Pyser (On Order Shortening
Time)

05/10/2019 Order ▾

Comment
Order Appointing Special Master

05/22/2019 Motion to Associate Counsel ▼

Comment

Motion to Assoiciate Counsel Jonna N. Summers

05/23/2019 Clerk's Notice of Hearing ▼

Comment

Notice of Hearing

05/29/2019 Notice ▼

Comment

Notice of Disassociation of Tiffany Miyumi Ikeda

05/30/2019 Motion to Associate Counsel ▼

Judicial Officer

Williams, Timothy C.

Hearing Time

9:00 AM

Result

Motion Granted

Comment

Motion to Associate Counsel Steven M. Pyser (On Order Shortening Time)

Parties Present▲
Plaintiff

    Attorney: HY, RICHARD K

Defendant

    Attorney: Polsenberg, Daniel F.

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

05/30/2019 Order Granting Motion ▼

Comment

Order Granting "Motion to Associate Steven M. Pyser (On Order Shortening Time)

06/04/2019 Order ▾

Comment
Order Denying Manufacturers' and Distributors' Motions for Partial
Reconsideration of Order Denying Defendants' Motions to Dismiss
First Amended Complaint and All Joinder Thereto

06/04/2019 Notice of Entry ▾

Comment
Notice of Entry of Order Denying Manufacturers' and Distributors'
Motions for Partial Reconsideration of Order Denying Defendants'
Motions to Dismiss First Amended Complaint and All Joinder Thereto

06/06/2019 Motion to Associate Counsel ▾

Comment
Motion to Associate Lindsay Zanello, Esq. as Counsel; Request for
Hearing

06/06/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

06/10/2019 Notice of Change of Firm Name ▾

Comment
Notice of Firm Name Change

06/10/2019 Notice of Bankruptcy ▾

Comment
Notice of Bankruptcy Filing and Imposition of Automatic Stay

06/11/2019 Notice of Change of Address ▾

Comment
Notice of Change of Address for Attorney Nathan Shafroth

06/14/2019 Motion to Stay ▾

Comment
Defendants' Motion For Stay Pending Resolution of Writ Petition and
Request for Order Shortening Time Based Upon Stipulation Among
Counsel

06/14/2019 Stipulation and Order ▾

Comment
Stipulation And (Proposed) Order Re: Briefing And Hearing Schedule
For Defendants Motion For Stay Pending Resolution Of Writ Petition

06/17/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

06/17/2019 Joinder ▾

Comment
DEFENDANT C&R PHARMACY D/B/A KEN S PHARMACY F/K/A
LAM S PHARMACY, INC. S JOINDER TO DEFENDANTS MOTION
FOR STAY PENDING RESOLUTION OF WRIT PETITION

06/17/2019 Order Granting ▾

Comment
Order Scheduling Hearing and Accepting Briefing Schedule Re:
Defendants' Motion for Stay Pending Resolution of Writ Petition

06/18/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Scheduling Hearing and Accepting Briefing
Schedule Re: Defendants Motion for Stay Pending Resolution of Writ
Petition

06/21/2019 Opposition ▾

Comment
Clark County's Opposition to Defendants' Motion for Stay Pending
Resolution of Writ Petition

06/24/2019 Reply in Support ▾

Comment
Reply in Support of Defendants' Motion for Stay Pending Resolution
of Writ Petition

06/27/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Counsel Jonna N. Summers

06/27/2019 Motion to Associate Counsel ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Granted

Comment
Motion to Associate Lindsay Zanello, Esq. as Counsel

---

06/27/2019 Motion For Stay ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Denied

Comment
Defendants' Motion For Stay Pending Resolution of Writ Petition and
Request for Order Shortening Time Based Upon Stipulation Among
Counsel

---

06/27/2019 Joinder ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Motion Denied

Comment
Defendant C&R Pharmacy D/B/A Ken S Pharmacy F/K/A Lam S
Pharmacy, Inc s Joinder To Defendants Motion For Stay Pending
Resolution Of Writ Petition

---

06/27/2019 All Pending Motions ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Matter Heard

Parties Present▴
    Plaintiff

        Attorney: Eglet, Robert T.

Attorney: Adams, Robert M

Attorney: HY, RICHARD K

Attorney: Cummings, Cassandra

Defendant

Attorney: Miller, Hayley E.

Defendant

Attorney: Smith, Stephanie J.

Defendant

Attorney: Smith, Stephanie J.

Defendant

Attorney: Lundvall, Patricia K.

Defendant

Attorney: Lundvall, Patricia K.

Defendant

Attorney: Smith, Abraham G.

Defendant

Attorney: Smith, Abraham G.

Defendant

Attorney: Smith, Abraham G.

Defendant

Attorney: Smith, Abraham G.

Defendant

Attorney: Smith, Abraham G.

---

07/01/2019 Stipulation and Order ▾

Comment
STIPULATION AND ORDER TO DISMISS DEFENDANT ASSERTIO
THERAPEUTICS, INC. F/K/A DEPOMED, INC. WITHOUT
PREJUDICE

---

07/01/2019 Notice of Entry of Stipulation and Order ▾

Comment
NOTICE OF ENTRY OF STIPULATION AND ORDER TO DISMISS
DEFENDANT ASSERTIO THERAPEUTICS, INC. F/K/A DEPOMED,
INC. WITHOUT PREJUDICE

---

07/01/2019 Stipulation and Order for Dismissal Without Prejudice ▾

Comment
Stipulation and Order Dismissing Johnson & Johnson and Janssen
Pharmaceuticals Without Prejudice

07/03/2019 Motion ▾

Comment
Clark County's Motion for Leave to File Third Amended Complaint

07/08/2019 Stipulation and Order ▾

Comment
Stipulation and Order to Dismiss Defendant James Kumle without Prejudice

07/08/2019 Notice of Entry ▾

Comment
Notice of Entry of Order Granting Dismissal Without Prejudice of Johnson & Johnson Pharmaceuticals, Inc.

07/09/2019 Request ▾

Comment
Plaintiff's Request for Hearing of Plaintiff's Motion on Leave to File Third Amended Complaint

07/10/2019 Order Admitting to Practice ▾

Comment
Order Granting Motion to Associate Counsel - Lindsay Zanello, Esq.

07/10/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Admitting to Practice - Lindsay Zanello, Esq.

07/10/2019 Notice of Entry ▾

Comment
Notice of Entry of Stipulation and Order to Dismiss Defendant James Kumle without Prejudice

07/11/2019 Order Admitting to Practice ▾

Comment
Order Admitting to Practice (Jonna N. Summers)

07/11/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Admitting to Practice (Jonna N. Summers)

07/12/2019 Order ▾

Comment
Order Denying Defendants' Motion for Stay Pending Resolution of
Writ Petition and all Joinders Thereto

07/15/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of "Order Granting Motion to Associate Steven M.
Pyser" (On Order Shortening Time)

07/15/2019 Notice of Stay ▾

Comment
Notice of Stay Order

07/15/2019 Notice of Entry of Order ▾

Comment
Notice of Entry of Order Denying Defendants' Motion for Stay
Pending Resolution of Writ Petition and all Joinders Thereto

07/18/2019 Substitution of Attorney ▾

Comment
SUBSTITUTION OF COUNSEL FOR DEFENDANT
AMERISOURCEBERGEN DRUG CORPORATION

07/23/2019 Non Opposition ▾

Comment
Notice of Non-Opposition to Clark County's Motion for Leave to File
Third Amended Complaint

07/24/2019 Case Management Order ▾

Comment
Recommendation for Case Management Order

07/26/2019 Notice ▾

Comment
Notice of Filing Joinder in Supreme Court Writ Petition

07/30/2019 Motion to Vacate ▾

Comment
Motion to Vacate and Reconsider Case Management Order Entered,
and Objections Thereto

07/31/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

08/01/2019 Request ▾

Comment
Plaintiff's Request for Hearing of Plaintiff's Motion on Leave to File
Third Amended Complaint

08/02/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

08/02/2019 Notice of Change of Address ▾

Comment
Notice of Change of Address

08/05/2019 Joinder To Motion ▾

Comment
Defendant Aida Maxsam's Joinder to Defendants' Motion to Vacate
and Reconsider Case Management Order Entered, and Objections
Thereto

08/05/2019 Joinder ▾

Comment
Defendant C&R Pharmacy D/B/A Ken S Pharmacy F/K/A Lam S
Pharmacy, Inc. s Joinder To Motion To Vacate And Reconsider Case
Management Order Entered, And Objections Thereto

08/07/2019 Report and Recommendations ▾

Comment
Report & Recommendation for Protective Order

08/13/2019 Opposition to Motion ▾

Comment
Clark Coutnty's Opposition to Defendants' Motion to Vacate and
Reconsider Case Management Order Entered, and Objections
Thereto

08/19/2019 Objection ▾

Comment
Defendants' Objection To The Special Master's Report And
Recommendation For Protective Order

08/20/2019 Clerk's Notice of Hearing ▾

Comment
Notice of Hearing

08/23/2019 Order ▾

Comment
Order Regarding Document and Electronically Stored Information
Production Protocol

08/23/2019 Objection ▾

Comment
Plaintiff's Objection to the Order Regarding Document and
Electronically Stored Information Production Protocol

08/26/2019 Response ▾

Comment
Clark County's Response to Defendants' Objection to the Special
Master's Report and Recommendation for Protective Order

08/29/2019 Order ▾

Comment
Order Setting Status Check

08/30/2019 Motion ▾

Comment
Clark County's Motion to Advance the Hearing on Defendant's
Objection to Special Master Report and Recommendation for
Protective Order to September 10, 2019 at 10:00 a.m. on an Order
Shortening Time

09/03/2019 Opposition to Motion ▾

Comment
Defendants' Opposition to Plaintiff's Motion to Advance Hearing on
Defendants' Objection to Special Master Report and
Recommendation for Protective Order

09/03/2019 Reply in Support ▾

Comment
Clark County's Reply In Support of the Motion to Advance the
Hearing on Defendants' Objection to Special Master Report and
Recommendation for Protective Order to September 10, 2019 at
10:00 a.m. On Order Shortening Time

09/04/2019 Motion ▾

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Result
Matter Heard

Comment
Clark County's Motion to Advance the Hearing on Defendant's Objection to
Special Master Report and Recommendation for Protective Order to
September 10, 2019 at 10:00 a.m. on an Order Shortening Time

Parties Present ▲
  Plaintiff

    Attorney: Eglet, Robert T.

    Attorney: Adams, Robert M

    Attorney: HY, RICHARD K

    Attorney: Cummings, Cassandra

  Defendant

    Attorney: Miller, Hayley E.

  Defendant

    Attorney: Hymanson, Philip M.

  Defendant

    Attorney: Hymanson, Philip M.

  Defendant

    Attorney: Lundvall, Patricia K.

  Defendant

    Attorney: Lundvall, Patricia K.

  Defendant

    Attorney: Corrick, Max E

  Defendant

    Attorney: Hymanson, Philip M.

  Defendant

    Attorney: Hymanson, Philip M.

  Defendant

    Attorney: Hymanson, Philip M.

  Defendant

    Attorney: Rickard, Jarrod L.

  Defendant

    Attorney: Polsenberg, Daniel F.

    Attorney: Polsenberg, Daniel F.

  Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Polsenberg, Daniel F.

Defendant

    Attorney: Corrick, Max E

Defendant

    Attorney: Corrick, Max E

---

09/04/2019 Reply ▼

Comment
Defendants Reply to Opposition to Motion to Vacate and Reconsider Case Management Order

---

09/04/2019 Motion to Associate Counsel ▼

Comment
Motion to Associate Counsel - Alex Edwin Spjute

---

09/04/2019 Errata ▼

Comment
Errata to Motion to Vacate and Reconsider Case Management Order Entered, and Objections Thereto

---

09/04/2019 Clerk's Notice of Hearing ▼

Comment
Notice of Hearing

---

09/06/2019 Response ▼

Comment
Defendants' Response to Clark County's Objection to the Order Regarding Electronically Stored Information (ESI) Production Protocol

---

09/10/2019 Motion for Leave ▼

Judicial Officer
Williams, Timothy C.

Hearing Time
9:00 AM

Cancel Reason

Vacated - per Judge

Comment

Clark County's Motion for Leave to File Third Amended Complaint

---

09/10/2019 Notice of Hearing ▾

Comment

Notice of Hearing

---

09/10/2019 Notice of Change ▾

Comment

Notice of Change of Time for Hearings

---

09/11/2019 Media Request and Order ▾

Comment

Media Request And Order Allowing Camera Access To Court Proceedings... The Young Turks Network

---

09/12/2019 Order ▾

Comment

Order Granting Clark County's Motion for Leave to File Third Amended Complaint

---

09/12/2019 Notice of Entry ▾

Comment

Notice of Entry of Order Granting Clark County's Motion for Leave to File Third Amended Complaint

---

09/12/2019 Amended Complaint ▾

Comment

Third Amended Complaint and Demand for Jury Trial

---

09/12/2019 Motion to Associate Counsel ▾

Comment

Motion to Associate Counsel on Order Shortening Time

---

09/12/2019 Notice of Appearance ▾

Comment

Notice of Appearance

---

09/12/2019 Initial Appearance Fee Disclosure ▾

Comment

Initial Appearance Fee Disclosure

09/12/2019 Peremptory Challenge ▾

    Comment
    Peremptory Challenge of Judge

09/12/2019 Errata ▾

    Comment
    Errata to Motion to Associate Counsel on Order Shortening Time

09/12/2019 Notice of Department Reassignment ▾

    Comment
    Notice of Department Reassignment

09/12/2019 Notice of Change of Hearing ▾

    Comment
    Notice of Change of Hearing

09/12/2019 Motion ▾

    Comment
    Motion to Strike Peremptory Challenge and Request for Sanctions on an Order Shortening Time

09/12/2019 Reply in Support ▾

    Comment
    REPLY IN SUPPORT OF DEFENDANTS' OBJECTION TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION FOR PROTECTIVE ORDER

09/24/2019 Motion to Vacate ▾

Judicial Officer
Johnson, Susan

Hearing Time
8:30 AM

Comment
Defendants' Motion to Vacate and Reconsider Case Management Order Entered, and Objections Thereto

09/24/2019 Joinder ▾

Judicial Officer
Johnson, Susan

Hearing Time
8:30 AM

Comment
Defendant Aida Maxsam's Joinder to Defendants' Motion to Vacate and Reconsider Case Management Order Entered, and Objections Thereto

---

09/24/2019 Joinder ▾

Judicial Officer
Johnson, Susan

Hearing Time
8:30 AM

Comment
Defendant C&R Pharmacy D/B/A Ken S Pharmacy F/K/A Lam S Pharmacy, Inc. s Joinder To Motion To Vacate And Reconsider Case Management Order Entered, And Objections Thereto

---

09/24/2019 Objection ▾

Judicial Officer
Johnson, Susan

Hearing Time
8:30 AM

Comment
Defendants' Objection To The Special Master's Report And Recommendation For Protective Order

---

09/24/2019 Status Check ▾

Judicial Officer
Johnson, Susan

Hearing Time
8:30 AM

Comment
Status Check re Scheduling Order/Trial Setting

---

09/24/2019 Objection ▾

Judicial Officer
Johnson, Susan

Hearing Time
8:30 AM

Comment
Plaintiff's Objection to the Order Regarding Document and Electronically Stored Information Production Protocol

---

09/24/2019 Motion to Associate Counsel ▾

Judicial Officer
Johnson, Susan

Hearing Time
8:30 AM

Comment
Motion to Associate Counsel on Order Shortening Time

10/24/2019 Motion to Associate Counsel ▾

Judicial Officer
Johnson, Susan

Hearing Time
9:00 AM

Comment
Defendants' Motion to Associate Alex Edwin Spjute, Esq. as Counsel

## Financial

Clark County

| | Total Financial Assessment | | | $1,089.50 |
| --- | --- | --- | --- | --- |
| | Total Payments and Credits | | | $1,089.50 |
| 12/7/2017 | Transaction Assessment | | | $270.00 |
| 12/7/2017 | Fee Waiver | | | ($270.00) |
| 3/13/2018 | Transaction Assessment | | | $25.00 |
| 3/13/2018 | Payment (Window) | Receipt # 2018-17931-CCCLK | Glen Meek | ($25.00) |
| 3/13/2018 | Transaction Assessment | | | $28.00 |
| 3/13/2018 | Payment (Window) | Receipt # 2018-17936-CCCLK | Robert Van Ralph | ($28.00) |
| 10/22/2018 | Transaction Assessment | | | $3.50 |

| 10/22/2018 | Efile Payment | Receipt # 2018-70180-CCCLK | Clark County | ($3.50) |
|---|---|---|---|---|
| 9/12/2019 | Transaction Assessment | | | $763.00 |
| 9/12/2019 | Efile Payment | Receipt # 2019-55897-CCCLK | Clark County | ($763.00) |

Purdue Pharma, L.P.

| | Total Financial Assessment | | | $1,376.00 |
|---|---|---|---|---|
| | Total Payments and Credits | | | $1,376.00 |
| 8/13/2018 | Transaction Assessment | | | $703.00 |
| 8/13/2018 | Efile Payment | Receipt # 2018-53394-CCCLK | Purdue Pharma, L.P. | ($703.00) |
| 8/13/2018 | Transaction Assessment | | | $450.00 |
| 8/13/2018 | Efile Payment | Receipt # 2018-53404-CCCLK | Purdue Pharma, L.P. | ($450.00) |
| 4/18/2019 | Transaction Assessment | | | $223.00 |
| 4/18/2019 | Efile Payment | Receipt # 2019-23964-CCCLK | Purdue Pharma, L.P. | ($223.00) |

Teva Pharmaceuticals Usa, Inc.

| | Total Financial Assessment | | | $1,012.00 |
|---|---|---|---|---|
| | Total Payments and Credits | | | $1,012.00 |
| 10/9/2018 | Transaction Assessment | | | $343.00 |
| 10/9/2018 | Efile Payment | Receipt # 2018-67266-CCCLK | Teva Pharmaceuticals Usa, Inc. | ($343.00) |
| 4/18/2019 | Transaction Assessment | | | $669.00 |
| 4/18/2019 | Efile Payment | Receipt # 2019-24120-CCCLK | Teva Pharmaceuticals Usa, Inc. | ($669.00) |

Johnson & Johnson

| | Total Financial Assessment | | | $223.00 |
|---|---|---|---|---|
| | Total Payments and Credits | | | $223.00 |

| | | | | |
|---|---|---|---|---|
| 4/18/2019 | Transaction Assessment | | | $223.00 |
| 4/18/2019 | Efile Payment | Receipt # 2019-24026-CCCLK | Johnson & Johnson | ($223.00) |

**Janssen Pharmaceuticals, Inc.**

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $313.00 |
| | Total Payments and Credits | | | $313.00 |
| 10/22/2018 | Transaction Assessment | | | $313.00 |
| 10/22/2018 | Efile Payment | Receipt # 2018-70179-CCCLK | Janssen Pharmaceuticals, Inc. | ($313.00) |

**Endo Pharmaceuticals, Inc**

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $253.00 |
| | Total Payments and Credits | | | $253.00 |
| 8/24/2018 | Transaction Assessment | | | $253.00 |
| 8/24/2018 | Efile Payment | Receipt # 2018-56474-CCCLK | Endo Pharmaceuticals, Inc | ($253.00) |

**Allergan PLC**

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $253.00 |
| | Total Payments and Credits | | | $253.00 |
| 10/19/2018 | Transaction Assessment | | | $253.00 |
| 10/19/2018 | Efile Payment | Receipt # 2018-70076-CCCLK | Allergan Plc | ($253.00) |

**Amerisourcebergen Drug Corporation**

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $223.00 |
| | Total Payments and Credits | | | $223.00 |
| 9/10/2018 | Transaction Assessment | | | $223.00 |
| 9/10/2018 | Efile Payment | Receipt # 2018-59768-CCCLK | Amerisourcebergen Drug Corporation | ($223.00) |

**Cardinal Health, Inc**

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $608.00 |
| | Total Payments and Credits | | | $608.00 |

| Date | Type | Receipt | Party | Amount |
|---|---|---|---|---|
| 9/27/2018 | Transaction Assessment | | | $346.50 |
| 9/27/2018 | Efile Payment | Receipt # 2018-64489-CCCLK | Cardinal Health, Inc | ($346.50) |
| 10/22/2018 | Transaction Assessment | | | $3.50 |
| 10/22/2018 | Efile Payment | Receipt # 2018-70146-CCCLK | Cardinal Health, Inc | ($3.50) |
| 2/13/2019 | Transaction Assessment | | | $3.50 |
| 2/13/2019 | Efile Payment | Receipt # 2019-09765-CCCLK | Cardinal Health, Inc | ($3.50) |
| 3/7/2019 | Transaction Assessment | | | $3.50 |
| 3/7/2019 | Efile Payment | Receipt # 2019-14604-CCCLK | Cardinal Health, Inc | ($3.50) |
| 4/19/2019 | Transaction Assessment | | | $226.50 |
| 4/19/2019 | Efile Payment | Receipt # 2019-24327-CCCLK | Cardinal Health, Inc | ($226.50) |
| 5/2/2019 | Transaction Assessment | | | $3.50 |
| 5/2/2019 | Efile Payment | Receipt # 2019-27308-CCCLK | Cardinal Health, Inc | ($3.50) |
| 5/3/2019 | Transaction Assessment | | | $3.50 |
| 5/3/2019 | Efile Payment | Receipt # 2019-27611-CCCLK | Cardinal Health, Inc | ($3.50) |
| 5/8/2019 | Transaction Assessment | | | $3.50 |
| 5/8/2019 | Efile Payment | Receipt # 2019-28362-CCCLK | Cardinal Health, Inc | ($3.50) |
| 5/30/2019 | Transaction Assessment | | | $3.50 |

| Date | Transaction | Receipt # | Payee | Amount |
|---|---|---|---|---|
| 5/30/2019 | Efile Payment | Receipt # 2019-32818-CCCLK | Cardinal Health, Inc | ($3.50) |
| 7/15/2019 | Transaction Assessment | | | $3.50 |
| 7/15/2019 | Efile Payment | Receipt # 2019-42804-CCCLK | Cardinal Health, Inc | ($3.50) |
| 7/26/2019 | Transaction Assessment | | | $3.50 |
| 7/26/2019 | Efile Payment | Receipt # 2019-45892-CCCLK | Cardinal Health, Inc | ($3.50) |
| 9/6/2019 | Transaction Assessment | | | $3.50 |
| 9/6/2019 | Efile Payment | Receipt # 2019-54840-CCCLK | Cardinal Health, Inc | ($3.50) |

McKesson Corporation

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $223.00 |
| | Total Payments and Credits | | | $223.00 |
| 10/22/2018 | Transaction Assessment | | | $223.00 |
| 10/22/2018 | Efile Payment | Receipt # 2018-70154-CCCLK | Mckesson Corporation | ($223.00) |

Masters Pharmaceutical, Llc

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $223.00 |
| | Total Payments and Credits | | | $223.00 |
| 11/19/2018 | Transaction Assessment | | | $223.00 |
| 11/19/2018 | Efile Payment | Receipt # 2018-76847-CCCLK | Masters Pharmaceutical, Llc | ($223.00) |

C & R Pharmacy

| | | | | |
|---|---|---|---|---|
| | Total Financial Assessment | | | $223.00 |
| | Total Payments and Credits | | | $223.00 |
| 6/11/2018 | Transaction Assessment | | | $223.00 |
| 6/11/2018 | Efile Payment | Receipt # 2018-38881-CCCLK | C & R Pharmacy | ($223.00) |

Depomed Inc

| | Total Financial Assessment | | | | $446.00 |
| | Total Payments and Credits | | | | $446.00 |
| | | | | | |
| 8/27/2018 | Transaction Assessment | | | | $223.00 |
| 8/27/2018 | Efile Payment | Receipt # 2018-56704-CCCLK | Depomed INC | ($223.00) |
| 4/18/2019 | Transaction Assessment | | | | $223.00 |
| 4/18/2019 | Efile Payment | Receipt # 2019-24143-CCCLK | Depomed Inc | ($223.00) |

Insys Therapeutics Inc

| | Total Financial Assessment | | | | $446.00 |
| | Total Payments and Credits | | | | $446.00 |
| | | | | | |
| 9/27/2018 | Transaction Assessment | | | | $223.00 |
| 9/27/2018 | Efile Payment | Receipt # 2018-64469-CCCLK | Insys Therapeutics Inc | ($223.00) |
| 4/18/2019 | Transaction Assessment | | | | $223.00 |
| 4/18/2019 | Efile Payment | Receipt # 2019-24223-CCCLK | Insys Therapeutics Inc | ($223.00) |

Mallinckrodt LLC

| | Total Financial Assessment | | | | $446.00 |
| | Total Payments and Credits | | | | $446.00 |
| | | | | | |
| 10/19/2018 | Transaction Assessment | | | | $223.00 |
| 10/19/2018 | Efile Payment | Receipt # 2018-69914-CCCLK | Mallinckrodt LLC | ($223.00) |
| 4/18/2019 | Transaction Assessment | | | | $223.00 |
| 4/18/2019 | Efile Payment | Receipt # 2019-24044-CCCLK | Mallinckrodt LLC | ($223.00) |

Maxsam, Aida B

| | Total Financial Assessment | | | | $223.00 |
| | Total Payments and Credits | | | | $223.00 |

| Date | Transaction | Receipt | Name | Amount |
|------|-------------|---------|------|--------|
| 9/10/2018 | Transaction Assessment | | | $223.00 |
| 9/10/2018 | Efile Payment | Receipt # 2018-59719-CCCLK | Maxsam, Aida B | ($223.00) |

**Foster, Allison**

| | | | | |
|------|-------------|---------|------|--------|
| | Total Financial Assessment | | | $223.00 |
| | Total Payments and Credits | | | $223.00 |
| 8/27/2018 | Transaction Assessment | | | $223.00 |
| 8/27/2018 | Efile Payment | Receipt # 2018-56989-CCCLK | Foster, Allison | ($223.00) |

**Kumle, James**

| | | | | |
|------|-------------|---------|------|--------|
| | Total Financial Assessment | | | $223.00 |
| | Total Payments and Credits | | | $223.00 |
| 10/19/2018 | Transaction Assessment | | | $223.00 |
| 10/19/2018 | Efile Payment | Receipt # 2018-70072-CCCLK | Kumle, James | ($223.00) |

**Holper, Steven A, M.D.**

| | | | | |
|------|-------------|---------|------|--------|
| | Total Financial Assessment | | | $283.00 |
| | Total Payments and Credits | | | $283.00 |
| 7/3/2018 | Transaction Assessment | | | $283.00 |
| 7/3/2018 | Efile Payment | Receipt # 2018-44013-CCCLK | Holper, Steven A | ($283.00) |

**Cardinal Health 6 Inc**

| | | | | |
|------|-------------|---------|------|--------|
| | Total Financial Assessment | | | $7.00 |
| | Total Payments and Credits | | | $7.00 |
| 1/14/2019 | Transaction Assessment | | | $3.50 |
| 1/14/2019 | Efile Payment | Receipt # 2019-02706-CCCLK | Cardinal Health 6 Inc | ($3.50) |
| 2/28/2019 | Transaction Assessment | | | $3.50 |
| 2/28/2019 | Efile Payment | Receipt # 2019-12877-CCCLK | Cardinal Health 6 Inc | ($3.50) |

**Allergan Inc**

| | | | | |
|------|-------------|---------|------|--------|
| | Total Financial Assessment | | | $223.00 |
| | Total Payments and Credits | | | $223.00 |

| 4/18/2019 | Transaction Assessment | | | $223.00 |
| 4/18/2019 | Efile Payment | Receipt # 2019-24139-CCCLK | Allergan Inc | ($223.00) |

CVS Pharmacy Inc

| Total Financial Assessment | $223.00 |
| Total Payments and Credits | $0.00 |

| 9/12/2019 | Transaction Assessment | $223.00 |

CVS Indiana L.L.C

| Total Financial Assessment | $30.00 |
| Total Payments and Credits | $0.00 |

| 9/12/2019 | Transaction Assessment | $30.00 |

CVS RX Services Inc

| Total Financial Assessment | $30.00 |
| Total Payments and Credits | $0.00 |

| 9/12/2019 | Transaction Assessment | $30.00 |

CVS Tennessee Distrubution L.L.C

| Total Financial Assessment | $30.00 |
| Total Payments and Credits | $0.00 |

| 9/12/2019 | Transaction Assessment | $30.00 |